```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                        ALEXANDRIA DIVISION
_____

                                  )
 UNITED STATES OF AMERICA         )
                                  ) Case No. 1:14-mj-239
         v.                       ) Alexandria, Virginia
                                  )
 WILLIAM ANDREW CLARKE,           ) May 30, 2014
                                  ) 2:33 p.m.
         Defendant.               )
                                  )
_____



                      TRANSCRIPT OF HEARING

             BEFORE THE HONORABLE JOHN F. ANDERSON

                  UNITED STATES MAGISTRATE JUDGE
```

APPEARANCES:

| | |
|---|---|
| For the United States: | Maya D. Song, Esq. |
| For the Defendant: | Karin R. Porter, Esq.<br>David Benowitz, Esq. |

(Proceedings digitally recorded by the FTR system.)

P R O C E E D I N G S

THE CLERK: *United States v. William Andrew Clarke*. Case No. 14 --

THE COURT: 239.

THE CLERK: -- 239-mj.

MS. SONG: Good afternoon, Your Honor. Maya Song for the United States.

THE COURT: Good afternoon, Ms. Song.

Good afternoon, Ms. Porter, Mr. Clarke.

MS. PORTER: Good afternoon, Your Honor.

Your Honor, you had previously entered an order on my motion *pro hac vice* to enter my cocounsel, David Benowitz, as counsel.

THE COURT: Okay. Thank you.

MR. BENOWITZ: Good afternoon, Your Honor.

THE COURT: Good afternoon. This is here for a preliminary hearing; is that correct?

MS. SONG: Yes, Your Honor. The government will proceed with one witness.

THE COURT: Okay. Thank you.

MS. SONG: The government calls Special Agent Kristina Eyler.

**KRISTINA EYLER**,
    after having been duly sworn or affirmed,
    took the stand and testified as follows:

**DIRECT EXAMINATION**

BY MS. SONG:

Q. Good afternoon, Agent. Please state your name and spell it for the record.

A. Kristina Eyler. K-R-I-S-T-I-N-A; last name is Eyler, E-Y-L-E-R.

Q. Agent Eyler, how are you employed?

A. With the Department of Homeland Security.

Q. And within the Homeland -- Department of Homeland Security, which division do you work in?

A. Homeland Security Investigations.

Q. How long have you worked for Homeland Security Investigations?

A. Since 2003.

Q. Agent Eyler, what are some of your duties as an agent?

A. I'm responsible for conducting investigations on any wide range of crimes against the government to include drugs, importing of goods, immigration crimes, et cetera.

Q. And do you also investigate cases involving child exploitation?

A. I do.

Q. Are you the primary agent assigned to the matter before the Court?

A. Yes.

Q. Agent Eyler, are you familiar with William Andrew Clarke?

1  A. Yes.
2  Q. And do you see him in the courtroom today?
3  A. Yes. He's the gentleman in the middle of the two defense
4  counsels.
5      MS. SONG: Your Honor, may the record reflect the
6  identification of the defendant.
7      THE COURT: Yes. Mr. Clarke has been identified.
8      MS. SONG: Thank you.
9  BY MS. SONG:
10 Q. Agent Eyler, I'm going to pass up to you a document that has
11 been marked as Government Exhibit 1.
12     Agent Eyler, do you recognize this document?
13 A. Yes.
14 Q. And what is it?
15 A. It's the affidavit for criminal complaint.
16 Q. Is it an affidavit that you prepared?
17 A. Yes.
18 Q. What information does it contain?
19 A. Details of the investigation regarding Mr. Clarke.
20 Q. Does it describe online communications between Mr. Clarke
21 and an undercover agent?
22 A. Yes.
23 Q. Does it generally describe the circumstances of his arrest?
24 A. Yes.
25 Q. Does it state that Mr. Clarke traveled to a predetermined

1  meeting spot to meet with the undercover in Fairfax, Virginia?
2  A.  Yes.
3  Q.  And is that in the Eastern District of Virginia?
4  A.  Yes.
5  Q.  On page 10 of the document, if you would take a look, is
6  that your signature?
7  A.  Yes.
8  Q.  Is the information in Government Exhibit 1 a true and
9  accurate reflection of the facts known at the time you executed
10 this affidavit?
11 A.  Yes.
12 Q.  Are there any corrections you need to make this document?
13 A.  No.
14 Q.  For purposes of today's hearing, Agent Eyler, do you
15 incorporate and adopt the facts in the affidavit as part of your
16 testimony?
17 A.  Yes.
18         MS. SONG:  Your Honor, the government moves admission
19 of Government 1 into evidence.
20         THE COURT:  Any objection?
21         MS. PORTER:  There's no objection, Your Honor.
22         THE COURT:  Government's Exhibit No. 1 is admitted for
23 the purposes of this hearing.
24         MS. SONG:  Thank you, Your Honor.  There are no further
25 questions for this witness.

1            THE COURT: Thank you. Ms. Porter.
2            MS. PORTER: Thank you, Your Honor.
3                         **CROSS-EXAMINATION**
4    BY MS. PORTER:
5    Q.  Good afternoon, Agent Eyler.
6    A.  How are you?
7    Q.  Doing well. Thank you. I'd like to ask you some followup
8    questions regarding your role in the investigation.
9        Can you describe for us when your role in the investigation
10   began and what specifically you did when you assisted the
11   undercover agent in this matter?
12   A.  Basically it's -- my part was from the beginning. However,
13   I did not take part in any of the dialogue or the communication
14   between Mr. Clarke and the undercover agent.
15   Q.  How did you become aware of the content of the communication
16   between my client and the undercover agent?
17   A.  The other agent is my partner. We do these cases quite
18   often.
19   Q.  So the alleged offense was October 10, 2013, through
20   October 11, 2013? Is that your understanding?
21   A.  Yes.
22   Q.  And when did you become aware that the undercover agent had
23   made contact to my client?
24   A.  Sometime on October 10th.
25   Q.  October 10th. Okay. And that would be Agent Laws; is that

1  correct?
2  A.  Yes, ma'am.
3  Q.  What is his first name?
4  A.  Kevin.
5  Q.  What agency does he work for?
6  A.  Homeland Security Investigations.
7  Q.  And what are his primary duties?
8  A.  He is -- he does these cases and he also is a -- trains
9  other agents to do these cases.
10 Q.  Is it fair to say that his main capacity during these types
11 of investigations is as the undercover agent?
12 A.  Yes, ma'am.
13 Q.  And how long has he been doing that, if you know?
14 A.  About 20 years.
15 Q.  Can you explain what reports you created during the course
16 of this investigation?
17 A.  I just kind of keep track of the dialogue, any other
18 communications that they've had -- that he's had with the people
19 that he communicates with.
20 Q.  So there's an incident report that you generated in this
21 case; is that correct?
22 A.  Yes.
23 Q.  And how many incident reports are there in total?
24 A.  I'm not sure.  I don't have my case file with me right now.
25 Q.  More than one?

1  A.  Yes.

2  Q.  More than five?

3  A.  I'm not sure.

4  Q.  Did you take any handwritten notes during the course of your

5  investigation of this incident?

6            THE COURT:  The issue in front of me today is whether

7  there's probable cause to the charge that's been brought against

8  the defendant.  Whether there are handwritten notes or not, I'm

9  a little confused just to how that goes to the issue of probable

10 cause.

11           MS. PORTER:  Yes.  Thank you, Your Honor.

12           The government had opened the door as to the agent's

13 role in the investigation of the case.  So I'm speaking to

14 specify specifically what was her role as the basis for the

15 probable cause determination or facts that she's set forth in

16 her affidavit.  The government had opened the door to what her

17 role was.

18           THE COURT:  Well, she's the case agent.

19           MS. PORTER:  Yes, Your Honor.

20           THE COURT:  She's signed this affidavit.  If you have

21 any questions about the information that's contained in the

22 affidavit, then I understand that.  But whether there are

23 written notes or not that underlie her statements in this

24 affidavit, I don't see how that goes to the issue of probable

25 cause.  It's a discovery-related issue.

1     MS. PORTER: Yes, Your Honor.
2     THE COURT: But this isn't a discovery hearing. This
3 is a hearing on probable cause.
4     MS. PORTER: Yes, Your Honor. I'll move on. Thank
5 you.
6 BY MS. PORTER:
7 Q. So just to clarify, Agent Eyler. You don't have any
8 personal knowledge of the specific communication between my
9 client and Agent Laws; is that correct?
10 A. I don't understand your question.
11 Q. In other words, you weren't present when it happened?
12 A. Not all of it, no.
13 Q. Okay. And are you aware of the ways in which Agent Laws and
14 my client communicated with one another on October 10th?
15 A. Yes.
16 Q. And can you describe those ways?
17 A. In the affidavit, I believe, it says that they did it by
18 email, Skype, and Yahoo Chat.
19 Q. Was there also a website involved?
20 A. Yes.
21 Q. Do you know the name of the website?
22 A. Referring back to -- on page 3, paragraph 7, Mr. Clarke
23 referred to it as Social-Incest.
24 Q. Is that your understanding of the website in which Agent
25 Laws communicated with my client?

1  A.  At this time, yes, ma'am.
2  Q.  Okay.  Agent Laws used the alias of Jaye when communicating
3  with my client; is that correct?
4  A.  Yes.
5  Q.  And Agent Laws used the fictitious story about being an
6  adult father of two children?
7  A.  Yes.
8  Q.  And he also used the fictitious story that he recently moved
9  from Alaska with his children?
10 A.  Yes.
11 Q.  And he used a fictitious story that he was a government
12 contractor?
13 A.  Yes.
14 Q.  And he used a fictitious story that he homeschooled his
15 children?
16 A.  I believe so, yes.
17 Q.  And he used a fictitious story about weekly pizza and porn
18 night with his children; is that correct?
19 A.  Yes.
20 Q.  So Agent Laws was role-playing, wasn't he?
21 A.  I don't know.  You have to ask him.
22 Q.  Well, based on your understanding, all of those statements
23 that Agent Laws made to my client were all lies, correct?
24 A.  Yes.
25 Q.  And it's your understanding that there were in fact no minor

 1 | children involved in this incident in any way, shape, or form;
 2 | is that correct?
 3 | A. No.
 4 | Q. My client never communicated with a minor?
 5 | A. Not that I know of, no.
 6 | Q. And he never communicated with anyone he thought was a
 7 | minor; is that correct?
 8 | A. No.
 9 | Q. It is a correct statement, right?
10 | A. That he thought it was a minor?
11 | Q. He never communicated with anyone he thought was a minor.
12 | Do you agree with that statement?
13 | A. Correct.
14 | Q. If you know, Agent Eyler, the website in which Agent Laws
15 | communicated with my client requires people to set up user
16 | profiles; is that correct?
17 | A. Yes.
18 | Q. And Agent Laws had his own user profile?
19 | A. Yes.
20 | Q. Under a fake name?
21 | A. Yes.
22 | Q. And part of setting up their profile includes that the user
23 | certify that he or she is 18 or older; is that correct?
24 | A. I don't know.
25 | Q. Isn't it true that Agent Laws sent a friend request to my

1   client via that website?
2   A.   I believe so, yes.
3   Q.   And that was the first initiation of communication between
4   Agent Laws and my client?
5   A.   Yes.
6   Q.   And it was Agent Laws that did initiate that?
7   A.   Yes.
8   Q.   And it was Agent Laws who suggested that they leave the
9   website and communicate through Yahoo Messenger if you're aware?
10  A.   I believe they were also first doing it through email
11  accounts, and they also used Yahoo Chat on the same day.
12  Q.   On the same day.
13  A.   Yes, October 10th.
14  Q.   Okay.
15  A.   There's a lot of communication that occurred on October 10th
16  of last year.
17  Q.   Was it your understanding that it was Agent Laws' idea to
18  switch from the website to either email or Yahoo Chat?
19  A.   Right now I'm not a hundred percent sure.  I have to check
20  my notes in my case file.
21  Q.   Do you have your notes with you?
22  A.   No, I don't.
23  Q.   Would that be in your reports?
24  A.   Yes.
25  Q.   And it was Agent Laws who sent two photographs of these

1  purported children to my client?
2  A.  Yes.
3  Q.  And that was not something that my client requested or ever
4  suggested to the agent, correct?
5  A.  I don't -- can I refer back to the affidavit?  I believe
6  there was a mention of that in there.
7  Q.  If it will help refresh your recollection.
8  A.  Okay.  Yeah.  That will be great.  Thank you.
9           THE COURT:  Paragraph 18.
10          THE WITNESS:  Yes.  Let's see.  Yeah, paragraph 18.
11 Special Agent Laws responded to Mr. Clarke:  Do you have a pic
12 of yourself ... just an everyday type of pic?  BTW, I am Jaye.
13          And then on paragraph 19, Mr. Clarke responded with a
14 picture, he claims, a picture of himself.  And then Mr. --
15 Special Agent Laws responded back in the email which included an
16 image titled Mark n Amy.pdf.
17 BY MS. PORTER:
18 Q.  And in paragraph 19, isn't it true that my client asked
19 Agent Laws for a picture of him, not any children, correct, if
20 you know?
21      And I'm referring to paragraph 19, and the sentence says
22 would you be willing to share one of you.
23 A.  Yes, that would be correct.
24 Q.  Okay.  So it's fair to say that my client never requested
25 that Agent Laws send a picture of any children to him?

1  A.  Correct.
2  Q.  And Agent Laws initiated the Skype calls as well, didn't he,
3  if you know?
4  A.  I don't remember right now.  No.
5  Q.  Would that be something that would be in your report?
6  A.  Yes, ma'am.
7  Q.  Agent Eyler, if you know, how many times during the course
8  of the communication between Agent Laws and my client did Agent
9  Laws initiate the communication?
10 A.  Oh, I have no idea.
11 Q.  Well, is it fair to say that for each type of communication
12 that there was that Agent Laws was more likely the initiator
13 than my client?
14 A.  I can't say that right now.
15 Q.  Okay.  Agent Eyler, was my client unknown to law enforcement
16 prior to October 10th of 2013?
17 A.  Yes, ma'am.
18 Q.  So was it through this website and this website alone that
19 the federal government became aware of who my client was?
20 A.  Yes.
21 Q.  I'd like to ask you some questions about the arrest that
22 took place on October 11, 2013.  Were you present?
23 A.  I was.
24          THE COURT:  As long as they go to the issue of probable
25 cause.

1            MS. PORTER:  Thank you, Your Honor.
2     BY MS. PORTER:
3     Q.   And he was arrested before he was charged in federal court,
4     correct?
5     A.   Yes, ma'am.
6     Q.   Okay.  You mentioned the interview that you had with my
7     client in paragraph 34 of your affidavit; isn't that correct?
8     A.   Yes.
9     Q.   So you were using the information that my client said to you
10    during the course of that interview as a basis for your probable
11    cause in the affidavit?
12    A.   It's one part of it, yes, ma'am.
13    Q.   Okay.  And that interview happened after his arrest while he
14    was in custody on October 11, 2013?
15    A.   Yes.
16    Q.   And that interview took place pretty quickly after he was
17    arrested in the parking lot on Jermantown Road.  Is that fair to
18    say?
19    A.   Yes.
20    Q.   Okay.  And when he was arrested, he was nowhere near any
21    children; is that correct?
22    A.   Correct.
23    Q.   And he was nowhere near, if you know, Agent Laws at the time
24    or was he?
25    A.   He was close by because I arrested Agent Laws while somebody

1   else arrested Mr. Clarke.
2   Q.  You arrested Agent Laws?
3   A.  A pseudo arrest, yes, ma'am.
4   Q.  Okay.  What do you mean by pseudo arrest?
5   A.  I placed him in handcuffs.
6   Q.  What was the purpose of that?
7   A.  Just to make sure that he thought that he was -- Agent Laws
8   was a bad guy as well, a target.
9   Q.  So there was a ruse for Mr. Clarke to believe that Agent
10  Laws was also arrested on that date, correct?
11  A.  Yes.
12  Q.  In fact, when you questioned my client, you started out with
13  that ruse during the conversation with my client, right?
14  A.  Yes.
15  Q.  So it's fair to say that a good portion of that interview,
16  my client, Mr. Clarke, thought you were actually investigating
17  Jaye or Agent Laws?
18  A.  Possibly, yes.
19  Q.  Okay.  And that was a lie, correct?
20  A.  Yes.
21  Q.  And my client was cooperative with you?
22  A.  Yes.
23  Q.  Okay.  In your affidavit, you left out some significant
24  statements regarding what my client said about his intent that
25  day on October 11th; isn't that correct?

1  A. I left out a lot because we talked for quite awhile.
2  Q. Right. But as it specifically relates to his intent when he
3  met the undercover agent, you left out the statement that
4  Mr. Clarke stated he was not going to have sex with Jaye's
5  children and he didn't believe Jaye really had children,
6  correct?
7  A. I don't remember. I have to refer to my notes.
8  Q. Well, would you have written that statement in the police
9  report that you produced?
10 A. I don't know. I don't have it in front of me. But it was
11 recorded, either video and/or audio recording.
12         MS. PORTER: Your Honor, may I have permission to
13 submit a document to the witness to review?
14         THE COURT: Just to refresh her recollection.
15 BY MS. PORTER:
16 Q. Agent Eyler, if I showed you page 4 of your report number
17 001 in this case, do you think it would help refresh your
18 recollection about the specific statement I'm referring to?
19 A. Sure. I'll try.
20 Q. Thank you. And direct your attention towards the end of
21 that document.
22 A. Third paragraph from the bottom?
23 Q. I think so.
24 A. Okay.
25 Q. I have it highlighted, I think, and it's regarding what my

1  client said his intent was on October 11th.
2  A.   Okay.  Do you want me to read it out loud or do you want me
3  to read it to myself?
4  Q.   Well, the question is --
5         THE COURT:  Does that refresh your recollection as to
6  any statements he may have made about his intent at the time?
7         THE WITNESS:  Yes, sir.
8         THE COURT:  If it does, what were those statements?
9         THE WITNESS:  What I wrote was Clarke stated he was not
10 going to have sex with Jaye's children.  He didn't believe Jaye
11 really had children.
12 BY MS. PORTER:
13 Q.   Okay.  And my original question was that you omitted that
14 statement from your affidavit, correct?
15 A.   Yes.
16 Q.   Are there -- is there other evidence that tends to exculpate
17 my client that's left out of the affidavit?
18        THE COURT:  Again, this is not a discovery hearing.
19 This is a hearing as to whether there is probable cause.
20        MS. PORTER:  Yes, Your Honor.
21        THE COURT:  And whether there's other evidence that may
22 come into play at the trial of this case is different than
23 whether there's enough evidence to support the charge.
24        MS. PORTER:  Thank you, Your Honor.  Court's
25 indulgence.  One moment.

1         Thank you, Your Honor.  I have no further questions.
2              THE COURT:  Okay.  Thank you.  There's no need for
3    redirect, is there?
4              MS. SONG:  Nothing further.
5              THE COURT:  Thank you.  You may step down, Agent.
6    (Witness stands down.)
7              Any other evidence or proffers on behalf of the
8    government on the issue of probable cause?
9              MS. SONG:  No, Your Honor.
10             THE COURT:  Okay.  Any evidence or proffers from the
11   defendant on the issue of probable cause?
12             MS. PORTER:  No, Your Honor.  No argument.
13             THE COURT:  No argument.  Mr. Clarke, would you please
14   stand.
15             Mr. Clarke, having read the affidavit in support of the
16   criminal complaint and having heard the testimony here today, I
17   do find that there is probable cause for the charge that's been
18   brought against you so the case will be proceeding as charged.
19             You are free to go here today, but you are on the same
20   conditions of release that I've set out earlier today.  Okay?
21             Thank you.  Anything else in this matter?
22             MS. SONG:  No, Your Honor.
23             THE COURT:  Thank you.
24             MS. PORTER:  Thank you.
25             THE COURT:  Okay.  Court will be adjourned.

```
 1        * * *
 2        (Proceedings concluded at 2:54 p.m.)
 3
 4
 5                           CERTIFICATION
 6
 7        I hereby, this 18th day of September 2014, that the
 8   foregoing is a correct transcript from the recording provided by
 9   the court.  Any errors or omissions are due to the inability of
10   the undersigned to hear or understand said recording.
11
12                              /s/
                    _____
13                      Tracy Westfall, RPR, CMRS, CCR
```