UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

_____

UNITED STATES OF AMERICA          )
                                  )
                                  )  Case No. 1:14-cr-246
          v.                      )  Alexandria, Virginia
                                  )
WILLIAM ANDREW CLARKE,            )  February 23, 2015
                                  )  10:03 a.m.
          Defendant.              )
                                  )

_____


TRANSCRIPT OF TRIAL
(Volume I)

BEFORE THE HONORABLE CLAUDE M. HILTON

UNITED STATES DISTRICT JUDGE

AND A JURY


<u>APPEARANCES</u>:

For the United States:      Matthew J. Gardner, Esq.
                            Scott A. Claffee, Esq.
                            Special Agent Kristina Eyler

For the Defendant:          Karin R. Porter, Esq.
                            David B. Benowitz, Esq.
                            Defendant William Andrew Clarke,
                            in person

 Court Reporter:        Tracy L. Westfall, RPR, CMRS, CCR
Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

1            I N D E X

2                    Direct    Cross    Redirect    Recross

3    FOR THE GOVERNMENT:

4    K. Laws              34      69        80          --

5    M. Brown             81      83        --          --

6    K. Eyler             84      99       108         110

7

8    FOR THE DEFENDANT:

9    Jeffrey Mills       115      --        --          --

10   Jeremy Mills        119      --        --          --

11   N. Mills            123      --        --          --

12   J. Miller           125      --        --          --

13   J. Clarke           126      --        --          --

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        P R O C E E D I N G S

 2            THE CLERK:  Criminal No. 2014-246, United States of

 3   America v. William Andrew Clarke.

 4            MR. GARDNER:  Good morning, Your Honor.  Matt Gardner

 5   and Scott Claffee for the United States.  With us at counsel's

 6   table is Special Agent Kris Eyler, and Loraine McNeill from our

 7   office is also present.

 8            MS. PORTER:  Good morning, Your Honor.  Karin Porter

 9   for Mr. Clarke, along with David Benowitz.  Also sitting at

10   counsel table is Mr. William Mason, who is assisting with note

11   taking today.

12            THE COURT:  We've got a couple of motions we need to

13   deal with while we're waiting for the jury to come.

14            MR. GARDNER:  Your Honor, I think with respect to two

15   of the motions, I believe that they are moot at this point.  In

16   conversations with defense counsel late Friday and over the

17   weekend, we reached an understanding that the government was not

18   going to introduce the 404(b) evidence, the chats, and the

19   defense would not call Dr. Berlin in their case.

20            Those are the subjects of the two main motion in

21   limine.  Based on the understanding with defense counsel, I

22   think those two motions are moot at this point.

23            THE COURT:  Is that correct?

24            MS. PORTER:  Yes, Your Honor.

25            THE COURT:  All right.  Very well.  We don't have any
```

1   motions to deal with.

2         MR. CLAFFEE:  Your Honor, the only outstanding motion

3   is our motion to be able to play a few short clips for the jury

4   of audio and video recordings.

5         Your Honor, we feel that this would streamline the case

6   and the testimony of Special Agent Laws.  There would be a

7   minimal disruption to the courtroom.  We have our own equipment

8   ready, and we think it's helpful to the jury to hear the

9   defendant's words in his own --

10        THE COURT:  I'll let you play it.  I don't think it's

11  to streamline anything.  It's going to take us a little more

12  time, but you can play it.  Unless you have some objection to

13  what they're going to play?

14        MS. PORTER:  No, Your Honor.  They've provided notice

15  of what the statements are that they wish to present.

16        THE COURT:  All right.  There's no objection.  You may

17  play it.

18        MR. BENOWITZ:  Your Honor, I just have one issue I

19  wanted to clear with the Court and get the Court's position on.

20        During cross-examination of government witnesses, if

21  the -- I just wanted to see what the Court's position on is, for

22  example, if I'm cross-examining a government witness, I lay the

23  foundation for, let's say, impeachment with a portion of

24  testimony, if I seek to admit it during the government's case,

25  is it the Court's position that I've foregone the ability to

1   make a Rule 29 motion at the end of the government's case?

2          THE COURT:  Well, I believe that's the law if the

3   government raises that issue.

4          MR. BENOWITZ:  Very well, Your Honor.  Again, what I

5   will do then is lay the foundation and not seek to admit any

6   evidence until the defense's case.

7          THE COURT:  Fine.  Now, you-all asked me to inquire of

8   the jury about the witnesses, but I don't have a witness list

9   from you or maybe you don't have any now.

10          MS. PORTER:  We do have a witness list that we

11   received -- oh.  Yes, Your Honor.

12          THE COURT:  Defendant's.  I've got the government's

13   witnesses, but if you want me to ask about witnesses, I need to

14   ask about all of them.

15          MS. PORTER:  Yes, Your Honor.

16          MR. BENOWITZ:  Your Honor, I just had one other issue.

17   Just wanted to front-load the issue with the Court.

18          With respect to closing arguments, which I anticipate

19   we probably -- we may very well get to today, I would ask -- and

20   I've spoken with the government, I think we both are about the

21   same time -- I would ask for 25 minutes.  I may actually be a

22   little bit shorter than that, but I just want to give myself

23   enough time.

24          THE COURT:  Well, I'll consider that when we finish.

25   That sounds like a long time for such a simple case.

1          MR. BENOWITZ:  Well, Your Honor --

2          THE COURT:  I'll listen to the evidence before I make

3     that determination.

4          MR. BENOWITZ:  I appreciate that.  Your Honor, I

5     actually timed myself.  I was at 22 minutes.  So I just wanted

6     to give myself a little cushion.

7          THE COURT:  You can always shorten that up just a

8     little.

9          MR. BENOWITZ:  I was speaking fast.

10          THE COURT:  Being precise makes a better argument.

11          MR. BENOWITZ:  I hear that, Your Honor.  I was speaking

12     really fast when I did it too.  I will try.  I just wanted to

13     let the Court know.

14          THE COURT:  All right.  Bring in the jury.

15        (The jury enters at 10:08 a.m.)

16          THE CLERK:  Criminal No. 2014-246, *United States of*

17     *America v. William Andrew Clarke.*

18          This case comes on for trial by jury.  Will counsel

19     please note your appearances for the record.

20          MR. GARDNER:  Good morning, Your Honor.  Matt Gardner

21     and Scott Claffee for the United States.  Special Agent Kris

22     Eyler is sitting with us at counsel's table, along with Loraine

23     McNeill from my office.

24          MS. PORTER:  Good morning, Your Honor.  Karin Porter,

25     along with my cocounsel, David Benowitz, on behalf of

1   Mr. William Andrew Clarke, along with an associate, William

2   Mason.

3            THE CLERK:  Ladies and gentlemen of the jury, as I call

4   your name, please stand, answer present, and be seated as the

5   next name is called.

6            William Acree.

7            THE PROSPECTIVE JUROR:  Present.

8            THE CLERK:  Christopher Amolsch.

9            THE PROSPECTIVE JUROR:  Present.

10           THE CLERK:  Elizabeth Balmer.

11           THE PROSPECTIVE JUROR:  Present.

12           THE CLERK:  David Byrd.  David Byrd?

13           Raquel Castanos.

14           THE PROSPECTIVE JUROR:  Present.

15           THE CLERK:  Julie Christie.

16           THE PROSPECTIVE JUROR:  Present.

17           THE CLERK:  Bridget Cormack.

18           THE PROSPECTIVE JUROR:  Present.

19           THE CLERK:  Carlton Daniels.  Carlton Daniels?

20           Angela de Stacy?

21           THE PROSPECTIVE JUROR:  Present.

22           THE CLERK:  Lance Durante.

23           THE PROSPECTIVE JUROR:  Present.

24           THE CLERK:  Clifford Feldman.

25           THE PROSPECTIVE JUROR:  Present.

1          THE CLERK:  Daniel Feuerbach.

2          THE PROSPECTIVE JUROR:  Present.

3          THE CLERK:  Meesha Fields.

4          THE PROSPECTIVE JUROR:  Present.

5          THE CLERK:  Madhuban Guharoy.  Madhuban, G-U-H-A-R-O-Y?

6          THE PROSPECTIVE JUROR:  Guharoy.  Present.

7          THE CLERK:  Thank you.  Mark Gunderman.

8          THE PROSPECTIVE JUROR:  Present.

9          THE CLERK:  Kamaljit Halusa.

10         THE PROSPECTIVE JUROR:  Present.

11         THE CLERK:  Nancy Herring.

12         THE PROSPECTIVE JUROR:  Present.

13         THE CLERK:  Tuyen Huynh.  Tuyen, H-U-Y-N-H?

14         Susan Jevens.  Susan Jevens?

15         Nathan Knotts?

16         THE PROSPECTIVE JUROR:  Present.

17         THE CLERK:  Rodi Krick.  Rodi Krick?

18         Rebecca Lambert.

19         THE PROSPECTIVE JUROR:  Present.

20         THE CLERK:  Christopher Mabrey.

21         THE PROSPECTIVE JUROR:  Present.

22         THE CLERK:  Najeeba Malik.

23         THE PROSPECTIVE JUROR:  Present.

24         THE CLERK:  Joel Mendez.  Joel Mendez?

25         Michael Meserole.

```
1              THE PROSPECTIVE JUROR:  Present.

2              THE CLERK:  Sierra Miller.  Sierra Miller?

3         Julie Mooney.

4              THE PROSPECTIVE JUROR:  Present.

5              THE CLERK:  Catherine Nilsson.  Catherine Nilsson?

6         Sarah Nolan?

7              THE PROSPECTIVE JUROR:  Present.

8              THE CLERK:  Daniel Osei.

9              THE PROSPECTIVE JUROR:  Present.

10             THE CLERK:  Donald Palmer.

11             THE PROSPECTIVE JUROR:  Present.

12             THE CLERK:  Yun Jung Pang.

13             THE PROSPECTIVE JUROR:  Present.

14             THE CLERK:  Naomi Pizarro.

15             THE PROSPECTIVE JUROR:  Present.

16             THE CLERK:  Ella Ponomarenko.

17             THE PROSPECTIVE JUROR:  Present.

18             THE CLERK:  Seema Prasad.

19             THE PROSPECTIVE JUROR:  Present.

20             THE CLERK:  Gregory Pray.

21             THE PROSPECTIVE JUROR:  Present.

22             THE CLERK:  James Reid.

23             THE PROSPECTIVE JUROR:  Present.

24             THE CLERK:  Marina Richaud.

25             THE PROSPECTIVE JUROR:  Present.
```

1      THE CLERK:  Christopher Rose.  Christopher Rose?

2      Mary Ryan?

3      THE PROSPECTIVE JUROR:  Present.

4      THE CLERK:  Dana Sandoval.

5      THE PROSPECTIVE JUROR:  Present.

6      THE CLERK:  Marilyn Schuyler.

7      THE PROSPECTIVE JUROR:  Present.

8      THE CLERK:  Sanaullah Shaikh.

9      THE PROSPECTIVE JUROR:  Shaikh.  Present.

10     THE CLERK:  Thank you.  Mecca Shakir.

11     THE PROSPECTIVE JUROR:  Present.

12     THE CLERK:  Hoabinh Sharp.

13     THE PROSPECTIVE JUROR:  Present.

14     THE CLERK:  Erika Singleteary.

15     THE PROSPECTIVE JUROR:  Present.

16     THE CLERK:  Stephanie Spreeman.

17     THE PROSPECTIVE JUROR:  Present.

18     THE CLERK:  Claude Thomas, Jr.

19     THE PROSPECTIVE JUROR:  Present.

20     THE CLERK:  Vincent Urick, Jr.

21     THE PROSPECTIVE JUROR:  Present.

22     THE CLERK:  John Vardas.

23     THE PROSPECTIVE JUROR:  Present.

24     THE CLERK:  Hoai Vu.

25     THE PROSPECTIVE JUROR:  Present.

1          THE CLERK:  Joanna Wadsworth.

2          THE PROSPECTIVE JUROR:  Present.

3          THE CLERK:  Valeria Walters.

4          THE PROSPECTIVE JUROR:  Present.

5          THE CLERK:  Chelsee Woodey.

6          THE PROSPECTIVE JUROR:  Present.

7          THE CLERK:  Fedor Yelicie.

8          THE PROSPECTIVE JUROR:  Present.

9          THE CLERK:  Bernice Zeberlein.

10         THE PROSPECTIVE JUROR:  Present.

11         THE CLERK:  Ladies and gentlemen of the jury, will you

12    please stand, raise your right hand, and respond after the oath.

13       (The jury panel is sworn.)

14         THE CLERK:  Please be seated.

15         THE COURT:  All right.  Ladies and gentlemen, we have

16    for trial today a criminal case, wherein the government has

17    charged the defendant, William Andrew Clarke, with knowingly

18    using a facility or a means of interstate or foreign commerce to

19    attempt to persuade, induce, entice, and coerce any individual

20    who had not attained the age of 18 to engage in sexual activity.

21         The government is being represented by Mr. Scott

22    Claffee, Mr. Matthew Gardner, seated at the table to my left.

23         The defendant's being represented by Ms. Karin Riley

24    Porter, Mr. David Benowitz, seated at the table to my right.

25         I would ask if any of you know anything about the facts

1    and circumstance of this case?

2           Are any of you close personal friends, relatives of,

3    have any kind of business relationship with this defendant or

4    any of the lawyers involved in the case?

5           Yes.

6           THE PROSPECTIVE JUROR:  I know the defense counsel,

7    Judge.

8           THE COURT:  Mr. Amolsch?

9           THE PROSPECTIVE JUROR:  Yes, sir.

10          THE COURT:  Would that in any way prevent you from

11   rendering a fair and impartial verdict in this case?

12          THE PROSPECTIVE JUROR:  No, Judge.

13          THE COURT:  All right.  Thank you.

14          Anyone else?

15          Have any of you ever been involved in a criminal case

16   before as a victim, a witness, or a defendant?

17          Yes, sir.  Please tell me your name and the

18   circumstances, briefly.

19          THE PROSPECTIVE JUROR:  Fedor Yelicie.  My son was

20   murdered November 19, 2008.  The case was tried here.

21          Fedor Yelicie.

22          THE COURT:  All right.  Thank you.

23          Anyone else?  Yes, ma'am.

24          THE PROSPECTIVE JUROR:  As a child against my

25   stepfather, we brought charges.  Julie Christie.

```
 1              THE COURT:  Thank you.  Anyone else?  Either a victim,
 2    a witness, or a defendant in a criminal case?
 3              Yes, sir -- or ma'am.  I'm sorry.
 4              THE PROSPECTIVE JUROR:  I was called in as a witness
 5    once to a drunk driving accident.
 6              THE COURT:  All right.  What is your name?
 7              THE PROSPECTIVE JUROR:  Angela de Stacy.
 8              THE COURT:  Thank you.  Anyone else?
 9              Have any of you or any members of your immediate family
10    employed in law enforcement in any capacity?
11              Yes, ma'am.
12              THE PROSPECTIVE JUROR:  My brother is a current officer
13    with Alexandria City.  My father's retired with Alexandria City.
14              THE COURT:  What is your name?
15              THE PROSPECTIVE JUROR:  Julie Mooney.
16              THE COURT:  Thank you.
17              Anyone else?  Law enforcement in any capacity?
18              Yes, ma'am.
19              THE PROSPECTIVE JUROR:  My name's Hoabinh Sharp.  I
20    work for the Federal Bureau of Investigation.
21              THE COURT:  All right.  Thank you.
22              THE PROSPECTIVE JUROR:  Sharp, S-H-A-R-P.
23              THE COURT:  Thank you.
24              I saw another hand.  Yes, ma'am.
25              THE PROSPECTIVE JUROR:  My husband's a Fairfax County
```

1  Deputy Sheriff.

2          THE COURT:  What is your name?

3          THE PROSPECTIVE JUROR:  Kamaljit Halusa.

4          THE COURT:  Thank you.  Yes, ma'am.

5          THE PROSPECTIVE JUROR:  Rebecca Lambert.  My husband is

6  a contractor with Customs and Border Patrol.

7          THE COURT:  Thank you.  Yes.

8          THE PROSPECTIVE JUROR:  Nathan Knotts.  My

9  brother-in-law is an officer for Fairfax County.

10          THE COURT:  Thank you.  Anyone else?

11          Other than these people who are listed as lawyers on

12  this jury sheet, have any of you had any legal training of any

13  kind?

14          THE PROSPECTIVE JUROR:  Christopher Amolsch.  Yes,

15  Judge.

16          THE COURT:  All right.  Thank you.

17          THE PROSPECTIVE JUROR:  Marilynn Schuyler.  Yes.

18          THE COURT:  What kind of training?

19          THE PROSPECTIVE JUROR:  Graduated law school.

20          THE COURT:  You're a lawyer?

21          THE PROSPECTIVE JUROR:  Practicing attorney.

22          THE COURT:  All right.  Thank you.

23          THE PROSPECTIVE JUROR:  Judge, Donald Palmer.  I work

24  for the Administrative Office of the U.S. Courts.  I've been

25  through some legal counsel training.

1           THE COURT:  Thank you.  Anyone else?

2           There will be testimony from law enforcement officers

3    in this case.

4           Do any of you give more credit to the testimony of a

5    law enforcement officer than any other witnesses simply because

6    of their employment?

7           Have you or any members of your immediate family

8    belonged to any crime prevention groups or neighborhood watch

9    associations?

10          Yes, sir.

11          THE PROSPECTIVE JUROR:  Vincent Urick.  I'm on my

12   neighborhood watch.

13          THE COURT:  Thank you.  Have any of you or any member

14   of your immediate family ever been the victim of a sexual

15   assault or sex crime?

16          Yes.  You already spoke to us.  What's your name again,

17   ma'am?

18          THE PROSPECTIVE JUROR:  Julie Christie.

19          THE COURT:  Thank you.

20          Anyone else?  Yes.

21          THE PROSPECTIVE JUROR:  Yeah.  I have a cousin who was

22   a victim of a sexual crime by another relative.

23          THE COURT:  What is your name, ma'am?

24          THE PROSPECTIVE JUROR:  Bernice Zeberlein.

25          THE COURT:  Thank you.  Anyone else?

1    Do any of you have any religious or other views

2 concerning people who are gay, lesbian, bisexual, or transgender

3 that would in any way prevent you from rendering a fair and

4 impartial verdict in this case?

5    Now, I anticipate this case will be tried today.  If

6 anything, it might go over into tomorrow early, but the case is

7 not going to take very long to try.

8    Is there any member of this panel that has any

9 particular difficulty or disability that would prevent you from

10 sitting on this jury?

11    THE PROSPECTIVE JUROR:  I have an aunt that's currently

12 terminally ill with cancer, and she is -- I'm helping with her

13 treatment when I need to as needed.

14    THE COURT:  You'll only be here a day.  Does that

15 include today?  Do you have to tend her today?

16    THE PROSPECTIVE JUROR:  I don't know.  I don't think so

17 today.  Possibly tomorrow.

18    THE COURT:  All right.  Yes, sir.

19    THE PROSPECTIVE JUROR:  I have an aunt who passed away

20 yesterday in Goldsboro, North Carolina.  Not sure when the

21 funeral is going to be, but I'm sure it's not today or tomorrow.

22    THE COURT:  All right.  Thank you.

23    Anyone else?

24    Considering all of the questions I've asked, is there

25 any reason why any one of you could not sit on this jury, render

1    a fair and impartial verdict based on the evidence presented

2    here in the courtroom and the instructions on the law as will be

3    given you by the Court?

4            All right.  Would you pick the jury.

5            MR. BENOWITZ:  Your Honor, can we approach?

6            THE COURT:  Yes.

7       (Conference at the bench, as follows:)

8            MR. BENOWITZ:  Your Honor, with respect to -- I don't

9    want to be stepping out of turn.  But we'd move to strike, it's

10   Juror No. 6, Ms. Christie, for cause, particularly because it

11   appears that she had been a victim of -- she's the victim of

12   sexual assault.  I'm not sure --

13           THE COURT:  Do you have any objection?

14           MR. GARDNER:  No objection.

15           THE COURT:  All right.  She'll be dismissed.

16           MR. BENOWITZ:  As well, we'd also move to strike

17   No. 57, which is Bernice Zeberlein, Z-E-B-E-R-L-E-I-N, who also

18   had a victim of -- a family member who was the victim of a

19   sexual assault.

20           MR. GARDNER:  No objection.

21           THE COURT:  All right.  That will be granted.

22           MR. BENOWITZ:  And then there's also No. 46, Ms. Sharp,

23   who works for the FBI.  We'd move to either strike her for cause

24   or ask for further inquiry as to whether or not she could be

25   fair and impartial given that she's law enforcement.

```
 1          THE COURT:  She already told me that.  I asked her that
 2   question.  She said she could.
 3          MR. BENOWITZ:  Very well.
 4      (Thereupon, the following proceedings continued in open
 5   court:)
 6          THE CLERK:  Will the following jurors please come
 7   forward and have a seat in the jury box as directed by the
 8   marshal:
 9          Juror No. 30, Sarah Nolan.
10          Juror No. 44, Sanaullah Shaikh, S-H-A-I-K-H.
11          Juror No. 9, Angela de Stacy.
12          Juror No. 34, Naomi Pizarro.
13          Juror No. 7, Bridget Cormack.
14          Juror No. 12, Daniel Feuerbach.
15          Juror No. 17, Nancy Herring.
16          Juror No. 1, William Acree.
17          Juror No. 13, Meesha Fields.
18          Juror No. 11, Clifford Feldman.
19          Juror No. 48, Stephanie Spreeman.
20          Juror No. 53, Joanna Wadsworth.
21      (Pause.)
22          THE CLERK:  Will the following jurors please return to
23   your seats in the courtroom:  Juror No. 9, Angela de Stacy;
24   Juror No. 1, William Acree; Juror No. 48, Stephanie Spreeman;
25   and Juror No. 13, Meesha Fields.
```

1        Will the following jurors please come forward and have

2   a seat in the jury box:

3        Juror No. 46, Hoabinh Sharp, please come forward and

4   have a seat in the jury box.

5        Juror No. 2, Christopher Amolsch.

6        Juror No. 52, Hoai Vu.

7        Juror No. 31, Daniel Osei.

8      (Pause.)

9        THE CLERK:  Will the following jurors please return to

10  your seats in the courtroom:  Juror No. 2, Christopher Amolsch;

11  Juror No. 46, Hoabinh Sharp; and Juror No. 52, Hoai Vu.

12        Will the following jurors please come forward and have

13  a seat in the jury box:

14        Juror No. 38, James Reid.

15        Juror No. 32, Donald Palmer.

16        Juror No. 20, Nathan Knotts.

17      (Pause.)

18        THE CLERK:  Will Juror No. 32, Donald Palmer, please

19  return to your seat in the courtroom.

20        Juror No. 22, Rebecca Lambert.

21      (Pause.)

22        THE CLERK:  Juror No. 22, Rebecca Lambert, please

23  return to your seat in the courtroom.

24        Juror No. 39, Marina Richaud.

25      (Pause.)

 1          THE CLERK:  Will the defendant please stand and face

 2   the jury.

 3          Ladies and gentlemen of the jury, will you please

 4   stand, raise your right hand, and respond after the oath.

 5      (The jury is sworn.)

 6          THE CLERK:  Please be seated.  Those jurors not

 7   selected are excused until your next court date.

 8      (Potential jurors not selected exit at 10:39 a.m.)

 9          THE COURT:  All right.  Members of the jury, now that

10   you've been sworn, I'll give you some preliminary instructions

11   which I hope will guide you in your participation in the trial.

12          It's going to be your duty to find from the evidence

13   what the facts are.  You, and you alone, are the judges of the

14   facts.  You will then have to apply those facts to the law as

15   the Court will give it to you.  You must follow that law whether

16   you agree with it or not.

17          The evidence from which you will find the facts will

18   consist of the testimony of witnesses, documents received into

19   the record as exhibits, any facts that the lawyers stipulate to,

20   or any facts that the Court may instruct you to find.

21          Certain things are not evidence and must not be

22   considered by you.

23          Statements, arguments, and questions by lawyers are not

24   evidence.

25          Objections to questions are not evidence.  Lawyers have

an obligation to their clients to object when they believe that

evidence is being offered which is improper under the Rules of

Evidence.  You should not be influenced by the objection or by

the Court's ruling on it.  If the objection is sustained, ignore

the question.  If it's overruled, treat the answer like any

other.  If you're instructed that some item of evidence is

received for a limited purpose only, you must follow that

instruction.

Testimony that the Court has excluded or told you to

disregard is not evidence and must not be considered by you.

Anything you've seen or heard outside the courtroom is

not evidence in this case.  You're to decide this case solely on

the evidence presented here in the courtroom.

There are two kinds of evidence: direct and

circumstantial.  Direct evidence is the direct proof of a fact,

such as testimony of an eyewitness.  Circumstantial evidence is

proof of facts from which you may infer or conclude that other

facts exist.  You may consider both kinds of evidence.

Just a few words as to your conduct as jurors.

I would first instruct you that during the trial you're

not to discuss this case with anyone nor permit anyone to

discuss it with you.  Until you retire to the jury room at the

end of the case to deliberate on your verdict, you simply should

not talk about the case.

Second, don't read or listen to anything touching the

case in any way.  If anyone should try to talk to you about it,
bring it to the Court's attention promptly.

Don't try to do any research or make any investigation
about the case on your own.

Finally, don't form any opinion until all of the
evidence is in.  Keep an open mind until you start your
deliberations at the end of the case.

Now, I would prefer that you-all not take notes but
simply listen to the evidence as it comes in and the testimony
of witnesses as it comes in and rely on your collective
recollection of the facts when you begin your deliberations.

The trial's going to begin.  Each side is going to make
an opening statement.  Then the government may call their
witnesses and the defense may cross-examine them.  When the
government's finished, the defense, if they wish to, may call
witnesses.  If they do, the government may cross-examine them.

After all of the evidence is in, the lawyers will make
their closing arguments, I will instruct you on the law, and
you'll retire to deliberate on your verdict.

We'll take a recess here in the middle of the morning
and try to recess for lunch about 1 o'clock, take a recess in
the middle of the afternoon, and maybe by the end of the day
we'll have this case to you.  I hope so.

All right.

MR. GARDNER:  Thank you, Your Honor.

1          May I proceed, Your Honor?

2          THE COURT:  Indeed.

3          MR. GARDNER:  Ladies and gentlemen, good morning.

4   Again, my name is Matt Gardner.  I'm here on behalf of the

5   United States.

6          Ladies and gentlemen, this case begins with a website,

7   a website that was originally called Social-Incest.  It changed

8   its name to Family Intimacy.  The website allows for individuals

9   who are interested in incest to create a profile to meet other

10  individuals who are interested in incest.

11         The evidence will show that Mr. Clarke had a profile on

12  this website in which he stated that he did have an interest in

13  incest.  That's how this case began.

14         The evidence will show that in October 2013, another

15  individual on that website using the name Jaye contacted

16  Mr. Clarke by sending a friend request and that Mr. Clarke

17  responded to that.

18         On Jaye's profile he stated that he lived in Virginia,

19  and Mr. Clarke, once he got the friend request, wrote back and

20  said, quote, Hey, there.  Love finding a local guy into the

21  incest thing.  Then Jaye and the defendant, Mr. Clarke, began

22  communicating.

23         They asked -- Mr. Clarke asked Jaye if he had any,

24  quote, incest experience.  Jaye responded that he was sexually

25  abusing his daughter.  Ladies and gentlemen, the evidence will

show in response to that, Mr. Clarke wrote back, quote, awesome.
Jaye also told Mr. Clarke that he had an 8-year-old son.  After
receiving that, Mr. Clarke wrote back, Oh, my God.  You have a
son!  We have to meet.

They quickly discussed meeting in person.  Jaye
suggested that if Mr. Clarke was serious, he could come to
Jaye's house so he can molest both of Jaye's children, Amy and
Mark, and that Jaye would watch.  The evidence will show in
response to that, Mr. Clarke said, quote, Yes, I am totally
serious, and I think a get-together would be awesome.

Jaye then provided details about how he molested his
two children, Mark and Amy.  He said that on Friday nights, he
did what they called, quote, pizza and porn night.  That he
would order pizza for the kids and then the three of them would
get together and they would watch pornography, and that
eventually Jaye would sexually molest his daughter, Amy.

Jaye also sent two pictures at this time to Mr. Clarke,
one of Jaye with his arm around the girl he said was his
daughter, Amy, and another picture of Amy and Mark sitting on a
bench.

At this point, ladies and gentlemen, the evidence will
show that Mr. Clarke had been told by Jaye that he was abusing
his two children and he had seen pictures of those two children.
What was Mr. Clarke's response to that?  Did he call the police?
Did he stop communicating with Jaye?  Did he say something to

the effect of I'm sorry, there's been a misunderstanding, I was just into some sort of bizarre fantasy or role-play?  No.  The evidence will show Mr. Clarke never said any of those things to Jaye.  Instead he continued planning to meet with Jaye in order to sexually abuse Mark and Amy.

In their communications, both Jaye and Mr. Clarke expressed fear, fear that the other person was either a cop or wasn't serious about this.  So they agreed to speak on the phone.  And the evidence will show that on the two phone calls, they both tried to reassure the other that they weren't a cop and that they were serious about what they were talking and planning.

Then they had a live video chat on Skype.  Again, the evidence will show that during this live video chat, when they can see each other face to face, they both assured the other that they were serious and that they were not cops.  And during this video chat on camera, Mr. Clarke described exactly what sex acts he wanted to perform on both Mark and Amy.

They agreed that Mr. Clarke would come that Friday, October 11, 2013, for Jaye's next pizza and porn night.  They agreed to meet in the parking lot of a McDonald's in Fairfax at lunchtime.

What happened?  Did he show?  Was Mr. Clarke serious about this?  Ladies and gentlemen, the evidence will show that absolutely Mr. Clarke was serious about this and he showed up.

He showed up at the parking lot of McDonald's, and he walked

right to the car where Jaye was sitting and then he was

arrested.

Ladies and gentlemen, Jaye is actually Special Agent

Kevin Laws.  He works for the Department of Homeland Security.

He was working in an undercover capacity on the website Family

Intimacy.  He's going to be the government's first witness

today.  Fortunately, Mark and Amy are not real children.

Ladies and gentlemen, Mr. Clarke has been charged with

online coercion and enticement of a minor.  The evidence will

show that he did just that.  He went online and he attempted to

coerce and entice two children to engage in illicit sexual

activity.  And at the end of the case, we'll ask for you to find

Mr. Clarke guilty.  Thank you.

MS. PORTER:  Good morning, ladies and gentlemen.  It's

my privilege, along with my cocounsel, David Benowitz, to

represent Mr. William Andrew Clarke.

As jurors today, you must answer one question: whether

or not the evidence created by the government fits the crime

that they chose to indict.  In answering the question, ladies

and gentlemen, you must view the evidence objectively, without

reliance on emotions or opinions of matters that simply are not

related to the legal questions before you.

Obviously at trial today, you're going to hear filthy

and outrageous and offensive words uttered by the government's

own agent, but also Mr. Clarke.  Obviously it's natural for
anyone who hears these types of words and these types of
thoughts to make certain moral judgments.  However, that's not
your job today.

Your job is not to judge the morality of Mr. Clarke's
words and conduct.  Rather, your job as jurors is to decide
whether or not his words and conduct violated the statute for
which the federal government chose to indict him for.

And in answering this question, you must also apply the
correct legal standard and hold the government to their burden
of proof.  This means that you must decide if the government has
produced enough evidence to prove that Mr. Clarke committed the
offense charged in the indictment beyond a reasonable doubt.

Judge Hilton has set forth the indictment for you.  But
it is so important for you to understand the language that you
have to deal with today, that I'm going to cite it again.

Mr. Clarke is charged with, indictment states, from on
or about October 1 to October 11 of 2013, in Fairfax County,
Virginia, within the Eastern District of Virginia and elsewhere,
the defendant, William Andrew Clarke, did unlawfully and
knowingly use any facility and means of interstate commerce and
foreign commerce to attempt to persuade, induce, entice, and
coerce any individual who had not attained the age of 18 years
to engage in any sexual activity for which any person can be
charged with a criminal offense under Virginia law.

 1          That's what the government must prove.  And let's be
 2    clear here, ladies and gentlemen.  Mr. Clarke is not charged
 3    with the intent to have sex with a minor.  He is not charged
 4    with traveling with the intent to have sex with a minor.

 5          Now, the government has told you what their evidence
 6    will show.  However, what will become clear at the end of this
 7    trial is what the evidence did not show.  The government will
 8    not produce evidence to show that Mr. Clarke attempted to
 9    persuade, induce, entice, or coerce a minor into sexual activity
10    using the phone, the Internet, or Skype technology.

11          The government's evidence will not prove that
12    Mr. Clarke offered money to Jaye, the undercover agent in this
13    case, in exchange for sex with the fictitious children.  The
14    government's evidence will not prove that Mr. Clarke offered
15    drugs or anything of value to Jaye in exchange for access to the
16    fictitious children.

17          The government's evidence will not prove that
18    Mr. Clarke offered sex to Jaye in exchange for access to the
19    fictitious children.  The government's evidence will not prove
20    that Mr. Clarke ever had any contact with the minors or anyone
21    he believed to be a minor.  The government's evidence will not
22    prove that Mr. Clarke offered money to the fictitious minors.

23          The government's evidence will not prove that
24    Mr. Clarke offered candy to the fictitious minors.  The
25    government's evidence will not prove that Mr. Clarke offered to

bring toys for the minors.  The government's evidence will not

prove that Mr. Clarke made any promises to the fictitious minors

through their own agent, Jaye.

The government's evidence will not prove that

Mr. Clarke asked Jaye to pass along a photograph of himself to

the fictitious minors.  The government's evidence will not prove

that Mr. Clarke asked Jaye to pass along any communications of

any sort to the fictitious minors through their government

agent.

As I mentioned, in this case you will hear filthy,

outrageous words that will shock you.  However, you must pay

attention to what you are not going to hear.  And what you are

not going to hear is actual evidence supporting a conviction for

the crime alleged in this indictment.

The repeated sexual abuse of children by a father or

anyone is repugnant and it is criminal in any jurisdiction, in

federal and state across the board.  However, disgusting

thoughts and shocking language themselves are not illegal.

Shock value is not evidence standing alone and shock value can

never be enough to sustain a conviction, a criminal conviction,

anywhere.

Let me give you an example, another example along with

the government's example, about what you will hear today.  This

is from an email from the undercover agent, Jaye, to Mr. Clarke,

known as Andy.  And I quote -- from Jaye -- Are you okay with

spending the weekend with us?  I think it's a waste of time to do only one day.  On Fridays, we do P and P night, porn and pizza.  We all sit on the couch naked and watch some sort of porn, everything from adult down to the kiddie stuff, and I jerk off.  That would be a great way to break the ice with the kids, that and if you could bring them a small toy.

Ladies and gentlemen, the government is banking on the shock value of language just like that, this back and forth chatter between their fictitious child-molesting father and Mr. Clarke.  The government knows you will morally judge Mr. Clarke.  They hope that you will do this and that you will not scrutinize their evidence and hold them to their very high burden of proof.

They will try to make you hate him by exploiting the shocking language and the content of the words used in this case.  They hope that your moral judging of him will fill the gaps that they have in their flawed case.

And let's examine how the government's case is flawed. First of all, it's important to understand that the government was in control of this operation from start to finish.  They picked the players, they made the rules, they chose the game. At the end of the day, they chose what to charge my client for.

Now at trial, they cannot rewind and replay how their operation played out in order to fit the crime.  Likewise, they can't change the crime to fit the facts in this case.  Let's

1    examine those facts.  At some point, as the government

2    explained, Mr. Clarke put on a profile of himself on the

3    Social-Incest website.  This is a website that's for adults

4    only.

5         Mr. Clarke used his real name and real date of birth

6    and his real photo.  Special Agent Kevin Laws, aka Jaye, was the

7    one who contacted Mr. Clarke via the website.  Jaye then sent

8    Mr. Clarke his email so they can communicate on email together.

9         Jaye was the first to introduce the topic of sex with

10   kids.  Jaye invited Mr. Clarke to his house for the weekend.

11   Jaye was the first to ask for photographs.  Jaye was the

12   first -- Jaye was the first to -- well, no photographs of

13   children were ever requested by Mr. Clarke.  In fact, he only

14   gave his photographs back when asked.  But Jaye, the

15   government's agent, introduced and sent photographs of the

16   fictitious children to Mr. Clarke.

17        Jaye then suggested that they transition to Yahoo

18   Instant Messenger to communicate, and Jaye was the one who

19   described how he had been sexually molesting his two children

20   for three years.  It was routine for them, porn and pizza night.

21   Watch porn, eat some pizza, and later engage in sexual

22   activities together.  This is what Jaye said he did.  Jaye

23   suggested several times that Andy bring a toy for his kids.

24   Mr. Clarke didn't bring a toy.

25        Finally, ladies and gentlemen, you will hear how Jaye

1   picked the time and the place and the location for the meet and

2   that Mr. Clarke traveled to a McDonald's in Fairfax, Virginia,

3   and was arrested before meeting Jaye.

4          The government's case is flawed because the evidence

5   that you hear does not amount to a violation of the crime that's

6   in this indictment.  Mr. Clarke is not charged with an intent to

7   have sex with a child.  Mr. Clarke is not charged with traveling

8   with the intent to have sex with a child.

9          Assuming for argument sakes that in fact Mr. Clarke did

10  want to meet Jaye for the purpose of engaging in sex with his

11  children, this is not what the statute set forth in the

12  indictment prohibits.  That is not the legal issue that you must

13  decide here.  You must decide if Mr. Clarke attempted to cause

14  the assent of a minor to engage in sexual activity through

15  persuasion, inducement, coercion, or enticement using the

16  Internet, the phone, or Skype technology.

17         The government will try to rely on the fact that

18  Mr. Clarke in fact traveled to meet Jaye.  However, the fact

19  that he travels simply doesn't matter because that activity did

20  not include the use of Internet, phone, or Skype.  Likewise, the

21  government will rely on items found inside of Mr. Clarke's car.

22  The possession of those items doesn't matter because it happened

23  after the use of the Internet, the phone, and the Skype

24  technology.

25         Ladies and gentlemen, this case boils down to the

federal government overreaching and charging Mr. Clarke with an
attempted enticement of a minor.  The evidence they tried to
create against Mr. Clarke simply doesn't fit the crime.  And the
government's case, this botched sting operation, is as strong as
a house of cards that will crumble under the test of trial here
today.

The law requires you, as a jury and Mr. Clarke's peers,
to hold the federal government to their burden.  You must hold
them accountable.  You must review and consider the evidence
through an intellectually honest and objective manner, not
through an emotional or morally-driven perspective.

In doing so, you must require the government to prove
guilt beyond a reasonable doubt.  Ladies and gentlemen,
Mr. Clarke is innocent until proven guilty.  Therefore, you will
see in this case nothing but reasonable doubt from the start to
the finish.  As a result, you must return the only verdict
consistent with the evidence in this case, not guilty.

Thank you.

THE COURT:  All right.  Who's your first witness?

MR. CLAFFEE:  Kevin Laws.  The government calls Kevin
Laws.

**KEVIN J. LAWS,**

after having been duly sworn or affirmed,

took the stand and testified as follows:

**DIRECT EXAMINATION**

BY MR. CLAFFEE:

Q.  Good morning.

A.  Good morning.

Q.  Would you please state your name and spell it for the record.

A.  Kevin J. Laws.  K-E-V-I-N, J-A-Y, L-A-W-S.

Q.  What is your current job?

A.  I'm a special agent program manager with Homeland Security Investigations in Fairfax, Virginia.

Q.  Are you in any particular unit at Homeland Security Investigations?

A.  I am.  I'm in the Child Exploitation Investigations Unit.

Q.  Agent Laws, what types of cases do you work on?

A.  Strictly child exploitation where it happens to be possession of child pornography, distribution, production, traveler cases like we're here today.

Q.  Any particular means that you use to conduct your investigations?

A.  They're all computer based.  All the ones that I do are all computer based.

Q.  What was your last job before joining Homeland Security Investigations?

A.  Well, I started with U.S. Customs in 1989.  I haven't changed agencies, but the agency has just changed names.  So it

1    went from U.S. Customs and now Immigration and Customs

2    Enforcement, now Homeland Security Investigations.

3    Q.  Where were you located when you worked for what was called

4    U.S. Customs?

5    A.  I started in Fort Pierce, Florida, as a Marine enforcement

6    officer for a little over six years.  Then took a different job

7    as a special agent.  Moved out to Yuma, Arizona, for six years.

8        After that I transferred to Anchorage, Alaska, for 11 years.

9    And then I've been here in Virginia for coming up on three

10   years, probably two-and-a-half years now.

11   Q.  When did you start working on child exploitation cases?

12   A.  Roughly, 1997.

13   Q.  And where were you at that time?

14   A.  In Yuma, Arizona.

15   Q.  What types of cases were you working on?

16           THE COURT:  Counsel, let's get down to this case.

17   BY MR. CLAFFEE:

18   Q.  When did you start doing undercover work?

19   A.  September of 2004.

20   Q.  And what is undercover work?

21   A.  Well, in this particular instance, it's going online,

22   creating a persona, and then talking to suspects online or in

23   whatever medium it happens to be, a chat room or some other

24   website, something like that.

25   Q.  What persona have you been using since you moved to

1   Virginia?

2   A.  I'm an adult.  Offered my two children for sex.

3   Q.  Where is your office physically located?

4   A.  11320 Random Hills Road in Fairfax, Virginia.

5   Q.  Could you describe what your office is like?

6   A.  It's a typical office building.

7           MS. PORTER:  We make an objection to relevance.

8           THE COURT:  Objection sustained.

9   BY MR. CLAFFEE:

10  Q.  Agent Laws, walk us through what you do when you're

11  conducting an online investigation.

12  A.  It depends on the investigation.  Typically --

13          MS. PORTER:  Your Honor, we would also --

14          THE COURT:  Objection sustained.  Ask him what he did

15  in this case.

16  BY MR. CLAFFEE:

17  Q.  Agent Laws, directing your attention to the week of

18  October 7, 2013, do you remember if you were working on a

19  particular website at that point in time?

20  A.  Yes, I was.

21  Q.  What was that website?

22  A.  Family Intimacy.

23  Q.  What is Family Intimacy?

24  A.  It's a website centered around incest.  To describe the

25  site, it's sort of like Facebook.  If you have a Facebook page,

1  it has a layout similar to that.  You can add friends.  You have

2  a news feed.

3      Particular to this case or this website, what's unique is a

4  portion of it will -- has a geo location.  So when you're

5  building your profile, if you put your location, like Virginia,

6  Haymarket, or something like that, it will find other people in

7  your state and bring that to your attention and highlight that

8  on your profile page.

9  Q.  Did you have a profile set up on Family Intimacy?

10 A.  I did.

11 Q.  With the assistance of the court security officer, I would

12 like to show you the binder of government exhibits.  Ask you to

13 turn to Government Exhibit 1, please.

14 A.  Okay.

15 Q.  Do you recognize Government Exhibit 1?

16 A.  I do.

17 Q.  What is it?

18 A.  This is a one-page printout of a portion of my profile page

19 on Family Intimacy.

20 Q.  How was this, if you know, was this printout made?

21 A.  This is -- this particular one, I'm using a Mac computer.

22 So there's a series of keystrokes that you can use to take a

23 photograph of everything that I see on the screen.

24     So this is what I did.  I made a photograph of what I seen

25 on the screen and this is what's displayed, a portion of my

1   profile page.

2   Q.   What type of information is in the profile page?

3   A.   My name, Robert Pervjohnsky, and then in the -- over to the

4   right you can see recent logins, people that's recently logged

5   in.  In the middle is akin to Facebook, the news feed, what's

6   happening, people's posting.

7        And then in particular to this site or what's unique about

8   this site, you can see over to the right, there's a very small

9   icon.  It says members in your state, and you can actually click

10  on that icon and it will take you to the person's profile page.

11           MR. CLAFFEE:  Your Honor, the government offers

12  Exhibit 1 into evidence.

13           MS. PORTER:  Your Honor, we do have an objection.  It's

14  not necessary.  The witness has already testified to the content

15  thereof.  It's irrelevant.

16           THE COURT:  Objection overruled.  It will be admitted.

17  BY MR. CLAFFEE:

18  Q.   Agent Laws, did you do anything with respect to that

19  thumbnail or icon that you saw on the right-hand side of

20  Exhibit 1?

21  A.   I did.  I clicked on it.

22  Q.   Could you please turn to Exhibit 2.  Do you recognize

23  Government Exhibit 2?

24  A.   I do.

25  Q.   What is it?

1    A.  This is the profile page or portion of the profile page for

2    Andy Ring.  Again, it's a screen print that I took off of my

3    undercover computer.

4    Q.  Is the photo in this exhibit the same as the thumbnail that

5    was on Exhibit 1?

6    A.  Yes, it is.

7    Q.  Do you recognize the person in the photo?

8    A.  I do.

9    Q.  Who is it?

10   A.  It's the gentleman sitting at the -- to my right at the end

11   of the table, it's either a dark blue or black suit with a

12   burgundy tie.

13   Q.  How do you know it's the same person as in the photo?

14   A.  It looks the same.  It's the same person who eventually came

15   to McDonald's and was subsequently arrested on October 11, 2013.

16   Q.  Can you describe what information is contained on the

17   defendant's profile page?

18   A.  I can.  Sorry, but I have to --

19       We have a relationship.  It says single.  He's male.  It

20   gives a date of birth, location, VA DC MD for Virginia,

21   Washington, D.C., Maryland, when he logged in, how long he's

22   been a member.

23       In particular, what's good about this one, it has his

24   turn-ons and it gives a list of different sex acts: oral, anal,

25   water sports, et cetera.  His experience, whose his experience

1    is with: uncle, brother, nephew.  If he has incest experience

2    and -- actually, incest interests, and it lists a number of

3    people who he wants to have incest with: mother/son, father, on

4    and on.  Inbreeding: yes.

5        And then particular to this, what I'm interested in, is

6    underage.

7            MS. PORTER:  Objection, Your Honor, to the commentary

8    by the witness.  He's saying what I'm interested in and what's

9    interesting.  It's evidence that speaks for itself.

10           THE COURT:  Objection overruled.  He just said he was

11   interested in the minor information.  Objection overruled.

12   BY MR. CLAFFEE:

13   Q.  Agent Laws, why are you interested in whether the person on

14   this profile page has a problem with underage individuals?

15   A.  Well, because that's -- that's the crime that I'm -- or I'm

16   investigating is crimes against children.

17       So if the person's interested in having sex with underage

18   children, then that's somebody I want to look at.

19           MR. CLAFFEE:  The government moves Exhibit 2 into

20   evidence.

21           MS. PORTER:  No objection.

22           THE COURT:  It's admitted.

23   BY MR. CLAFFEE:

24   Q.  Agent Laws, did you send the defendant a friend request?

25   A.  Yes, I did.

1   Q.   Was it accepted?

2   A.   It was.

3   Q.   What happened next?

4   A.   The next thing I -- within this program there's a

5   rudimentary, not really messaging, but an email service within

6   the site.

7        So I received a message from Va Andy or Andy Ring saying

8   something to the effect, Glad I found you.  You know, we're

9   close.  Then I replied with, Hey, if you want to chat sometime,

10  and I provided my undercover email account -- or address rather.

11  Q.   Could you please turn to Government Exhibit 3.

12  A.   Okay.

13  Q.   Do you recognize this exhibit?

14  A.   I do.

15  Q.   What is it?

16  A.   This is the screen print that I made of the communications

17  between myself and Andy Ring.

18            MR. CLAFFEE:  The government offers Exhibit 3 into

19  evidence.

20            MS. PORTER:  No objection.

21            THE COURT:  It's admitted.

22  BY MR. CLAFFEE:

23  Q.   What happened next?

24  A.   What happened next is I received an email to my undercover

25  email account.

1   Q.   Could you please turn to Exhibit 4 in the binder.

2   A.   Okay.

3   Q.   Do you recognize Exhibit 4?

4   A.   I do.

5   Q.   What is it?

6   A.   It is a one-page printout from my undercover Gmail email

7   account.   And the subject is -- actually, there's no subject and

8   it was created -- or the email was from October 10, 2013, at

9   approximately 10:17 a.m.

10  Q.   Who's the first email from?

11  A.   VaRing419@aol.com.

12  Q.   Is this an email address belonging to the defendant?

13  A.   It is.

14  Q.   How do you know?

15  A.   Because through all of the communications, we went from

16  Family Intimacy to the Gmail to Yahoo, and then the defendant

17  eventually showed up at the McDonald's and was arrested.

18  Q.   Generally, what is this email exchange about?

19  A.   Just an introduction.  Yeah, just a basic introduction.  And

20  then at the end, VaRing asks me if I have incest experience.

21          MR. CLAFFEE:   The government offers Exhibit 4 into

22  evidence.

23          MS. PORTER:   No objection.

24          THE COURT:   It's admitted.

25

BY MR. CLAFFEE:

Q.  Can you please turn to Exhibit 5.

A.  Okay.

Q.  What is this exhibit?

A.  This is a followup email.  Rather than a reply to an email, this is a new email.  This one's titled Experience.  It's a one-page email that occurred just several minutes after the initial email.

Q.  Generally, what is this email about?

A.  This is a reply, because at the end Andy asked do I have incest experience, and I just merely reply I do with my daughter, and he says that's awesome.  He's glad that we're in the same area.

Q.  Did the defendant ask you anything else in that email?

A.  He does.  He ends it with asking me how long I've been active with my daughter or active with her.

Q.  What does active mean?

A.  Active means actively molesting, not like this second, but, you know, have you molested your daughter.

MR. CLAFFEE:  I offer Exhibit 5 into evidence.

MS. PORTER:  No objection.

THE COURT:  It's admitted.

BY MR. CLAFFEE:

Q.  Can you please turn to Exhibit 6.

A.  Okay.

 1    Q.  Do you recognize Exhibit 6?

 2    A.  I do.

 3    Q.  What is it?

 4    A.  Again, a one-page printout from my undercover email account

 5    from Gmail.  This one's titled Active.

 6    Q.  Generally, what is this email exchange about?

 7    A.  I tell him that I'm actually not in -- not in Haymarket.

 8    I'm actually in Fairfax.  Because what happened on my profile

 9    page on Family Intimacy, I wrote Haymarket rather than saying

10    exactly where I was.  So now I'm making the correction, not in

11    Haymarket, I'm in Fairfax.

12        He says even better.  He's in Reston.  He wants to know if

13    the mom's -- the kid's mom is involved or is she out of the

14    picture.  And then towards the end he says, If you want to make

15    communication faster, and he offers a phone number so I can text

16    him if I want to.

17            MR. CLAFFEE:  The government moves Exhibit 6 into

18    evidence.

19            MS. PORTER:  No objection.

20            THE COURT:  It's admitted.

21    BY MR. CLAFFEE:

22    Q.  Will you please turn to Government Exhibit 7.

23        Do you recognize this exhibit?

24    A.  I do.

25    Q.  What is it?

1   A.   Again, it's a one-page printout from my undercover email

2   account from Gmail.  This one's titled Wife.

3   Q.   Generally, what is this email exchange about?

4   A.   I tell him why -- that my wife's out of the story, that she

5   went to prison so it's just me and the kids, and we've been to

6   Virginia just over a year coming from Alaska.

7   Q.   How does the defendant respond?

8   A.   He wants to know the schooling situation with the kids.  He

9   asked if they're homeschooled and he's interested in finding

10  like-minded guys.

11  Q.   What did you think the defendant meant by like-minded?

12  A.   Like-minded --

13          MS. PORTER:  Objection, Your Honor.

14          THE COURT:  Objection sustained.

15  BY MR. CLAFFEE:

16  Q.   Did the defendant ask you anything else at the end of this

17  email exchange?

18  A.   He asked if I'm bi, meaning bisexual.

19          MR. CLAFFEE:  The government moves Exhibit 7 into

20  evidence.

21          MS. PORTER:  No objection.

22          THE COURT:  It's admitted.

23  BY MR. CLAFFEE:

24  Q.   Will you please turn to Exhibit 8.

25  A.   Okay.

1   Q.   What is this?

2   A.   Again, a one-page printout from my undercover email account

3   from Gmail.  This one's titled Bi.

4   Q.   Generally, what is this email exchange about?

5   A.   This is a reply from the last question.  He's asking if I'm

6   bisexual.  I tell him not, but I have an 8-year-old son.  I tell

7   him that my son's helped me masturbate a few times and my girl

8   is great.  She's into oral and anal.

9   Q.   How does the defendant respond?

10  A.   He says, OMG, you have a son, and that we need to meet and

11  he ends it with a smiley face.

12          MR. CLAFFEE:  Offer Government Exhibit 8 into evidence.

13          MS. PORTER:  No objection.

14          THE COURT:  It's admitted.

15  BY MR. CLAFFEE:

16  Q.   Will you please turn to Exhibit 9.  What is this?

17  A.   Again, a one-page email printout from my online -- or my

18  undercover email account from Gmail.  This one's titled Meet.

19  Q.   Generally, what is this email exchange about?

20  A.   I tell him if he's serious that I could have him at my house

21  for a weekend and that he can watch.

22      Actually -- sorry -- I said if he didn't mind me watching

23  while I masturbated and Amy would perform oral sex on him.

24  Q.   How did the defendant respond?

25  A.   He said -- he said it would be awesome to get together.

1    Then he asked if I seen the picture on the site, if not, and

2    then he sent the same picture again, and the picture's embedded

3    into the email.

4    Q.  Do you recognize the picture that's attached to this email?

5    A.  I do.

6    Q.  How do you recognize it?

7    A.  It's the same -- it's the same picture that was attached to

8    the profile on Family Intimacy.

9            MR. CLAFFEE:  Offer Government Exhibit 9 into evidence.

10           MS. PORTER:  No objection.

11           THE COURT:  It's admitted.

12   BY MR. CLAFFEE:

13   Q.  Would you please turn to Exhibit 10.

14   A.  Okay.

15   Q.  Do you recognize this?

16   A.  I do.

17   Q.  What is it?

18   A.  It's a one-page email printout from my undercover Gmail

19   account.  This one's titled Our Pic.

20   Q.  Why did you send this email?

21   A.  Well, I want to prove that -- who I am.  So I'm going to

22   send him a picture of me and a picture of my daughter.

23   Q.  Is there anything attached to this email?

24   A.  There is.  It's actually a PDF document.  So what I did is I

25   took a photograph and converted it to a document and attached

 1  that to this email account.

 2  Q.  Could you please flip to Exhibit 11 in the binder.

 3  A.  Okay.

 4  Q.  What is that?

 5  A.  That is a picture of me wearing a gray tee shirt, Mountain

 6  Dew night pants.  There's a young lady standing next to me.

 7  She's in blue jeans, some kind of a floral shirt.

 8      You can't see her face.  You can only see her from the

 9  shoulders down.  And I'm holding a sign that says, R U cumming

10  to see us?

11          MR. CLAFFEE:  Offer Government Exhibits 10 and 11 into

12  evidence.

13          MS. PORTER:  No objection.

14          THE COURT:  They're admitted.

15  BY MR. CLAFFEE:

16  Q.  Could you please turn to Exhibit 12.

17  A.  Okay.

18  Q.  What is this exhibit?

19  A.  Again, a one-page printout from my undercover email account.

20  This one's titled Kids.

21  Q.  Was this exhibit sent around the same time as Exhibit 10?

22  A.  Yes, within a couple minutes.

23  Q.  Generally, what is this email about?

24  A.  This -- there's no message.  I didn't write a message on

25  this one.  This is -- I'm attaching another picture that's been

converted into a document.  So this one's titled Mark n Amy.

It's a PDF document.

Q.  Could you please flip to Exhibit 13.

A.  Okay.

Q.  What is that?

A.  This is a young man and a young woman sitting on a bench,

and the young man is sitting next to a giant-sized Snoopy dog.

MR. CLAFFEE:  I offer Exhibits 12 and 13 into evidence.

MS. PORTER:  No objection.

THE COURT:  They're admitted.

BY MR. CLAFFEE:

Q.  Could you please turn to Exhibit 14.

A.  Okay.

Q.  What is this exhibit?

A.  This is a one-page email printout from my undercover email

account.  This one's titled Just For You.

Q.  Generally, what is this email exchange about?

A.  On a previous email, he asked if this was a stock photo,

meaning a photo that, and what I understood, is something that I

kept around.  I tell him no, you know, I don't keep stock

photos.

I tell him -- you know, ask if he has Yahoo.  I give him my

Yahoo account.  So rather than exchanging emails back and forth,

we jump over to Yahoo Messenger and communication will be a lot

faster.

1        MR. CLAFFEE:  Move Exhibit 14 into evidence.

2        MS. PORTER:  No objection.

3        THE COURT:  It's admitted.

4  BY MR. CLAFFEE:

5  Q.  Agent Laws, what happened after you sent the defendant your

6  Yahoo address?

7  A.  Moments later a screen popped up on my screen.  It's a --

8  I'm familiar with it from using Yahoo so much.  It's a friend

9  request dialogue box that comes up, and then it gives some

10  information and ask if I want to approve the request or deny the

11  request for a friend.

12  Q.  Could you please flip to Exhibit 15.

13  A.  Okay.

14  Q.  What is this?

15  A.  This is the dialogue box that I just explained from Yahoo

16  Messenger, and it's from vaandy1266.  It says -- asks if I'd

17  like to add him as a friend.

18  Q.  Did you accept the defendant's friend request?

19  A.  I did.

20        MR. CLAFFEE:  Offer Government's Exhibit 15 into

21  evidence.

22        MS. PORTER:  No objection.

23        THE COURT:  It's admitted.

24  BY MR. CLAFFEE:

25  Q.  How does Yahoo Messenger work?

A.  Yahoo Messenger is a near realtime chat program.  Think of
texting on your phone where texting is nearly instantaneous.
There's a little bit of a lag time in Yahoo Messenger, not
minutes, but a number of seconds so we can just type back and
forth.  A lot easier than two or three minutes for an email
exchange.

Q.  Did you and the defendant engage in a Yahoo Chat?

A.  We did.

Q.  When?

A.  October 10th of 2013.

Q.  How long after your last email with the defendant did this
chat take place?

A.  A couple minutes.

Q.  Approximately, how long did the chat with the defendant
last?

A.  Nearly two hours.

Q.  Generally, what did you talk about?

A.  It was a lot of getting to know each other.  We talked about
what kind of experience that I had with my kids.  I told him the
ages of the kids, Amy being 9, Mark being 8.  Saying that most
of the time I had incest experience, sexual experience, with my
daughter, not much with my son, and then we talked about
possibly meeting.

Q.  Did you record your Yahoo Chat in any way?

A.  I did in two different ways.

1   Q.   How did you record it?

2   A.   The first way, I took the screen prints, pictures of the

3   screen.  So each screen full of chat messages, I guess that's

4   the best way to do it, I'd take a picture of it, move the bottom

5   line to the top, and on and on and on until the end of the chat.

6        The other way I did it was I actually went into the chat,

7   copied and pasted the text out, and put that into a Word

8   document.

9   Q.   Please take a look at Exhibit 16-1.

10  A.   Okay.

11  Q.   Do you recognize this exhibit?

12  A.   I do.

13  Q.   What is it?

14  A.   It is a one-page printout from the first few lines of the

15  chat on Yahoo Messenger.

16  Q.   Generally, what did you and the defendant discuss in this

17  portion of the chat?

18  A.   I tell him my name.  I tell him a little bit of what -- I

19  have incest experience, and I ask him if he's had incest

20  experience as well.

21  Q.   Please take a look at 16-2.

22            THE COURT:  Are you planning to go through all of these

23  individually?

24            MR. CLAFFEE:  Very quickly, Your Honor, yes.

25            THE COURT:  Why don't you do them all at once very

1    quickly.

2    BY MR. CLAFFEE:

3    Q.  Agent Laws, could you please take a few moments to flip

4    through Government's Exhibit 16-2 through 16-9.

5              THE COURT:  While he's doing that, it's time for us to

6    take a brief recess.  He can look.  We'll get them all in at one

7    time.

8         (Recess taken at 11:27 a.m. until 11:45 a.m.)

9    BY MR. CLAFFEE:

10   Q.  Agent Laws, have you had a chance to review Government

11   Exhibit 16-1 through 16-9?

12   A.  I did.

13   Q.  Do you recognize those?

14   A.  I do.

15   Q.  What are they?

16   A.  Those are the screen prints that I made from the chat that I

17   had with Andy on December -- sorry -- October 10, 2013.

18             MR. CLAFFEE:  The government moves Exhibit 16-1 through

19   9 into evidence.

20             MS. PORTER:  There's no objection.

21             THE COURT:  They're admitted.

22   BY MR. CLAFFEE:

23   Q.  Generally, what did you discuss during that portion of the

24   chat?

25   A.  A little bit more of getting to know each other.  I talked

about P and P night, porn and pizza night.  I went into a brief
description about that.

    Told him that the kids and I get together on -- it happens
on Friday night.  I download some kind of pornography, whether
it be adult or child.  We sit on the couch naked watching
pornography, and then I usually masturbate or have Amy
masturbate me.

    And then he wanted to know about Mark, my 8-year-old, wanted
to know what he was into.  And then towards the end, I gave him
my phone number.

Q.  How did that portion of the chat end?

A.  I can't remember exactly how it ended, but I know towards
the end I gave him my undercover cellphone.

Q.  Did the defendant in fact call you on that cellphone?

A.  He did.

Q.  How do you know it was the defendant?

A.  That's the only person that had the number.  It was a
brand-new phone right out of the box.

Q.  Approximately what time of day was that?

A.  Approximately 4:20 in the afternoon.

Q.  How long did you talk?

A.  Approximately 20 minutes.

Q.  What did you talk about generally in that first phone call?

A.  Generally, again, just to get to know each other.  We talked
about Andy's house.  It was on the river.  He described it, how

1    he had a bunch of -- a riverfront view.  It was a very nice

2    house.

3        Talked about how he was concerned about talking to people

4    who were into fantasy and that he wasn't into fantasy.  That he

5    had a hard time -- I think the quote was something like he had a

6    hard time getting around the chat of it all.  In other words,

7    talking to people that just wanted to chat about molesting their

8    children, not actually move forward to doing it.

9    Q.  Agent Laws, did you make a recording of the phone call?

10   A.  I did.

11   Q.  How did you do it?

12   A.  With a digital recorder where I put an earpiece in my ear,

13   and then the phone went up to my ear and then to my face and

14   then recorded it.

15   Q.  Have you made these recordings before in the course of your

16   investigations?

17   A.  I have.

18   Q.  How did the call end?

19   A.  When my cellphone went dead.

20   Q.  What happened next?

21   A.  Next thing, we jumped back onto Yahoo Chat for another brief

22   chat.

23   Q.  Please take a quick look at Exhibits 16-10 and 16-11.  In

24   addition, if you could look again back to the bottom portion of

25   16-9.

1      Do you recognize those exhibits?

2  A.   I do.

3  Q.   Is this the portion of the chat after your phone went dead?

4  A.   Yes, it is.

5          MR. CLAFFEE:  Move Exhibits 16-10 and 16-11 into

6  evidence.

7          MS. PORTER:  No objection.

8          THE COURT:  They're admitted.

9  BY MR. CLAFFEE:

10 Q.   How did the chat end in Exhibit 16-11?

11 A.   He wanted to know if I had a cam, meaning a web camera, so

12 that we could see each other.

13 Q.   Did there come a time that you resumed talking on the

14 telephone?

15 A.   Yes.

16 Q.   When was that?

17 A.   Approximately 5:15, 5:20 same day.

18 Q.   Could you please take a look at Government Exhibit No. 17.

19 A.   Okay.

20 Q.   Do you recognize this exhibit?

21 A.   I do.

22 Q.   What is it?

23 A.   This is a multipage printout from the text from the Yahoo

24 Chat.  So what I did, as I mentioned earlier, did the screen

25 prints and then I went into the chat and just copied it out and

1    pasted it into a Word document.  So this is the result of the --

2    or this is the Word document that I created from the chat.

3           MR. CLAFFEE:  The government moves Exhibit 17 into

4    evidence.

5           MS. PORTER:  Your Honor, I would just ask that they lay

6    a foundation that it's true and accurate and that no

7    modification has been made from the screen shots to the Yahoo

8    Chat.  I don't think that's been established.

9           THE COURT:  All right.  I think that's fair enough.

10   BY MR. CLAFFEE:

11   Q.  Agent Laws, could you explain how you created Exhibit 17?

12   A.  I went into the actual -- the chat program in Yahoo,

13   highlighted the chat, and copied it directly into a Word

14   document.

15   Q.  Did you highlight the entire chat?

16   A.  I did.

17   Q.  Is this exhibit the same copy as the document you created at

18   the time?

19   A.  Yes.

20          THE COURT:  All right.  It's admitted.

21   BY MR. CLAFFEE:

22   Q.  When the defendant called you back on the telephone, what

23   did you talk about generally?

24   A.  We talked about more -- having sex with the children.

25   Talked about when he wanted to meet.  He actually said he

 1   would -- he would have came that day, so October 10th, but he

 2   had a fundraiser that evening.  So we moved towards meeting the

 3   next day, so October 11th of 2013.  Told him that we can meet at

 4   the McDonald's by my house.  That's about it.

 5   Q.  What, if anything, did you discuss about what you would tell

 6   the kids?

 7   A.  I told the kids -- or I told Andy originally that I would

 8   make up a name.  I would say, hey, you know, Uncle Bob's coming

 9   over.  And then Andy said it's just easier, just use Andy

10   instead.  That way if somebody mentions a name that I'm not

11   familiar with, then, you know, I might not turn.  So make it

12   more natural using his real first name.

13   Q.  Did you make a recording of that phone call?

14   A.  I did.

15   Q.  Did you use the same methods that you described earlier?

16   A.  I did.

17   Q.  Could you please flip to Government Exhibit 18 in the

18   binder.

19   A.  I have that.

20   Q.  What is that?

21   A.  That is a CD that contains the phone calls.

22   Q.  How do you know that that CD contains the phone calls?

23   A.  Because it has my initials on the front, KJL, and I listened

24   to the phone calls.

25   Q.  And does that disk contain a true and accurate copy of the

1  recordings that you made at the time?

2  A.  It does.

3        MR. CLAFFEE:  The government moves Exhibit 18 into

4  evidence.

5        MS. PORTER:  No objection.

6        THE COURT:  It's admitted.

7        MR. CLAFFEE:  Your Honor, at this point in time, I

8  would like to play three brief clips from the telephone call for

9  the jury.

10       THE COURT:  All right.

11    (Audio clips played into the record at 11:55 a.m.)

12  BY MR. CLAFFEE:

13  Q.  Agent Laws, at this point did you think the defendant was

14  going to meet you the next day?

15  A.  Well, I wasn't positive, but I was hopeful.

16  Q.  Why did you think that?

17  A.  Well, it's progressing.  We've exchanged pictures.  We've

18  chatted on -- or we've exchanged emails.  We've chatted back and

19  forth on Yahoo.  Now the phone calls.  So it's moving towards

20  the natural progression of the actual face-to-face meeting.

21  Q.  What happened after you got off the phone with the

22  defendant?

23  A.  Let's see.  Oh, I remember.  Sorry.  I texted him the

24  address to the McDonald's.

25  Q.  Could you please take a look at Government Exhibit 23.

1   A.   Okay.

2   Q.   What is this?

3   A.   This is a one-page email from my undercover email account.

4   Q.   I'm sorry.  Are you looking at Exhibit 23?

5   A.   Oh, sorry.  Okay.  I have the correct one.  Exhibit 23.

6   Q.   Do you recognize Exhibit 23?

7   A.   I do.

8   Q.   What is it?

9   A.   This -- it's titled Extraction Report.  It's from a Apple

10  iPhone.  This is a program that's used by forensic folks to

11  extract messages from a cellphone.

12  Q.   Is your undercover cellphone's number the number between

13  which the messages were sent and received?

14  A.   It is.

15          MR. CLAFFEE:  At this time, Your Honor, I'd like to

16  read a stipulation.

17          THE COURT:  All right.

18          MR. CLAFFEE:  The United States of America and the

19  defendant for purposes of trial hereby stipulate and agree as

20  follows:

21          One.  An Apple iPhone mobile telephone was seized from

22  defendant William Andrew Clarke on October 11, 2013;

23          Two.  The government, through Detective Michael Croson,

24  Town of Herndon Police, performed a forensic review of the

25  defendant's mobile phone using reliable methods.

1        Three.  Government's Exhibit 23 is a true and accurate

2   copy of an extraction report of SMS text messages sent and

3   received between the defendant's mobile phone and a mobile phone

4   belonging to Special Agent Kevin Laws.

5        At this time the government moves Exhibit 23 into

6   evidence.

7             MS. PORTER:  No objection.

8             THE COURT:  It's admitted.

9   BY MR. CLAFFEE:

10  Q.  Did you do anything else after you texted him the address of

11  the McDonald's?

12  A.  Later that evening, I sent an email.

13  Q.  Could you please look at Exhibit 19.

14  A.  Okay.

15  Q.  What is this?

16  A.  This is a one-page email from my undercover email account.

17  This email is titled Missed You.

18  Q.  What did you and the defendant discuss in this email

19  exchange?

20  A.  Actually, just told him it was a long night, excited to see

21  him.  And just in case we don't have an opportunity to contact

22  each other, I tell him what I'm driving and what I'll be wearing

23  when we meet at the McDonald's the following day.

24  Q.  Did the defendant respond to your email?

25  A.  He did.  He wanted to know if I was -- he wanted to know if

1    I was still awake.  He definitely wanted to chat before he came.

2    He said the fundraiser was okay, but he was distracted and he

3    wanted me to call if it wasn't too late.

4            MR. CLAFFEE:  I move Government Exhibit 19 into

5    evidence.

6            MS. PORTER:  No objection.

7            THE COURT:  It's admitted.

8    BY MR. CLAFFEE:

9    Q.  What, if anything, happened the following morning?

10   A.  The following morning we had a brief chat on Yahoo

11   Messenger.

12   Q.  Approximately how long did this chat last?

13   A.  I believe it was less than an hour.

14   Q.  Generally, what did you talk about in that Yahoo Chat?

15   A.  Talked about -- talked about meeting again, what time.  I'm

16   not sure if there was any chat about sex.  Actually, the more

17   important thing we talked about was getting onto Skype and doing

18   an actual live video chat.

19   Q.  Did you record this portion of your Yahoo Chat in any way?

20   A.  I did.

21   Q.  Was it using the same methods as the previous portion of the

22   Yahoo Chat?

23   A.  Yes, same way.  Screen prints and then copying the text out

24   into a Word document.

25   Q.  Could you please take a look at Government's Exhibit 20-1

1    through 20-4 and Exhibit 21.

2    A.   I'm sorry.  What was the last exhibit?

3    Q.   21.

4    A.   Okay.

5    Q.   Do you recognize those exhibits?

6    A.   I do.

7    Q.   What are they?

8    A.   The first exhibits are the screen prints from the Yahoo

9    Chat, and Exhibit 21 is the Word document created from the text

10   of the chat.

11   Q.   Is that a true and accurate copy of the document you created

12   at the time?

13   A.   It is.

14        MR. CLAFFEE:  The government moves Exhibits 20-1

15   through 20-4 and Exhibit 21 into evidence.

16        MS. PORTER:  There's no objection.

17        THE COURT:  They'll be admitted.

18   BY MR. CLAFFEE:

19   Q.   What happened next?

20   A.   I actually got onto Skype and we had a face-to-face video

21   chat.

22   Q.   What is Skype?

23   A.   Skype is a realtime video program.  Actually, it's -- you

24   can also text in Skype.  So you can text and you can do video at

25   the same time.  You can do either audio or audio and video.  In

1  this instance, we did audio and video so we could actually hear

2  and see each other.

3  Q.  How did you know that it was the defendant?

4  A.  From the pictures that he sent me from the Family Intimacy

5  page, it was the same person.

6  Q.  Approximately how long did that Skype chat take?

7  A.  Approximately 30 minutes.

8  Q.  What did you talk about generally?

9  A.  We talked about -- the original thing that was brought up is

10  proving that I wasn't a cop.  He wanted me to pull my pants down

11  and show him my penis.  I refused saying that, you know, hey,

12  this is just what you're after.  So we quickly moved past that.

13      And then we went into talking about sex with the children.

14  He wanted to know if it was okay if he performed oral sex on

15  Mark and Mark performed oral sex on him, and also if he

16  performed oral sex on Amy.

17      He said if I took the lead and told him when to join in, he

18  would be comfortable with that.  We talked about what time to

19  come.  He also said that he was in a grayish-blue Mercedes so I

20  could be on the lookout for what vehicle he was driving.

21  Q.  Why did he ask you to show you his penis -- show him your

22  penis?

23  A.  Well, because in a lot of people's mind they think that law

24  enforcement, it's illegal to show someone our penis.

25  Q.  Is that true?

A.  It's not.  Actually, in reality, if I wanted to do that, I could have.

Q.  What, if anything, did you discuss about what you would tell the kids?

A.  We told the kids that we have a special visitor coming for P and P, porn and pizza night, that we would do it earlier, around noon.  That it was a friend of mine, Andy, that would be visiting us.

Q.  Did the defendant discuss anything about his experience with other families and sexual activity?

A.  He did.  He said that he had a college roommate named Jeff. That Jeff had eventually gotten married, had a couple kids, Logan and Noah, and that he had incest experience with both of them, actually with Jeff, and they would join in with the two kids.  I believe they were 11 and 10, somewhere in that age range.

Q.  Did you make a recording of the Skype chat?

A.  I did.

Q.  How did you do that?

A.  I used QuickTime player.

Q.  Have you made such recordings before in the course of your investigations?

A.  I have.

Q.  Could you please flip to Government Exhibit 22.

A.  Okay.

1  Q.  What is Exhibit 22?

2  A.  This is a CD or DVD of the Skype chat.

3  Q.  How do you know?

4  A.  Because I watched it.  And there was also my initials, KJL,

5  on the CD/DVD.

6  Q.  Is it a true and accurate copy of the recording you made of

7  the Skype chat at the time?

8  A.  It is.

9       MR. CLAFFEE:  The government offers Exhibit 22 into

10  evidence.

11       MS. PORTER:  Your Honor, may we approach?

12    (Conference at the bench, as follows:)

13       MS. PORTER:  Your Honor, the defense objects to the

14  admissibility of the Skype recording on the basis of lack of

15  foundation to establish what the technology is based upon.

16       There hasn't been any testimony regarding what Skype is

17  and how the lines of communication are established from the

18  sender and receiver.  So that's lacking.  We object to the

19  admissibility of Skype based on that.

20       And we would offer -- we would suggest to the Court

21  that that requires an expert to explain that.  We didn't receive

22  any expert notice.

23       THE COURT:  He's testified that this recording is an

24  accurate recording of the conversation, hasn't he?

25       MS. PORTER:  Right, but he hasn't established what

1   Skype is.

2           THE COURT:  I know, but it's irrelevant as long as it

3   produces a recording that's --

4           MS. PORTER:  Yes, Your Honor.  But it has to relate

5   back to the indictment which establishes -- or requires the

6   government to prove the communication or the conduct was done

7   through the use of interstate commerce or foreign commerce.

8           THE COURT:  But that's not the recording.  He recorded

9   something that went through interstate or foreign commerce.

10          MS. PORTER:  Yes, but he hasn't established that.

11  There's case law that says --

12          THE COURT:  Objection overruled.  It's admitted.

13          MS. PORTER:  May I complete the record just to be

14  clear?

15          THE COURT:  You've got it for the record.

16          MS. PORTER:  Thank you.

17     (Thereupon, the following proceedings continued in open

18  court:)

19          MR. CLAFFEE:  Your Honor, at this time I would like to

20  play a short clip from the Skype chat for the jury.

21          THE COURT:  Very well.  That exhibit is admitted.

22     (Video and audio clip played into the record at 12:09 p.m.)

23  BY MR. CLAFFEE:

24  Q.  What happened next after the Skype chat?

25  A.  After the Skype chat, we set up at the McDonald's a

1    surveillance team, a cover team.  I got into the vehicle that I

2    was using, and we went over to McDonald's and waited for Andy to

3    arrive.

4    Q.  Did the defendant communicate with you in any way between

5    the end of the Skype chat and McDonald's?

6    A.  He did.  There were several text messages exchanged.

7    Q.  Could you please flip back to Government Exhibit 23.

8    A.  Okay.

9    Q.  Do you see those texts in Exhibit 23?

10   A.  I do.

11   Q.  What did the defendant say about traffic?

12   A.  He says traffic's messy.

13   Q.  When was the last text message you got from the defendant?

14   A.  The last text message was at 17:49 UTC so 1:49 p.m.

15   Q.  What did he say?

16   A.  Where are you now?

17   Q.  What happened next?

18   A.  Next thing that happened, I was in the middle of responding

19   to that text.  I actually had an old flip phone.  You have to

20   actually count through the letters so it takes a long time to

21   reply.

22        So I had my head down looking at the phone.  There's a knock

23   at the driver's side window.  I kind of ignored that.  There was

24   another knock.  I looked up and it was the -- it was Andy.  His

25   face was near inches from me.  So he hadn't driven up.  It was a

1  torrential downpour at the time.  Somebody had missed the car

2  coming in.  So he had walked a length of ways across the parking

3  lot and actually walked up to the van.

4  Q.  What happened after he approached your van?

5  A.  I started to roll the window down.  I was a bit flustered.

6  It was raining really hard so I rolled it back up, went to open

7  the door, and then the cover team came and slammed Andy against

8  the driver side door, started to handcuff him, pulled me out.

9  Two other agents pulled me out, handcuffed me, and walked me

10 away.

11 Q.  Did you ever see the defendant again after that?

12 A.  Not until this morning.

13 Q.  Or hear from him in any way?

14 A.  No.

15 Q.  Again, is the man who came to your car window the defendant

16 that you identified earlier?

17 A.  Yes.

18         MR. CLAFFEE:  We pass the witness.

19         THE COURT:  Okay.

20                        **CROSS-EXAMINATION**

21 BY MS. PORTER:

22 Q.  Good afternoon, sir.

23 A.  Good afternoon.  How are you?

24 Q.  Good.  Thank you.  I would like to ask some questions about

25 the website that you talked about earlier.

1       First of all, you would agree that's a website that's

2   designed for adults only, right?

3   A.  Well, I couldn't say that.  I'd only been on the site just a

4   couple days.  So I didn't have enough experience with the site

5   to say if it was centered around solely adults or children.

6   Q.  Do you recall the questions that the computer program

7   prompted you to ask before you created a profile?

8   A.  Generally, yes.

9   Q.  Weren't there questions that you had to answer just to

10  certify that you were 18 years of age or older?

11  A.  That I don't remember.  I remember filling out my profile.

12  I don't remember a series of like prompts to get into the site.

13  Q.  Well, do you recall that there were some default settings on

14  some of the fields when you go to set up your profile?

15  A.  No.  Sorry.  I don't remember that.

16  Q.  And you used a default setting on your profile; is that

17  correct?

18  A.  I do.

19  Q.  And you were the first one to contact Andy through the

20  website?

21  A.  That's correct.

22  Q.  In fact, the other information that you created on the

23  website was fake.  For instance, you had stated that you lived

24  in Haymarket, but you actually resided in Fairfax, right?  You

25  had said that on direct exam.

1  A.  Yes, that's correct.

2  Q.  So you would agree that some of the things that are put on

3  the Internet are not true?

4  A.  Oh, absolutely.

5  Q.  Right.  Okay.  And then transitioning from the website to

6  email, that was your idea.  You provided your email address to

7  Andy, correct?

8  A.  That's correct.

9  Q.  And you were the first person to introduce sex with children

10  into this communication; isn't that correct?

11  A.  That's correct.

12  Q.  In fact, quickly you began to give details to Andy about the

13  sex you would have with your fictitious children, correct?

14  A.  Yes.

15  Q.  And you were the one who invited Andy over to your house to

16  engage in sex with your fictitious children?

17  A.  That's correct.

18  Q.  And you were the first to ask for photos; isn't that

19  correct?

20  A.  I can't remember if I was first or he was first.

21  Q.  Directing your attention to Government's Exhibit 9, does

22  that help refresh your recollection about that email?

23  A.  One moment.  That's correct.  I did ask him for a picture.

24  Q.  First, correct?

25  A.  Yes.

1  Q.  Okay.  Then Andy sent you a picture back just of himself,

2  right?

3  A.  That's correct.

4  Q.  It was the same picture that he used as his profile picture,

5  right?

6  A.  Yes.

7  Q.  The one that he's in?

8  A.  Yes.

9  Q.  And he was fully clothed in that photo?

10  A.  Yes.

11  Q.  And then Andy asked you to send back a photo of you,

12  correct?

13  A.  Correct.

14  Q.  And you only.  He never asked for you to send photographs of

15  your children to him, correct?

16  A.  That's correct.

17  Q.  But you did that on your own accord; isn't that right?

18  A.  I did.

19  Q.  And at some point during your communication with Andy, he

20  asked you if you were bisexual?

21  A.  Yes.

22  Q.  And he asked you and he said, quote, let's take Amy and Mark

23  out of the equation and just get to know each other, didn't he?

24  A.  He did.

25  Q.  And he also asked you if he could perform oral sex on you.

1   Do you recall that?

2   A.   No.  That part I must have missed.

3   Q.   Okay.  I'd like to direct your attention to Government's

4   Exhibit 21.  That would be the Yahoo Chat.

5        Okay.  I'd like to direct your attention to the time stamp

6   starting with 9:26 a.m.

7   A.   Okay.

8   Q.   Starting with the line that says question and colon, do you

9   see that, sir?

10  A.   I do.

11  Q.   Okay.  Can you read the line under that and see if that

12  helps refresh your recollection as to whether or not Mr. Clarke

13  asked you to perform -- or would you be open to performing oral

14  sex on him?

15  A.   He does ask me that.

16  Q.   Okay.  I'd like to talk to you about Government's

17  Exhibit 11.  That was the photograph with you and the other

18  person without the head showing.  Do you recall that photograph?

19  A.   I do.

20  Q.   And you're holding a sign in that photograph.  Do you recall

21  what that said?  It was Exhibit 11.

22  A.   I do.

23  Q.   Did you write that?

24  A.   I did.

25  Q.   What does that say?

1   A.  It says, R U, the letter R, the letter U, and then cumming,

2   C-U-M-M-I-N-G, to see us, and then I believe there's one or two

3   exclamation -- or not exclamation, question marks at the end.

4   Q.  So you misspelled the word coming as C-U-M-M-I-N-G, right?

5   A.  Yes.

6   Q.  And you did that because you wanted to inject sex into this

7   conversation.

8               MR. CLAFFEE:  Objection.

9               THE WITNESS:  Absolutely.

10              THE COURT:  What's the objection?

11              MR. CLAFFEE:  He's speculating as to what he meant when

12  he wrote that.

13              MS. PORTER:  It wouldn't be speculation if it's coming

14  from him.

15              THE COURT:  Objection overruled.

16              MS. PORTER:  Thank you, Your Honor.

17  BY MS. PORTER:

18  Q.  All right.  Agent Laws, I'd like to talk to you about

19  Government's Exhibit 10.  If you could turn to that, please.

20  A.  Okay.

21  Q.  Did you find it, sir?

22  A.  I did.

23  Q.  If you want to just take a look at that and read it to just

24  refresh your recollection before I ask you some questions.

25  A.  Okay.

1  Q.  So Jaye was the one that asked Andy to come spend the

2  weekend with him, correct?

3  A.  That's correct.

4  Q.  All right.  And you, as Jaye, describe several times

5  throughout your communications with Mr. Clarke about porn and

6  pizza night; is that right?

7  A.  That's correct.

8  Q.  How porn and pizza was routine for you and your fictitious

9  children to engage in; is that right?

10 A.  That's correct.

11 Q.  And that included you having sexual intercourse or sexual

12 activity with both your son and your daughter; is that right?

13 A.  Well, it didn't go into sexual intercourse, but, yes,

14 generally about sex, yes.

15 Q.  Well, didn't you talk about anal sex with your daughter at

16 some point?

17 A.  Yes, but that wasn't mentioned as part of the porn and pizza

18 night scenario.

19 Q.  Okay.  Well, let's just talk about, and then in general, the

20 communications.  You're the one throughout this whole sting

21 operation describing the sex that you had with your children,

22 right?

23 A.  Yes.

24 Q.  Okay.  That it had been going on for three years, right?

25 A.  Yes.

1    Q.  Three years was the key.  All right.

2        You also said, directing your attention back to Exhibit 10,

3    the email, you also said to Andy that inviting him to join in

4    P and P night was a great way to break the ice with the kids,

5    right?

6    A.  That's correct.

7    Q.  That was, again, your idea?

8    A.  That's correct.

9    Q.  All right.  Just to clarify.  Your routine with the

10   fictitious children was once a week for three years, P and P

11   night; is that correct?

12   A.  That's correct.

13   Q.  All right.  I'd like to talk to you about another item in

14   that email, Exhibit 10.  You asked Andy to bring a small toy for

15   the kids; is that correct?

16   A.  That's correct.

17   Q.  And then the next day you bring up this toy idea again, and

18   this is on October 11th, the very next day, and this time you

19   imply that it should be a sex toy, right?

20   A.  No.  No.  I asked him -- I actually asked him if he could --

21   if he wanted to bring toys, not for the kids, meaning any kind

22   of sex toys, he can bring them.  But I did ask him if he could

23   bring something later on like a mixed bag of Halloween candy or

24   something like that.

25   Q.  Right.  So there's actually toys used two different ways,

1  sex toy and then a toy for the kids to use to play with; is that

2  correct?

3  A.  That's correct.

4  Q.  Okay.  And Andy never brought the toy to your knowledge; is

5  that correct?

6  A.  To my knowledge, that's correct.

7  Q.  Agent Laws, it was your idea to transition to Yahoo

8  messaging; is that correct?

9  A.  That's correct.

10 Q.  Again, you describe P and P night through Yahoo messaging,

11 right?

12 A.  Correct.

13 Q.  Agent Laws, Andy, Mr. Clarke, never spoke to the fictitious

14 children, correct?

15 A.  That is correct.

16 Q.  And he never spoke to anyone else he thought were children,

17 correct?

18 A.  In this scenario?

19 Q.  In this scenario with you, with you involved, you

20 witnessing?

21 A.  That's correct.

22 Q.  And it was you, Agent Laws, that said I told the kids we

23 would be doing something extra special -- be doing an extra

24 special P and P night.  My good friend, Andy, is coming for a

25 visit.  They are really excited.  That was your idea, right?

1   A.  Did I say that?  Yes.

2   Q.  Okay.  So Andy never said to you, hey, tell the kids I'm

3   coming.  That was your idea to bring that up; isn't that

4   correct?

5   A.  Well, he asked me what -- he asked me what I had told the

6   kids.

7   Q.  Right.  But you had said that first that you were telling

8   the kids that Andy -- or Uncle Bob was coming.  You brought that

9   up first, correct?

10  A.  Correct.

11  Q.  All right.  And then you gave your phone number over instant

12  messaging for Andy to call; isn't that correct?

13  A.  That's correct.

14  Q.  And during that phone call, Agent Laws, you were the first

15  to bring up this proposed meeting?

16  A.  Correct.

17  Q.  And you were the one who directed where and when you would

18  meet him?

19  A.  Correct.

20  Q.  You chose a public location, the McDonald's near your

21  office?

22  A.  Correct.

23  Q.  And then Mr. Clarke was arrested before any conversation or

24  any meeting between you and him could happen; is that correct,

25  sir?

1   A.  Well, no.  He arrived at my van.  So that was at the

2   proposed place and then he was subsequently arrested.

3   Q.  There was no conversations though?

4   A.  No.

5   Q.  And Andy didn't offer money to you as Jaye in exchange for

6   access to the children, correct?

7   A.  No.

8   Q.  And Andy didn't offer drugs or anything of value to you in

9   exchange for access to the kids?

10  A.  No.

11  Q.  Andy didn't offer sex to Jaye in exchange for access to the

12  kids?

13  A.  No.

14  Q.  Andy didn't offer any money to the kids?

15  A.  No.

16  Q.  He didn't offer any toys.  That was your idea, correct?

17  A.  Correct.

18  Q.  And he didn't make may promises to the fictitious children,

19  did he?

20  A.  No.

21  Q.  Again, he never talked to the children or anyone he thought

22  were kids?

23  A.  That's correct.

24  Q.  Okay.  And he never had any contact with kids other than

25  talking.  Like he didn't talk to them, he didn't email, no

 1    texting as it relates, to your knowledge, during the sting

 2    operation that you created?

 3    A.   That's correct.

 4              MS. PORTER:   Thank you.   No further questions.

 5              THE COURT:   Do you have anything else?

 6              MR. CLAFFEE:   Briefly, Your Honor.

 7                        **REDIRECT EXAMINATION**

 8    BY MR. CLAFFEE:

 9    Q.   Counsel asked you if porn and pizza night was routine.   Do

10    you remember that?

11    A.   I do.

12    Q.   Was it routine to include other people in P and P night?

13    A.   No.

14    Q.   Counsel also asked whether getting onto Yahoo Messenger was

15    your idea or the defendant's idea.   Do you remember that?

16    A.   I do.

17    Q.   And how did you respond?

18    A.   It was my idea.

19    Q.   Whose idea was it to get onto a video chat?

20    A.   That was Andy's.

21              MR. CLAFFEE:   No further questions.

22              THE COURT:   All right.   Thank you.   You may step down.

23    (Witness stands down.)

24              Who's your next witness?

25              MR. GARDNER:   The United States calls Special Agent

1    Michael Brown.

2                          **MICHAEL BROWN,**

3               after having been duly sworn or affirmed,

4               took the stand and testified as follows:

5                      **DIRECT EXAMINATION**

6    BY MR. GARDNER:

7    Q.   Good afternoon.

8    A.   Good afternoon, sir.

9    Q.   Could you state and spell your name for the record.

10   A.   Yes.  Special Agent Michael Brown.  M-I-C-H-A-E-L,

11   B-R-O-W-N.

12   Q.   Can you tell the jury how you're employed?

13   A.   Yes.  I'm a special agent with the Virginia State Police

14   assigned to the Northern Virginia/D.C. Internet Crimes Against

15   Children Task Force.

16   Q.   Did you participate in the investigation of William Clarke?

17   A.   Yes, I did.

18   Q.   Were you present in the parking lot of the McDonald's on

19   Jermantown Road on October 11, 2013?

20   A.   Yes, I was.

21   Q.   Did you see Mr. Clarke that day?

22   A.   Yes, I did.

23   Q.   Do you see him here in the courtroom?

24   A.   Yes, I do.

25   Q.   Can you identify him based on where he's sitting and what he

 1  is wearing?

 2  A.  He's sitting to the right of me with a reddish tie.

 3          MR. GARDNER:  Your Honor, can the record reflect that

 4  the witness has identified the defendant.

 5          THE COURT:  He's identified him.

 6  BY MR. GARDNER:

 7  Q.  Did you participate in arresting Mr. Clarke on that day?

 8  A.  Yes, I did.

 9  Q.  Can you turn to -- I apologize.  The binder in front of you

10  at the witness stand, can you turn to Exhibit 27 in the binder,

11  please.

12          Do you recognize that?

13  A.  Yes, I do.

14  Q.  What is in that exhibit?

15  A.  This is the vehicle of Mr. Clarke that I had towed from the

16  scene.

17  Q.  When did you first see that vehicle?

18  A.  On the day of, when Mr. Clarke was arrested in the parking

19  lot of the shopping center.

20  Q.  You mentioned that you had it towed.  That was also the date

21  that you had it towed?

22  A.  Yes, sir.

23  Q.  When the tow truck arrived, what did you do?

24  A.  Once the tow truck driver arrived, I instructed him that the

25  vehicle was going to be towed to our Virginia State Police

1    impound lot and I gave him the address.  I told him that I would

2    be following right behind him.

3    Q.  Did you in fact follow him to the impound lot?

4    A.  Yes, I did.

5    Q.  Is the impound lot a secure area?

6    A.  Yes, it is.

7            MR. GARDNER:  Your Honor, the government would move to

8    admit what's been marked for identification as Government's

9    Exhibit 27.

10           MS. PORTER:  There's no objection.

11           THE COURT:  It's admitted.

12           MR. GARDNER:  No further questions.  Thank you.

13           THE COURT:  Do you have any questions?

14                            **CROSS-EXAMINATION**

15   BY MS. PORTER:

16   Q.  Good afternoon.

17   A.  Good afternoon.

18   Q.  So you impounded the car on October 11, 2013; is that

19   correct?

20   A.  Correct.

21   Q.  Did you ever participate after that date in anything related

22   to the vehicle?

23   A.  No, I did not, ma'am.

24   Q.  So you didn't see it from the time that it was impounded on

25   October 11th to the time it was searched by the government six

1  weeks later on November 21st?

2  A.  That is correct, ma'am.

3           MS. PORTER:  Thank you.  No further questions.

4           THE COURT:  Thank you.  You may step down and may be

5  excused.  (Witness stands down.)

6           MR. GARDNER:  Your Honor, the United States calls

7  Special Agent Kris Eyler.

8                        **KRISTINA EYLER,**

9             after having been duly sworn or affirmed,

10            took the stand and testified as follows:

11                     **DIRECT EXAMINATION**

12  BY MR. GARDNER:

13  Q.  Good afternoon.

14  A.  Good afternoon.

15  Q.  Can you state and spell your name for the record.

16  A.  Kristina Eyler.  K-R-I-S-T-I-N-A, last name's Eyler,

17  E-Y-L-E-R.

18  Q.  How are you employed?

19  A.  I'm a special agent with the Department of Homeland

20  Security.

21  Q.  In general, what type of cases do you investigate?

22  A.  I investigate crimes against children.

23  Q.  Are you assigned to the Internet Crimes Against Children

24  Task Force?

25  A.  Yes.

1   Q.  Are you familiar with the investigation of William Clarke?

2   A.  Yes.

3   Q.  Are you the case agent for that?

4   A.  Yes, I am.

5   Q.  Were you present -- does case agent mean lead investigator?

6   A.  Yes.

7   Q.  Were you present in the parking lot of the McDonald's on

8   Germantown Road on October 11, 2013?

9   A.  Yes.

10  Q.  Did you see Mr. Clarke on that day?

11  A.  Yes, I did.

12  Q.  Do you see him here in the courtroom?

13  A.  Yes.  He's sitting next to Ms. Porter, to the right of her,

14  wearing a suit and a red tie.

15          MR. GARDNER:  Your Honor, can the record reflect that

16  the witness has identified --

17          THE COURT:  She's identified him.

18  BY MR. GARDNER:

19  Q.  On October 11, 2013, what was the weather like?

20  A.  It was raining very heavily.

21  Q.  Where were you when you first saw Mr. Clarke?

22  A.  I was sitting in the parking lot of the McDonald's in

23  Fairfax, Virginia.

24  Q.  In Fairfax, Virginia.  Were you inside or outside of a car?

25  A.  Inside.

1  Q.  And what did you first see Mr. Clarke do in the McDonald's

2  parking lot?

3  A.  He was standing to the driver's window of the vehicle that

4  Special Agent Laws was sitting in.

5  Q.  And what did you do after you saw Mr. Clarke standing next

6  to Special Agent Laws's vehicle?

7  A.  I assisted in the arrest of Special Agent Laws.

8  Q.  Who was arrested at that time?

9  A.  Mr. Clarke and Special Agent Laws.

10  Q.  Why did you also arrest Special Agent Laws?

11  A.  As part of our -- the way we do these kind of cases, we kind

12  of continue the online persona, undercover persona, till the end

13  of the investigation.

14  Q.  Where did you next see Mr. Clarke on that day?

15  A.  He was sitting in the interview room of our converted RV

16  that we use as a mobile forensic lab.

17  Q.  First, where was this RV parked?

18  A.  In the parking lot adjacent to the McDonald's.

19  Q.  And can you describe for the jury what this RV is like?

20  What are we talking about?

21  A.  It's an RV.  Inside of it is like a lab.  There's computers,

22  monitors.  We use it to -- on enforcement actions to do an

23  online preview of people's devices that we seize pursuant to a

24  search warrant.  The back section of it is a table with bench

25  chairs on either side, and it's wired for video and audio

1  recording.

2  Q.  When you saw Mr. Clarke in the RV, approximately how many

3  minutes was that after he was arrested?

4  A.  It couldn't be more than 15, 20 minutes.

5  Q.  Was he handcuffed?

6  A.  Yes, he was.

7  Q.  When you entered the room, what, if anything, did you do

8  about the handcuffs?

9  A.  I asked Special Agent Snyder with the Virginia State Police

10  to remove the handcuffs.

11  Q.  Did you interview Mr. Clarke?

12  A.  Yes, I did.

13  Q.  Who was in the room when you interviewed Mr. Clarke?

14  A.  Special Agent Snyder.

15  Q.  So it was the three of you, yourself, Mr. Clarke, and

16  Special Agent Snyder?

17  A.  Yes.

18  Q.  Did you read Mr. Clarke his *Miranda* rights?

19  A.  Yes.

20  Q.  What did he say in response?

21  A.  He stated he understood the rights as I read them to him and

22  he agreed to speak with me.

23  Q.  At first, what did you tell Mr. Clarke about who Jaye was?

24  A.  I told him that I had been investigating Jaye for quite a

25  long time and that I had been trying to arrest him because I

1    knew that he had been trying to meet people to have sex with his

2    children.

3    Q.   Did you ask Mr. Clarke where he first met Jaye?

4    A.   Yes, I did.

5    Q.   What did he say?

6    A.   On a website called Social-Incest.

7    Q.   Did you ask -- excuse me -- did you ask Mr. Clarke for his

8    user names?

9    A.   Yes.

10   Q.   What did he say?

11   A.   VaRing.

12   Q.   Did you ask Mr. Clarke about his conversations with Jaye?

13   A.   Yes.

14   Q.   Did you ask him about Mark and Amy?

15   A.   Yes.  He stated that Jaye had told him that he was a single

16   father with two children.  Amy's approximately 9 years old and

17   Mark was approximately 8 years old.

18   Q.   What, if anything, did Mr. Clarke say about whether or not

19   Jaye had told him that he was sexually abusing Mark or Amy?

20   A.   He stated that he performed sexual acts on his daughter,

21   Amy, and that he has pizza and porn night with his kids and

22   sometimes he'll masturbate with Mark.

23   Q.   Did you discuss anything with Mr. Clarke during your

24   interview about Skype?

25   A.   Yes.

1  Q.  At first, what did you tell Mr. Clarke about Skype?

2  A.  I told him that we do not have access to the video

3  conversation that he and Jaye had.

4  Q.  Did you tell him anything about what Jaye was doing at that

5  time?

6  A.  I told him that Jaye was being interviewed at another

7  location by agents.

8  Q.  And did you tell him anything about how that interview was

9  going related to Skype?

10 A.  I told him that Jaye had explained to the agents that they

11 had this online -- or video conversation, and that in the

12 conversation Mr. Clarke had stated that he wanted to perform

13 sexual acts with the children, Mark and Amy.

14 Q.  And did you tell Mr. Clarke anything about whether or not

15 you could get access to a copy or record of the Skype

16 conversation he had with Jaye?

17 A.  Yes.  I told him I didn't have access to that.

18 Q.  Okay.  Was that true?

19 A.  No.

20 Q.  After you told Mr. Clarke that you would not be able to get

21 a copy of the content of the Skype video chat that he had with

22 Mr. Clarke, what did Mr. Clarke say?

23 A.  Mr. Clarke told me that he had made it very clear to Jaye

24 that he was only interested in meeting with him and talking with

25 him.

1    Q.  And did Mr. Clarke say when he told Jaye that?

2    A.  During this Skype conversation.

3    Q.  All right.  Have you reviewed this Skype video conversation

4    between Jaye and Mr. Clarke?

5    A.  Yes.

6    Q.  At any point during that Skype video conversation, did

7    Clarke say that he did not want to engage in sexual activity

8    with Mark and Amy?

9    A.  No, he did not.

10   Q.  What in fact did Mr. Clarke say during this Skype video chat

11   with Jaye about wanting to engage in sexual activity with Mark

12   and Amy?

13   A.  He stated he did want to do those acts.

14   Q.  You have a binder in front of you.  Can you turn to

15   Exhibit 8, please.

16   A.  Eight?  Is that what you said?

17   Q.  Eight, please.  Do you recognize that document?

18   A.  Yes, I do.

19   Q.  What is it?

20   A.  It's a copy of an email between Jaye and VaRing419.

21   Q.  That was Mr. Clarke; is that right?

22   A.  Yes, sir.

23   Q.  Did you have any printed out emails with you when you

24   interviewed Mr. Clarke?

25   A.  Yes, I did.

1    Q.   Was Exhibit 8 one of the emails that you had with you?

2    A.   Yes.

3    Q.   What, if anything, did you do with Exhibit 8 when you were

4    interviewing Mr. Clarke?

5    A.   I read the email to him verbatim.

6    Q.   Briefly, what is part of the email that you read to

7    Mr. Clarke?

8    A.   That not bi, but I have an 8-year-old son.  Don't really

9    play with him, although he has helped me masturbate a few times.

10   The girl is great at oral and anal.

11        And Mr. Clarke responded, OMG, you have son!  We need to

12   meet, smiley face.

13   Q.   You read that email to Mr. Clarke during the interview?

14   A.   Yes, I did.

15   Q.   What did Mr. Clarke say in response to your reading that

16   email?

17   A.   He stated that it was awful and it was undefendable.

18   Q.   Did you ask Mr. Clarke why he traveled to the McDonald's?

19   A.   Yes, I did.

20   Q.   What did Mr. Clarke say at first?

21   A.   That he was there to meet and talk with Jaye.

22   Q.   Did you ask Mr. Clarke if he planned on engaging in sexual

23   activity with Mark and Amy?

24   A.   Yes, I did.

25   Q.   At first, what did Mr. Clarke say?

1  A.  That he did not plan to do that.

2  Q.  Did Mr. Clarke's answer with respect to that ever change?

3  A.  Yes, it did.

4  Q.  What did he say?

5  A.  He eventually said that he possibly would consider it in the

6  long run.

7  Q.  And what did it mean in that context?

8  A.  Having sex with children.

9  Q.  During your interview with Mr. Clarke, did he ever discuss

10  fantasy or role-playing?

11  A.  Yes.

12  Q.  At first, what did Mr. Clarke say about fantasy or

13  role-playing?

14  A.  He said that that was what he was into.  That it was just a

15  fantasy chat that he was having.

16  Q.  Is that the chats with Jaye that he was talking about?

17  A.  Yes.

18  Q.  After Mr. Clarke said that his chats with Jaye were just a

19  fantasy, did either you or Special Agent Snyder say anything in

20  response?

21  A.  Yes.

22  Q.  What did -- what was said?

23  A.  Special Agent Snyder explained to Mr. Clarke that Jaye made

24  it very clear during his conversations that he does not believe

25  in role-play or fantasy, and that Mr. Clarke agreed with Mr. --

1    with Jaye's statement, that he didn't believe that as well, and

2    he stated he stood by that statement.

3    Q.  So just to break it down, what was said when?

4        Special Agent Snyder said during the conversations with Jaye

5    that both Jaye and Mr. Clarke said they did not believe in

6    fantasy and role-play; is that right?

7    A.  Yes.

8    Q.  And then during your interview with Mr. Clarke after he was

9    told that, what did Mr. Clarke say?

10   A.  He said he stood by that statement.

11   Q.  Did you ask Mr. Clarke if he ever called the police

12   regarding Jaye?

13   A.  Yes, I did.

14   Q.  What did he say?

15   A.  He did not.

16   Q.  Was your interview with Mr. Clarke recorded?

17   A.  Yes, it was.

18   Q.  Can you turn to Exhibit 41 in the binder, please.

19   A.  Okay.

20   Q.  Do you recognize Exhibit 41?

21   A.  Yes, I do.

22   Q.  What is it?

23   A.  It's an official copy of the video/audio recording of my

24   conversation with Mr. Clarke on that day.

25   Q.  Are your initials on it?

1    A.  Yes, they are.

2            MR. GARDNER:  Your Honor, at this time the government

3    moves to admit Exhibit 41.

4            MR. BENOWITZ:  No objection.

5            THE COURT:  It's admitted.

6    BY MR. GARDNER:

7    Q.  Did you obtain a search warrant for Mr. Clarke's car?

8    A.  Yes.

9    Q.  Can you turn in the binder to Exhibit 27, please.

10   A.  Okay.

11   Q.  Do you recognize that picture?

12   A.  Yes, I do.

13   Q.  What is it?

14   A.  It's Mr. Clarke's vehicle.  It was taken when we executed

15   the search warrant in November.  And that vehicle's located at

16   the secured impound lot, Virginia State Police impound lot in

17   Fairfax, Virginia.

18   Q.  Is this the car you searched?

19   A.  Yes, it is.

20   Q.  And this picture was taken actually in the impound lot; is

21   that right?

22   A.  Yes.

23   Q.  And that's where you searched the car?

24   A.  Yes.

25   Q.  Can you turn to the next page, which is Exhibit 28, please.

1        Do you recognize that picture?

2   A.   Yes, I do.

3   Q.   What's contained in that picture?

4   A.   It's a picture of the Virginia registration with the name

5   William Andrew Clarke written on it.

6   Q.   Where did you find that document?

7   A.   In the vehicle.

8   Q.   Can you turn to the next exhibit, Exhibit 29, please.

9        Do you recognize that document?

10  A.   Yes.

11  Q.   Briefly, what is that?

12  A.   It's a picture with a bunch of writing.  It was located

13  inside the vehicle.  One of the handwritten items has

14  VaAndy@aol.com on it.

15  Q.   Where did you find this?

16  A.   In the vehicle.

17  Q.   In the vehicle.  Turning next to Exhibit 30, please.  Do you

18  recognize that photograph?

19  A.   Yes.

20  Q.   What is that a photograph of?

21  A.   It's a picture of Mr. Clarke's trunk, and it has an

22  overnight bag in there.

23  Q.   And can you turn next to Exhibit 31, please.  Do you

24  recognize that photograph?

25  A.   Yes.

1  Q.  What is depicted in this photograph?

2  A.  It's a picture of the center console.  And it has a --

3  Q.  Stopping right there.  The center console?

4  A.  Of Mr. Clarke's vehicle.

5  Q.  Okay.

6  A.  It has a -- it's a picture of lubrication.

7  Q.  And what, if anything, did you find underneath the

8  lubrication that's depicted in this picture?

9  A.  Condoms.

10  Q.  Turning next to Exhibits 32 and 33, if you could take a look

11  at both of those exhibits, please.

12      Do you recognize those two -- I'm sorry.  Do you recognize

13  those two exhibits?

14  A.  Yes.

15  Q.  What's depicted in those two pictures?

16  A.  It's a piece of notebook paper.  No. 31 -- or 32, excuse me,

17  on the left-hand side, it has a handwritten note.  It says, Jaye

18  52.  Below that it says, Amy 9, and below that it says, Mark 8.

19      Below that is a cellphone number, which is Special Agent

20  Laws's UC cellphone number.

21  Q.  UC?

22  A.  The undercover cellphone number.

23  Q.  What's on the right-hand side?

24  A.  On the right-hand side is the name Jeff with 40 written next

25  to it, and below that is the name Noah, and then below that is

1    the name Logan.

2    Q.  Where did you find this document?

3    A.  In Mr. Clarke's vehicle.

4    Q.  The piece of paper depicted in Government's Exhibit 32

5    mentions the name Jeff, Noah, and Logan.

6        Did you investigate whether or not to the best of your

7    knowledge Mr. Clarke has sexually abused two children by the

8    name of Noah and Logan?

9    A.  Yes.

10   Q.  And what were you able to conclude?

11   A.  That he did not have any sexual encounters with those two

12   children.

13   Q.  Did you identify if Mr. Clarke knows children by the name of

14   either Noah or Logan?

15   A.  Yes, he does.

16   Q.  And are they brothers?

17   A.  No, they're not.  They're not related whatsoever.

18   Q.  Okay.  How many Logans were you able to identify that he

19   knows?

20   A.  There's one Logan and two Noahs.

21   Q.  Two different Noahs.  Are all three of them unrelated?

22   A.  They are all unrelated.

23        MR. GARDNER:  Thank you, Your Honor.  No further

24   questions at this time.

25        I apologize.  The government moves to admit Exhibits 28

1   through 33 at this time.

2          MR. BENOWITZ:  Your Honor, can we approach on that

3   issue?

4      (Conference at the bench, as follows:)

5          MR. BENOWITZ:  Your Honor, we'd object to the admission

6   of Exhibits 28 through 33.  The government hasn't established

7   the chain of custody.

8          They haven't established that the condition of the car

9   is the same from when Trooper Brown delivered it to when Agent

10  Eyler searched it six weeks later.

11         THE COURT:  Said it was in the police impoundment lot.

12         MR. BENOWITZ:  Your Honor, my understanding -- well, I

13  don't -- there hasn't been any testimony by either Agent Brown

14  or Agent Eyler that any record was made or any effort was made

15  to make sure there had been no change.

16         THE COURT:  I think that's sufficient.  They said it

17  was in the police impoundment lot.  Objection overruled.

18     (Thereupon, the following proceedings continued in open

19  court:)

20         MR. GARDNER:  Two more brief questions, if I may, Your

21  Honor.

22  BY MR. GARDNER:

23  Q.  With the assistance of the courtroom security officer, I'd

24  like to show you what's been marked for identification as

25  Government's Exhibit 43.

1        Do you recognize that?

2    A.   Yes, I do.

3    Q.   What is that?

4    A.   It's the piece of paper that is also labeled as Exhibit 32.

5              MR. GARDNER:  All right.  Your Honor, at this time the

6    government would move to admit Exhibit 43 as well as Exhibits 28

7    through 33.

8              THE COURT:  All right.  They're admitted.

9              MR. BENOWITZ:  Your Honor, just for the record, I make

10   the same objection.

11             THE COURT:  It's already on the record.

12             Do you have any questions?

13             MR. BENOWITZ:  Yes, Your Honor.

14                        **CROSS-EXAMINATION**

15   BY MR. BENOWITZ:

16   Q.   Good afternoon, Agent Eyler.

17   A.   Good afternoon -- morning.

18   Q.   Now, when you started investigating Mr. Clarke, you were

19   working with Agent Snyder, correct?

20   A.   Well, we're part of a task force.  So there's nine of us

21   that sit together.

22   Q.   Okay.  But you were working with him on this investigation,

23   right?

24   A.   He assisted me in the interview, yes, sir.

25   Q.   Okay.  Well, even before that, there was an operational plan

 1   created to arrest Mr. Clarke, right?

 2   A.   Yes, sir.

 3   Q.   Okay.  And who created that plan?

 4   A.   Special Agent Snyder.

 5   Q.   All right.  And you reviewed that plan, correct?

 6   A.   Yes.

 7   Q.   In fact, the goal, as it's stated in the operational plan,

 8   was to arrest Mr. Clarke for traveling with the intent to have

 9   sex with a child under 12, right?

10   A.   Correct.

11   Q.   Okay.  In fact, I'm going to show you what I'm going to mark

12   as Defendant's Exhibit 7.

13       I believe you have in your hand Defendant's Exhibit 7 for

14   identification.

15   A.   Yes, sir.

16   Q.   That's a copy of page 1 of the Bureau of Criminal

17   Investigation, Operational Plan, right?

18   A.   Yes, sir.

19   Q.   And in the operational objectives' section, it says to

20   safely and expeditiously execute and arrest at the above-named

21   target location, William Clarke, for traveling with intent to

22   engage in a sexual act with a child under the age of 12.

23       Is that right?

24   A.   Yes.

25   Q.   All right.  So that's what you're intending to do?

1  A.  Correct.

2  Q.  And this copy of this operational plan looks the same as

3  when you saw it originally?

4  A.  Yes, sir.

5  Q.  All right.  Now, I want to talk to you -- I have some

6  questions for you about the interview that you conducted with

7  Mr. Clarke.

8     He was cooperative with you throughout the interview; isn't

9  that right?

10 A.  Yes, sir.

11 Q.  And when you interviewed Mr. Clarke, you had goals that you

12 were trying to achieve; is that right?

13 A.  Yes.

14 Q.  One goal was to get Mr. Clarke to speak about his

15 communications with Jaye, the undercover?

16 A.  Yes.

17 Q.  And at first -- at first, you led Mr. Clarke to believe that

18 Jaye had also been arrested?

19 A.  Yes.

20 Q.  Of course, that wasn't really true?

21 A.  No, it's not.

22 Q.  All right.  And another goal of the interview was to have

23 Mr. Clarke tell you that he had intended to have sex with Jaye's

24 fictitious children after traveling to meet?

25 A.  Yes.

1   Q.  And your questions during the interview were directed toward

2   those goals?

3   A.  Yes.

4   Q.  Because that was the type of criminal charge you were

5   pursuing?

6   A.  Yes.

7   Q.  All right.  And during the interview, Jaye told you that --

8   I'm sorry -- Mr. Clarke told you that Jaye had contacted him

9   first, right?

10  A.  I believe so, yes.

11  Q.  And that was in fact true?

12  A.  Yes.

13  Q.  And at one point, Mr. Clarke told you that he didn't see any

14  harm meeting Jaye in a public place where absolutely there could

15  be no question of anything inappropriate, just talking to him?

16  A.  Yes.

17  Q.  And Mr. Clarke told you that Jaye had asked him to bring a

18  toy for the kids, right?

19  A.  Yes, sir.

20  Q.  And you know based on your search of Mr. Clarke's vehicle

21  that he did not bring a toy for the kids?

22  A.  No, he did not.

23  Q.  And Mr. Clarke told you during the interview that he had

24  seen that one of the pictures Jaye sent to him had a number

25  PD078 on the back, right?

1  A.  Yes, sir.

2  Q.  In fact, that initial meant police department; isn't that

3  right?

4  A.  I have no idea what that meant.

5        MR. BENOWITZ:  Okay.  Court's indulgence.

6  BY MR. BENOWITZ:

7  Q.  Now, I want to talk to you a little bit about this pizza and

8  porn routine that was part of Jaye's scenario.

9        Mr. Clarke told you that Jaye had told him about this

10  regular routine that Jaye had set up with having sex with his

11  son and daughter, right?

12  A.  Yes.

13  Q.  And it was called pizza and porn night?

14  A.  Yes.

15  Q.  And Jaye -- according to Mr. Clarke, Jaye had told him that

16  he was having pizza and porn night every Friday for the past

17  three years with his kids?

18  A.  I believe so, yes, sir.

19  Q.  Now, as part of the interview, Mr. Clarke had talked about

20  being sexually active with the children of his college roommate,

21  Jeff?

22  A.  Yes.

23  Q.  And he gave the names of the children?

24  A.  Yes.

25  Q.  And in the interview with you, he said that was all made up?

1   A.  Correct.

2   Q.  In fact, based on your investigation, it was all made up?

3   A.  Yes, sir.

4   Q.  In fact, that Jeff doesn't actually even have any kids,

5   right?

6   A.  Correct.

7   Q.  Did you actually do any followup investigation with respect

8   to Mr. Clarke's college roommate, Jeff Miller?

9   A.  I spoke to Jeremy Miller and Noah Miller.

10  Q.  Okay.  Now, Mr. Clarke was originally charged with crimes in

11  Virginia state court; isn't that right?

12  A.  Yes, sir.

13  Q.  And those charges were eventually dismissed when the case

14  was now brought into federal court, right?

15  A.  Yes, sir.

16  Q.  Now, with respect to the followup investigation you did

17  regarding the children, Noah and Logan, you did some interviews

18  of these kids, Noah and Logan; is that right?

19  A.  I didn't conduct the interview of Logan, but I did speak

20  with Noah.

21  Q.  Okay.  Well, agents did?

22  A.  Yes, sir.

23  Q.  And those were not conducted until February 5th and

24  February 10th of this year?

25  A.  Correct.

1   Q.  Of course, the interview with Mr. Clarke took place

2   October 11, 2013.

3   A.  Correct.

4           THE COURT:  Counsel, it's time for us to recess for

5   lunch.  We'll recess until 2:15.

6       (Lunch recess taken at 12:57 p.m. until 2:18 p.m.)

7           THE COURT:  All right.

8           MR. BENOWITZ:  Thank you, Your Honor.

9   BY MR. BENOWITZ:

10  Q.  Good afternoon, Agent Eyler.

11  A.  How are you?

12  Q.  Good, thanks.  How are you?

13  A.  Good.

14  Q.  Now, Agent Eyler, you said before, before we broke for

15  lunch, you said that interviews or investigation had been done

16  and agents had spoken to someone named Jeff Miller.

17  A.  No.

18  Q.  Okay.  Did you mean Jeff Mills?

19  A.  No.  I spoke with Jeremy Mills.

20  Q.  Jeremy Mills, not Miller?

21  A.  Yes, sir.

22  Q.  And you never spoke to anyone named Jeff Miller?

23  A.  No, sir.

24  Q.  And as far as you know, no agents spoke to anyone named Jeff

25  Miller?

1  A.  No, sir.

2  Q.  Now, I want to focus your attention on the search of

3  Mr. Clarke's car which occurred at the end of November 2013.

4  A.  Okay.

5  Q.  When that search was done, there was no children's toy found

6  in the car, correct?

7  A.  No, sir.

8  Q.  Meaning that there wasn't?

9  A.  No, it was not found.

10 Q.  Okay.  There was no -- there were no sex toys found in the

11 car?

12 A.  No.

13 Q.  And the car was seized on the day that Mr. Clarke was

14 arrested?

15 A.  Yes.

16 Q.  All right.  And it wasn't -- again, it was searched at the

17 end of November?

18 A.  Yes.

19 Q.  All right.  Now, I want to go back and talk -- I have a few

20 more questions about the interview you conducted with

21 Mr. Clarke.

22     At one point in the interview, Mr. Clarke said that what he

23 was -- that what he had done was wrong and inappropriate, right?

24 A.  Yes.

25 Q.  And that he had made a bad mistake?

1    A.   Yes.

2    Q.   And towards the end of the interview, you told Mr. Clarke

3    that while meeting Jaye wasn't illegal, it was what he and Jaye

4    had talked about doing once they met that was illegal?

5    A.   Yes, sir.

6    Q.   All right.  Now, you know Mr. Clarke is not charged with

7    traveling from one state to another with the intent to have sex

8    with a minor, right?

9    A.   Correct.

10   Q.   Okay.  And you know what he is in fact charged with?

11   A.   Yes, sir.

12   Q.   Now, during the interview Mr. Clarke never told you that

13   he'd offered money to Jaye in exchange for sex with the

14   fictitious children, right?

15   A.   Correct.

16   Q.   He never told you he'd offered drugs to Jaye in exchange for

17   access to the children?

18   A.   Correct.

19   Q.   Never told you he'd offered anything of value to Jaye in

20   exchange for access to the children?

21   A.   Correct.

22   Q.   And he never told you that he'd offered any money to the

23   kids through Jaye?

24   A.   Correct.

25   Q.   He never told you that he'd offered toys to the fictitious

1  kids through Jaye?

2  A.  Correct.

3  Q.  And never told you that he made any promises to the

4  fictitious kids through Jaye?

5  A.  Correct.

6  Q.  And based on your investigation, Mr. Clarke never directly

7  communicated with anyone he thought was a minor during this

8  case?

9  A.  Correct.

10          MR. BENOWITZ:  Court's indulgence.

11          I have nothing further.

12          MR. GARDNER:  Thank you, Your Honor.

13                    **REDIRECT EXAMINATION**

14  BY MR. GARDNER:

15  Q.  Good afternoon.

16  A.  Hello.

17  Q.  In October of 2013, you knew that Mr. Clarke had told Jaye

18  that he had molested two children, Noah and Logan; is that

19  right?

20  A.  Yes.

21  Q.  At that time in October of 2013, did you know the identities

22  of Jeff, Noah, or Logan?

23  A.  No.

24  Q.  When did you start trying to determine their identities?

25  A.  Sometime in January and then finally this past February,

1    this year.

2    Q.  Okay.  And you mentioned that in your search of the vehicle

3    there were no toys found; is that correct?

4    A.  Correct.

5    Q.  With the assistance of the courtroom security officer, I

6    would like to show you what's been marked for identification as

7    Government's Exhibit 50.  I'm providing a copy to defense.

8        Do you recognize that photograph?

9            MR. BENOWITZ:  Objection.  Beyond the scope.

10            THE COURT:  Objection overruled.

11            MR. BENOWITZ:  Can we approach, Your Honor?

12            THE COURT:  Yes.

13      (Conference at the bench, as follows:)

14            MR. BENOWITZ:  Your Honor, it appears the government's

15    going to seek to introduce an exhibit showing that there was

16    some candy found in the trunk of the car.  I didn't raise that

17    on cross-examination and the government didn't raise it on

18    direct.

19            THE COURT:  You did raise it.  You asked about toys.

20            MR. BENOWITZ:  Yeah, and this is not toys.  This is not

21    a picture of toys.

22            THE COURT:  It's the same thing.  It's gifts for kids.

23            MR. BENOWITZ:  Well, Your Honor, then I'd ask to be

24    able to have some followup questions based on what the

25    government's asking, do a recross.

 1          THE COURT:  When he finishes, you can ask those

 2  questions.

 3      (Thereupon, the following proceedings continued in open

 4  court:)

 5  BY MR. GARDNER:

 6  Q.  Do you recognize Exhibit 50?

 7  A.  Yes, I do.

 8  Q.  What is it?

 9  A.  It's a picture of a bag of mixed candy.

10  Q.  And where was that picture taken to the best of your

11  knowledge?

12  A.  From Mr. Clarke's vehicle.

13  Q.  When did you -- did you see that as part of your search of

14  Mr. Clarke's car?

15  A.  Yes.

16  Q.  In the bag, was there also a letter addressed to Brandy?

17  A.  Yes, there was.

18          MR. GARDNER:  No further questions.  Thank you, Your

19  Honor.

20          MR. BENOWITZ:  Thank you, Your Honor.

21                    **RECROSS EXAMINATION**

22  BY MR. BENOWITZ:

23  Q.  Agent Eyler, when Mr. Gardner was asking you questions, you

24  referred to finding a letter.  Was it actually a card?

25  A.  I know it's an envelope.  I never opened it so I don't know

1    what's inside.

2    Q.  You never opened the envelope?

3    A.  I did not.

4    Q.  Okay.  I'm going to show you what's been marked as

5    Defendant's Exhibit 3.

6        I'm showing you what's been marked as Defendant's Exhibit 3.

7    Is that the envelope that you saw?

8    A.  Yes, sir.

9    Q.  And on that envelope, it says the word Brandy, right?

10   A.  Yes.

11   Q.  And you said you never looked inside?

12   A.  I did not.

13   Q.  Do you know if any law enforcement agent looked inside the

14   envelope?

15   A.  No, I do not.

16   Q.  Now, during your interview with Mr. Clarke, Mr. Clarke

17   mentioned that he had a friend named Brandy who was having

18   surgery that coming weekend that he had come up to Fairfax;

19   isn't that right?

20   A.  Yes, sir.

21   Q.  And he also told you that Jaye had asked him to bring candy

22   for him and the kids; isn't that right?

23   A.  Yes, I believe so.

24           MR. BENOWITZ:  Court's indulgence.  Nothing further.

25           THE COURT:  All right.  Thank you.  You may step down.

1    (Witness stands down.)

2         Do you have anything else?

3         MR. GARDNER:  No further evidence, Your Honor.  The

4    government rests.

5         THE COURT:  All right.  The government rests.  Do

6    you-all have --

7         MR. BENOWITZ:  Your Honor, we have a motion to make.

8         THE COURT:  All right.  Let's approach the bench.

9       (Conference at the bench, as follows:)

10        MR. BENOWITZ:  Your Honor, pursuant to Rule 29, even

11   looking at the evidence in the light most favorable to the

12   government, we don't believe that the evidence presented by the

13   government here is a sufficient to sustain a conviction on the

14   sole charge against Mr. Clarke, which is a violation of

15   18 U.S.C. 2422(b).

16        All of the evidence here that the government's

17   presented is tailored specifically to a violation of 18 U.S.C.

18   2423(b), which is travel with intent to engage in illicit sexual

19   conduct.  Of course, here the evidence will show that Mr. Clarke

20   never traveled interstate.  So that charge wouldn't survive

21   either.

22        But the -- it's clear, and the government witnesses

23   have admitted, they were looking -- they were investigating

24   Mr. Clarke for travel to engage in illegal sex with a minor.

25   The evidence has nothing to do with the -- has nothing to do

with persuasion, inducement, coercion, or enticement of a minor
here or the attempt to do so.  The evidence isn't directed to
that charge.

It's clear, and Fourth Circuit case law is clear, that
the government has to show that Mr. Clarke intended to cause the
assent or to transform the will of a minor through persuasion,
inducement, coercion, or enticement, not that he acted with the
specific intent to engage in sexual activity.

The communications here -- the communications here,
whether it by phone, Skype, or on the Internet, don't show an
attempt by Mr. Clarke to persuade, induce, coerce, or entice
fictitious children.  In particular here where there is an adult
intermediary that's being used, there still has to be an intent
or the government still has to show that Mr. Clarke was
attempting to induce, persuade, coerce, or entice the children
through the intermediary.  They just haven't shown it here.

For all of the reasons we've stated in open court
through our questions, there's been, again, no promises made, no
attempt to communicate with the children.  There's been no
offers of any sort of toys or other inducements.  Again, no
attempt to persuade at all.

MR. GARDNER:  Your Honor, this was similar to the
defense's pretrial motion saying that coercion through an adult
intermediary isn't sufficient.  The case law is overwhelming
that coercion through an adult intermediary is legally

1    sufficient to be a violation of statute, including cases such as

2    *United States of America v. Hite*, the recent D.C. Circuit case.

3            It's just what the government's shown here.  There

4    doesn't have to be back and forth bribing with the children.  In

5    fact, there doesn't have to be any direct communication with the

6    children so long as the defendant is trying to overcome their

7    will to make them -- to coerce them or persuade them or entice

8    them into engaging in illicit sexual activity.  That's just what

9    he was doing here.  He was using Jaye to coerce the children

10   into having sex with him.  That's legally sufficient.

11           THE COURT:  I find there's ample evidence to go

12   forward, and your motion will be denied.

13           Are you going to present any evidence?

14           MR. BENOWITZ:  Yes, Your Honor.

15           THE COURT:  Okay.

16      (Thereupon, the following proceedings continued in open

17   court:)

18           MR. GARDNER:  Your Honor, just one point of

19   clarification between the parties.  It was my understanding that

20   the government did move to admit Government's Exhibit 50.  I

21   just wanted to make the record clear on that.

22           THE COURT:  Government's Exhibit 50?  You want it in?

23           MR. GARDNER:  Yes, Your Honor.

24           THE COURT:  All right.

25           MR. BENOWITZ:  We don't object, Your Honor.

1          THE COURT:  All right.  It's been entered.

2          All right.  Would you call your first witness.

3          MS. PORTER:  I'm going to bring an exhibit up to pass

4    up to the witness.  Thank you very much.

5          Your Honor, the defense would call Jeff Mills.

6                        **JEFFREY C. MILLS,**

7               after having been duly sworn or affirmed,

8               took the stand and testified as follows:

9                      **DIRECT EXAMINATION**

10   BY MS. PORTER:

11   Q.  Good afternoon, sir.

12   A.  Hi.

13   Q.  If you could please state your full name for the jury.

14   A.  Jeffrey Calvin Mills.

15   Q.  Mr. Mills, how old are you?

16   A.  Almost 43.

17   Q.  Okay.  How are you employed?

18   A.  I work two jobs.  I work in a grocery store and in a

19   financial office.

20   Q.  What city and state do you reside?

21   A.  Near Roanoke, Virginia.

22   Q.  Are you married?

23   A.  No.

24   Q.  Have you ever been married?

25   A.  No.

1   Q.   Do you have children?

2   A.   No.

3   Q.   Do you know my client, Mr. William Andrew Clarke?

4   A.   Yes, sir.

5   Q.   And what name do you know him by?

6   A.   Andy.

7   Q.   How do you know Mr. Clarke?

8   A.   We met in college.

9        MS. PORTER:  Your Honor, we'd ask the Court to

10  recognize that the witness has identified the defendant,

11  Mr. Clarke.

12       THE COURT:  He's identified him.

13       MS. PORTER:  Thank you.

14  BY MS. PORTER:

15  Q.   What college did you attend together?

16  A.   Bridgewater College.

17  Q.   Where is that located?

18  A.   In Bridgewater, Virginia.

19  Q.   What years did you attend there?

20  A.   I was there from '90 to '94.

21  Q.   In what capacity did you know Mr. Clarke?

22  A.   We lived next door to each other in the dorm.

23  Q.   Would you consider him being your friend back then?

24  A.   Yes.

25  Q.   Were you familiar with Mr. Clarke's circle of friends from

1  Bridgewater College?

2  A.  A number of them, yes.

3  Q.  Okay.  Were there any other persons who went by the name

4  Jeff that you are aware of?

5  A.  Yes.

6  Q.  Who was that?

7  A.  His name was Jeff Miller.

8  Q.  If you know, do you know whether or not Jeff Miller is

9  married?

10  A.  I don't know.

11  Q.  Prior to this date, sir, when is the last time that you saw

12  Andrew -- excuse me -- Mr. Clarke?

13  A.  If I had to guess, I would say it's probably been ten years,

14  maybe more or less.

15  Q.  Do you recall where that was?

16  A.  I think it was in Roanoke.

17  Q.  Mr. Mills, do you have a brother named Jeremy Mills?

18  A.  Yes.

19  Q.  How old is Jeremy?

20  A.  He is -- gosh, I guess he just turned 41, 42.  41.

21  Q.  Okay.  Did he also attend Bridgewater College?

22  A.  Yes.

23  Q.  Was it within one or two years of when you attended as well?

24  A.  Yes.  He was two years behind me.

25  Q.  Was Jeremy, your brother, was he also in the circle of

1    friends with you and Mr. Clarke?

2    A.   Yes.

3    Q.   Is Jeremy married?

4    A.   Yes.

5    Q.   Does he have children?

6    A.   Yes.

7    Q.   How many?

8    A.   He has two, a boy and a girl.

9    Q.   What is -- what are their names?

10   A.   Noah and Olivia.

11   Q.   How old is Noah?

12   A.   Noah is 15.

13   Q.   And have you ever seen Mr. Clarke in the presence of your

14   nephew, Noah?

15   A.   Not until today.

16   Q.   Has anyone from a police department or a federal law

17   enforcement agency ever contacted you about Mr. Clarke?

18   A.   No.

19          MS. PORTER:  I have no further questions.  The

20   government may have some questions for you.

21          MR. GARDNER:  No questions, Your Honor.

22          THE COURT:  All right.  You may step down and may be

23   excused.  (Witness stands down.)

24          MS. PORTER:  Our next witness, Your Honor, is Jeremy

25   Mills.

1                          **JEREMY W. MILLS,**

2                  after having been duly sworn or affirmed,

3                  took the stand and testified as follows:

4                          **DIRECT EXAMINATION**

5    BY MS. PORTER:

6    Q.  Good afternoon, sir.

7    A.  Hi.

8    Q.  Could you please state your full name and your occupation

9    for the jury.

10   A.  Jeremy William Mills.  I work for the Norfolk Southern

11   Railroad.

12   Q.  How old are you?

13   A.  41.

14   Q.  In what city and state do you reside?

15   A.  In Culpeper, Virginia.

16   Q.  Are you married?

17   A.  Yes.

18   Q.  Do you have any children?

19   A.  Yes.

20   Q.  How many children do you have?

21   A.  Two.

22   Q.  Boy or girl?

23   A.  A boy and a girl.

24   Q.  What is the boy's name?

25   A.  Noah.

1    Q.  How old is he?

2    A.  He's 15.

3    Q.  What grade is he in?

4    A.  Tenth grade.

5    Q.  And your brother is Jeff Mills?

6    A.  Correct.

7    Q.  And do you know my client, Mr. William Andrew Clarke?

8    A.  Yes.

9    Q.  Do you see him here in the courtroom today?

10   A.  Yes, I do.

11   Q.  Can you describe what he's wearing and where he's seated?

12   A.  Seated to my right with a gray suit.

13        MS. PORTER:  We'd ask the Court to recognize that the

14   witness has identified Mr. Clarke.

15        THE COURT:  He's identified him.

16   BY MS. PORTER:

17   Q.  How do you know him?

18   A.  From Bridgewater College.

19   Q.  In what capacity?

20   A.  We were both students.

21   Q.  Did you live near one another?

22   A.  Yes.

23   Q.  Okay.  Can you explain -- in the same apartment or dorm?

24   A.  Same dorm.  We were on the same hall for a year, I suppose.

25   Q.  Okay.  Did you consider Mr. Clarke to be one of your

1   friends?

2   A.  Yes.

3   Q.  Were you familiar with the other individuals who were part

4   of his circle of friends?

5   A.  Yes.

6   Q.  And was there anyone else other than your brother, Jeff

7   Mills, that went by the first name Jeff that was part of the

8   circle of friends?

9   A.  Yes.

10  Q.  Who was that?

11  A.  Jeff Miller.

12  Q.  To your knowledge is Jeff Miller married?

13  A.  Not to my knowledge, no.

14  Q.  When was the last time you saw Mr. Clarke?

15  A.  Before today, I think 1997.

16  Q.  Where was that?

17  A.  In Harrisonburg, Virginia.

18  Q.  Was that before your son, Noah, was born?

19  A.  Yes.

20  Q.  To your knowledge has Noah ever met Mr. Clarke?

21  A.  No, ma'am.

22  Q.  To your knowledge has Noah ever spoken or communicated with

23  Mr. Clarke via phone, email, instant messaging, or through

24  Facebook?

25  A.  No, ma'am.

```
 1   Q.  Do you have access to Noah's email and Facebook accounts?
 2   A.  Yes.
 3   Q.  And have you checked them to confirm the question I just
 4   asked you?
 5   A.  Yes.
 6   Q.  When did you do that?
 7   A.  It was a month or so ago.  It was when we learned of this
 8   case that my wife and I checked his email account and Facebook
 9   and found nothing out of the ordinary.
10   Q.  How did you learn about this case?
11   A.  I was contacted by the -- your office by an investigator.
12   Q.  Has anyone from any police department or federal law
13   enforcement agency or the U.S. Attorney's Office ever contacted
14   you about Mr. Clarke?
15   A.  No.  Well, they contacted me a couple of weeks ago.  They
16   went to my son's school and interviewed him, and then contacted
17   me to let me know what they had done.
18   Q.  Was that the same day, your understanding, that they
19   contacted you is when they went to Noah's school?
20   A.  Yes.
21   Q.  Okay.  And was that communication that you had with law
22   enforcement before or after I had called you about this case?
23   A.  It was after.
24   Q.  And was it before or after you received a subpoena by the
25   defense in this case?
```

1   A.  It was -- it was before I actually received the subpoena.

2   Q.  But it was after that that I contacted you?

3   A.  Yes, after.  Yes.

4       MS. PORTER:  No further questions for you, Mr. Mills.

5   The government may have some questions for you.

6       MR. GARDNER:  No questions, Your Honor.

7       THE COURT:  All right.  Thank you.  You may step down

8   and may be excused.  (Witness stands down.)

9       MS. PORTER:  Your Honor, our next witness is Noah

10  Mills.

11                      **NOAH J. MILLS,**

12          after having been duly sworn or affirmed,

13          took the stand and testified as follows:

14                   **DIRECT EXAMINATION**

15  BY MS. PORTER:

16  Q.  Hi, Noah.  Can you please state your full name for the jury,

17  please.

18  A.  Noah James Mills.

19  Q.  Noah, how old are you?

20  A.  15.

21  Q.  What grade are you in?

22  A.  Tenth.

23  Q.  What high school do you go to?

24  A.  Culpeper County High School.

25  Q.  Do you know this man, my client, Mr. Clarke, the individual

1    in the red tie?

2    A.   No.

3    Q.   Have you ever seen him before today?

4    A.   No, ma'am.

5    Q.   Have you ever communicated with him via phone, email,

6    instant messaging, or through Facebook?

7    A.   No, ma'am.

8    Q.   Has he ever tried to communicate or meet you in any way?

9    A.   No, ma'am.

10   Q.   Do you recall someone from a law enforcement agency coming

11   to your school and talking to you?

12   A.   Yes.

13   Q.   Do you remember when this happened?

14   A.   It was not this previous Tuesday, but the one before that.

15   Q.   About two weeks ago or so?

16   A.   Yes.

17        MS. PORTER:  I don't have any further questions.  The

18   government may have some questions for you.

19        MR. GARDNER:  No questions.  Thank you.

20        THE COURT:  Thank you.  You may step down and may be

21   excused.  (Witness stands down.)

22        MS. PORTER:  Our next witness is Jeff Miller.

23                    **JEFFREY K. MILLER,**

24          after having been duly sworn or affirmed,

25          took the stand and testified as follows:

1                    **DIRECT EXAMINATION**

2    BY MS. PORTER:

3    Q.   Good afternoon, Mr. Miller.

4    A.   Hi.

5    Q.   If you could please state your full name and your occupation

6    for the jury.

7    A.   Jeffrey Keith Miller.  I'm a public servant.

8    Q.   How old are you?

9    A.   43.

10   Q.   In what city and state do you reside?

11   A.   Alexandria, Virginia.

12   Q.   Are you married?

13   A.   No.

14   Q.   Have you ever been married?

15   A.   No.

16   Q.   Do you have children?

17   A.   No.

18   Q.   Do you know my client, Mr. Clarke, the gentleman in the suit

19   and the red tie?

20   A.   Yes, I do.

21   Q.   How do you know him?

22   A.   We attended college together.

23   Q.   What college?

24   A.   Bridgewater College.

25   Q.   In what capacity did you know him at Bridgewater College?

1    A.  He was a friend of mine and we socialized.

2    Q.  Did you also socialize or were you friendly with Jeff Mills

3    and Jeremy Mills?

4    A.  I was.

5    Q.  Other than Jeff Mills and yourself, do you have knowledge of

6    anyone else in that circle of friends who went by the first name

7    Jeff?

8    A.  No.

9    Q.  Mr. Miller, have you ever been contacted by the police

10   department or any law enforcement agency about Mr. Clarke?

11   A.  No.

12          MS. PORTER:  No further questions.

13          MR. GARDNER:  No questions, Your Honor.

14          THE COURT:  Thank you.  You may step down and may be

15   excused.  (Witness stands down.)

16          MS. PORTER:  Your Honor, our last witness is James

17   Clarke.

18                    **JAMES E. CLARKE,**

19            after having been duly sworn or affirmed,

20            took the stand and testified as follows:

21                    **DIRECT EXAMINATION**

22   BY MS. PORTER:

23   Q.  Good afternoon, sir.  Please state your full name and your

24   occupation.

25   A.  James Edward Clarke.  I'm an attorney.

```
 1   Q.  Do you know my client, Mr. Clarke?
 2   A.  Yes.  He is my first cousin.
 3   Q.  Can you explain your living arrangement with him to the
 4   jury?
 5   A.  Yes.  William Andrew rents a room in my house in Reston.
 6   Q.  Do you also have other property that you share?
 7   A.  Yes.  We invested in some property down in Essex County,
 8   Virginia, on the water.
 9   Q.  Have you ever had a sexual relationship with him?
10   A.  No.
11   Q.  I'd like to direct your attention back to the late summer of
12   2013.  Did you drive Mr. Clarke's Mercedes back then?  Do you
13   recall?
14   A.  Well, Andrew was on an overseas trip.  And I believe either
15   once or twice I drove the vehicle to make sure that the battery
16   stayed charged.
17   Q.  Okay.  Did he ask you to do that?
18   A.  Yes.
19   Q.  Okay.  Did you have -- did you look inside the center
20   console when you drove the car?
21   A.  I did on one occasion, yes.
22   Q.  Was there anything about that occasion that you noticed and
23   made note of?
24   A.  There were condoms and some type of lubricant in the center
25   console.
```

1    Q.  At the time that you noticed those items in the center

2    console, was this before Mr. Clarke was arrested in October of

3    2013?

4    A.  It would have been late August.  Yes, late August of 2013.

5    Q.  Okay.  Do you know a friend Mr. Clarke's with the first name

6    of Brandy?

7    A.  Yes.

8    Q.  Do you know her full name?

9    A.  Brandy Emmons-Powell.

10   Q.  Do you know how to spell it?

11   A.  I don't know if it's Brandy with an I or a Y, but it's

12   E-M-M-O-N-S, hyphen, Powell, P-O-W-E-L-L.

13   Q.  How do you know Ms. Emmons-Powell?

14   A.  I first met Brandy back in the nineties when she was a

15   roommate of my cousin in Harrisonburg.

16   Q.  And when you say my cousin, are you referring to Mr. Clarke?

17   A.  Yes.

18   Q.  Okay.  Would you be able to identify a photograph of

19   Ms. Emmons-Powell if I showed it to you?

20   A.  Yes.

21        MS. PORTER:  Your Honor, with the assistance of the

22   court security officer, I'd like to ask the witness to identify

23   what's been marked for identification purposes as Defendant's

24   Exhibit No. 5.

25

1  BY MS. PORTER:

2  Q.  Do you recognize the female in that photograph?

3  A.  Yes, I do.  That's Brandy Emmons-Powell.

4         MS. PORTER:  Okay.  Your Honor, at this point the

5  defense would move for the admission of Defendant's Exhibit

6  No. 5.

7         MR. GARDNER:  No objection, Your Honor.

8         THE COURT:  It's admitted.

9  BY MS. PORTER:

10 Q.  Also with the assistance of the court security officer, I'd

11 ask that the witness take a look at what's been marked for

12 identification purposes as Defendant's Exhibit 6.

13    Mr. Clarke, can you take a look at that piece of paper and

14 can you identify the patient name on that record?

15 A.  Yeah.  It appears to be a document from Spotsylvania

16 Regional Medical Center.  The patient is Brandy Ann

17 Emmons-Powell.

18        MS. PORTER:  Your Honor, at this point the defense

19 would like to read into the record a stipulation of the parties.

20        THE COURT:  All right.

21        MS. PORTER:  The defendant and the United States of

22 America for purposes of trial hereby stipulate and agree as

23 follows:

24        Defense Exhibit 6, identified as a redacted medical

25 record of Brandy Emmons-Powell, is a hospital business record

offered to show the patient's date of admittance into surgery.

The record was made at the time the patient was admitted to the hospital, and the record was prepared in the ordinary course of business of the Spotsylvania Regional Medical Center.

Accordingly, as an exception to the rule against hearsay, if called, an agent of the Spotsylvania Regional Medical Center who was custodian of the record would be able to verify its authenticity through testimony.

And Defense Exhibit -- based on that, Your Honor, we offer Defense Exhibit 6 into evidence.

THE COURT:  It's admitted.

MS. PORTER:  Court's indulgence one moment.

Your Honor, at this point by agreement between the parties, the defense offers Defense Exhibit 2.

MR. GARDNER:  No objection, Your Honor.

THE COURT:  It's admitted.

MS. PORTER:  Your Honor, no further questions for this witness.

MR. GARDNER:  No cross, Your Honor.  Thank you.

THE COURT:  Thank you.  You may step down and may be excused.  (Witness stands down.)

MR. BENOWITZ:  Your Honor, we previously laid the foundation for Defendant's Exhibits 3 and 7.  I'd like to move to admit them at this point.

1          MR. GARDNER:  If I could just double check?  No

2     objection.

3          THE COURT:  They're admitted.

4          MS. PORTER:  Your Honor, the defense rests.

5          THE COURT:  Do you have anything further?

6          MR. GARDNER:  Nothing further, Your Honor.

7          THE COURT:  All right.  Ladies and gentlemen, I'll let

8     you-all retire to the jury room.  I have some matters to take up

9     with counsel, and we'll be back with you shortly.

10         (The jury exits at 2:54 p.m.)

11         THE COURT:  All right.  I've taken a look at these

12    instructions.  And the way I do instructions is I will tell you

13    the areas I'm instructing on, and then you can tell me if

14    there's some additional instructions you want.

15         Then I'll go ahead and instruct the jury, and when I

16    finish, I'll give you an opportunity to object if you have any

17    objections that you want to do.

18         As I go through these instructions, if there's

19    something else you want, you need to tell me.  I'm going to use

20    my general instructions for the general instructions in the

21    case, credibility of witnesses and burden of proof and that kind

22    of thing.  What I'm going over with you is the instructions that

23    pertain in particularity to this case.

24         I'll tell them the nature of the offense, read them the

25    code section involved, tell them the essential elements of the

1   offense.  Tell them what facility and means of interstate

2   commerce means.  Explain enticement.  Explain attempted

3   enticement.

4        Define illegal sexual activity under Virginia law.

5   Define knowingly.  Talk about proof of knowledge or intent.

6   Tell them about undercover agents.  Explain disjunctive proof.

7   Define or explain on or about.  Tell them to consider only the

8   offense charged.

9        Is there anything else?

10       MR. GARDNER:  Your Honor, with respect to the

11  interstate and foreign commerce definition, I think the parties

12  submitted two instructions that were different.  The defense

13  required an additional portion that the actual communications

14  crossed state lines.

15       It's the government's position that there's clear case

16  law saying that's not required.  And the government's

17  instruction just says that the use of the Internet would

18  constitute the use of a facility or means of interstate

19  commerce.

20       THE COURT:  Well, I think that's what the law is.  What

21  instruction is that?

22       MR. GARDNER:  It's government's 30 on page 39.

23       THE COURT:  I think the government's a correct

24  statement of the law.  The government doesn't have to prove that

25  this particular communication traveled interstate commerce.  All

1   you have to do is use an interstate facility.

2          MS. PORTER:  Your Honor, we would renew our objection

3   that we previously made about the failure of proof to establish

4   that the Skype communication was a means of interstate or

5   foreign commerce.  There was no evidence to establish that.

6   Therefore, it does not become relevant to this case because it's

7   not linked into the nature of the case or the elements.

8          So based on that, we would renew our objection.  Based

9   on the jury instruction that Your Honor is going to give to the

10  jury, the Skype communication then becomes irrelevant and should

11  be excluded.

12         THE COURT:  Your objection is overruled.  There's

13  messages here that were on interstate communication facilities,

14  and that's sufficient.  Don't have to prove that the message was

15  going from state to state or a foreign country.  A foreign

16  country's a foreign country.

17         MR. GARDNER:  I believe the government does not have

18  any other objections.  Obviously we'll have to hear the full

19  instructions, but I believe that that would be sufficient.

20         THE COURT:  All right.

21         MS. PORTER:  Your Honor, I also submitted a jury

22  instruction instructing the jury about the effect of the

23  defendant's decision not to testify.

24         THE COURT:  I'll tell them about that in my general

25  instructions.  They're not to draw any conclusion from that

1  whatsoever.

2         MS. PORTER:  Your Honor, we also submitted an

3  instruction dealing with law enforcement witnesses.  That was

4  instruction No. 14, page 20.

5         Since all of the government's witnesses were law

6  enforcement, all the defense witnesses were not, there clearly

7  is an imbalance to that effect.  And we would ask the Court to

8  offer that instruction.

9         Defendant's instruction 14 on page 20 of what we

10 submitted.

11        THE COURT:  I'll give that.  I've already told them --

12 well, I told them that in the preliminary.

13        MS. PORTER:  I think it's important enough --

14        THE COURT:  I'll give it to them.

15        MS. PORTER:  Thank you.

16        Just for planning purposes for our argument, is Your

17 Honor taking the instructions from what the parties submitted?

18 Because we reviewed them ahead of time and we do have objections

19 to what the government presented.

20        THE COURT:  Sometimes I do and sometimes I don't.

21        MS. PORTER:  Would we be able to have a copy of what

22 the Court is going to instruct so we can look at it?

23        THE COURT:  No.  You'll be able to listen and you can

24 object when I'm finished.

25        MS. PORTER:  So you're going to recite it to us before

1    the jury comes out, right?

2          THE COURT:  No.  After I instruct the jury, I will give

3    you an opportunity -- you've objected to some things right now.

4    After I instruct the jury, I will give you an opportunity to

5    object to anything that I may have told the jury that you think

6    is incorrect.

7          MS. PORTER:  Respectfully though, then the cat is out

8    of the bag.  The attempt instruction --

9          THE COURT:  I can correct it.  There's nothing out of

10   the bag.  They'll listen to me.  If I bring them back and tell

11   them something else, they'll listen to me.  They take their job

12   seriously.

13         MS. PORTER:  Your Honor, just specifically, the attempt

14   statute, we're completely at odds with the government's

15   definition.  So we just want to make sure, Your Honor, that the

16   language from *Engle*, which is a Fourth Circuit case, dealing

17   with the intent has to be an intent for the defendant to

18   overcome and overbear the will and cause the assent of the

19   minors to engage in sexual activity.

20         That is the most important thing we're concerned about.

21   So we just wanted the opportunity to argue for that.  But if

22   Your Honor is already going to instruct it, then it's a moot

23   point.

24         THE COURT:  Well, you can always object to the

25   instruction that I give.  You're going to have to wait until I

1    give it before you object to it.

2           MS. PORTER:  Yes, Your Honor.  And is the protocol here

3    then to wait -- when would be the appropriate time to object?

4    After Your Honor's finished with all of the instructions?

5           THE COURT:  When I instruct the jury.  I've told you

6    the areas I'm going to instruct on now.  I've given you the

7    opportunity to ask for more areas if there are those.  You gave

8    me one, and I'm going to do that.

9           We're going to have closing arguments.  I'm going to

10   instruct the jury.  And when I finish, if I've said anything

11   that you think is wrong, you may object to it.

12          MS. PORTER:  Thank you, Your Honor.

13          THE COURT:  How long do you want to argue?

14          MR. GARDNER:  Mr. Claffee is going to do the initial

15   closing.  It will be about 20 minutes.  And then depending on

16   what they say, it will be roughly five minutes or so for

17   rebuttal, which I'll do, possibly a little bit more depending on

18   what they say.  So all told, less than 30 minutes, about

19   25 minutes.

20          THE COURT:  You still want 25 minutes for this case?

21          MR. BENOWITZ:  Your Honor, again, the last time I timed

22   myself, it was 22 minutes.  I'm going to try and be as quick as

23   possible.

24          THE COURT:  You didn't -- at lunchtime you didn't cut

25   that down?

1        MR. BENOWITZ:  I apologize, Your Honor.

2        THE COURT:  Could have cut that in half very easily if

3   you would've put your mind to it.

4        MR. BENOWITZ:  I was eating.  I apologize, Your Honor.

5        I will try and be as quick as possible.  Again, I

6   practiced four times myself.  The quickest I was able to do it

7   was 22 minutes.  Again, we --

8        THE COURT:  I'll give you 25.  I'll give you 20 and

9   5 --

10       MR. GARDNER:  Thank you, Your Honor.

11       MR. BENOWITZ:  Thank you, Your Honor.

12       THE COURT:  -- in rebuttal.  I'll take a ten-minute

13   recess, and we'll come back and begin closing arguments.

14      (Recess taken at 3:04 p.m. until 3:18 p.m.)

15       THE COURT:  You-all need to pay attention to the time

16   now because I'm going to cut you off when your time is up.

17       Okay.  Bring in the jury.

18      (The jury enters at 3:19 p.m.)

19       THE COURT:  All right.

20       MR. CLAFFEE:  Ladies and gentlemen, how do we know that

21   the defendant, William Andrew Clarke, intended to use Agent Laws

22   to persuade his children to engage in illegal sexual activity

23   with him?  He said so in his own words and then he showed up at

24   the meeting place.

25       At the beginning of this trial, my colleague,

1   Mr. Gardner, told you what we expected the evidence to show, and
2   now I'm going to review that evidence with you.  Shortly, the
3   case will be in your hands.  You should carefully review the
4   exhibits.  Take your time.  Read the emails and the chats.
5   Listen to the audiotapes, watch the video, and remember what the
6   witnesses told you.

7          The government bears the burden of proving beyond a
8   reasonable doubt that the defendant's conduct met every element
9   required to be convicted of the crime of attempted enticement of
10  a minor to engage in illegal sexual activity.  Hold the
11  government to our burden.  But in the end, I'm confident that
12  you'll find that we have met that burden.

13         So what has the government presented to you and what
14  does that evidence prove?  The bulk of the evidence and all you
15  really need to reach a guilty verdict in this case is the
16  defendant's own words.  These words were presented to you
17  through Special Agent Laws, an investigator who works undercover
18  on child exploitation cases.

19         Special Agent Laws told you how he came across the
20  defendant on a social network like Facebook for a small
21  community of people who engage in incest and those who want to
22  meet incestuous families in order to join them in sexual
23  activity.

24         This website was new to Agent Laws, but his story was
25  not.  He had been posing as a father with a prepubescent son and

daughter for years.  He told you that he found the defendant

because the website said he lived nearby.  So he looked at the

defendant's profile page.  What did he find?

The defendant says he is interested in having sex

either one-on-one or in a group with mothers and sons, fathers

and sons, uncles and nephews, and brothers.  He says that incest

and family is a, quote, must have, and he says he has, quote, no

problem with underage children.  This is all in Government

Exhibit 2, and you should take a close look at it.  This is the

context in which Agent Laws meets the defendant.

Because he met the criteria for further investigation

by indicating an interest in underage children, Agent Laws sent

the defendant a friend request but didn't say anything to the

defendant.  A couple days later, the defendant spoke first.

He sent a message to Agent Laws, and his very first

words in Government Exhibit 3 were that he, quote, loves finding

a local guy into the incest thing.  That was Thursday,

October 10th, around 10 o'clock in the morning.

From there things escalated quickly.  Over the next

24 hours, the defendant and Agent Laws exchanged emails, chatted

online through Yahoo Messenger, spoke on the phone, texted, and

saw each other in a video chat.  By Friday afternoon, the

defendant was standing in a rainy lot knocking on the window of

Agent Laws's minivan hoping his words would become reality.

Agent Laws explained that people online who are serious

like to get off websites and into forms of communication.  When

you get back to the room, take a good look at Government

Exhibits 5 through 14.  See what the defendant wanted to know

about Agent Laws in those email communications.  What was he

interested in?  The defendant wants to know if Agent Laws has

incest experience, where he lives, and how long he's been having

sex with his children.  He also wants to know if the mother is

in the picture.

Now take a look at Government Exhibits 7 and 8.  The

defendant says he's been looking for, quote, like-minded guys

close by and asks if Agent Laws is bisexual.  Agent Laws says

no, but he has an 8-year-old son.  One minute later comes the

defendant's response.  Oh, my God.  You have a son!  We need to

meet.

Then things pick up.  Agent Laws proposes that they get

together for a weekend so that his children can engage in sexual

activity with the defendant.  The defendant says that sounds

awesome.  He sends Agent Laws a photo of himself, and Agent Laws

replies with one of himself and one of his purported children.

Things are moving fast so the two men switch to Yahoo Messenger

where they can chat in realtime.

The screen shots of the chat are in Exhibit 16-1

through 16-11, and there's a full copy of the chat in

Exhibit 17.  I suggest you read the whole exchange, but you will

see that three themes begin to emerge in what the defendant is

saying.

One, he has personal experience with incest and has had sex with children, and he has been looking for another man who will share his children with him. Two, he is very interested in meeting Agent Laws in order to have sex with his children. Three, he wants to be sure this is real. He is worried about being caught by the police, and he hopes that this isn't some fantasy or game.

Things start to get specific in the Yahoo Chats. After telling Agent Laws that he has been into having sex with young children his whole life, he asks Agent Laws how old his children are and what he has done with them. When he hears that the children are 9 and 8 years old, he says great. That's in Exhibit 16-4. Then this exchange happens.

Do you think Mark wants to do more than just JO? which means masturbate. When Agent Laws says yes, but he is more into Amy, the defendant instantly responds, quote, well, Mark needs me around, laugh out loud. This is Exhibit 16-5.

Shortly thereafter, in Exhibit 16-6, Agent Laws asks the defendant if he'd have sex with Amy in addition to Mark, and the defendant says of course.

Read the rest of the Yahoo Chat. The defendant tells Agent Laws he's seriously considering coming up to Northern Virginia the next day to participate in pizza and porn night with Agent Laws and his children, but the defendant wants to

make sure he doesn't end up on NBC's *To Catch a Predator*.

So how do these two men make sure that this is for real and not just fantasy or a police operation?  Well, they start with a phone call.  You heard Agent Laws talk about the two phone calls and you heard a few clips from the second call.

I strongly suggest that you listen to the full recordings on Government Exhibit 18.  You'll have a computer back in the jury room that you can use to play the audio files.  In the calls, the defendant talks more about his sexual experience with children, his frustration with not finding real people who will share their children, and he talks about meeting Agent Laws and having sex with his children.

The defendant says he is explicitly into boys and girls and calls the proposed meeting with Agent Laws a, quote, ideal situation.  When Agent Laws says how thrilling it will be for him to watch the defendant having sex with his children, the defendant replies, That's awesome.  It's thrilling for me too.  He's ready to make this happen.

Again, listen to the tapes.  Hear what the defendant says in his own words.  Although the defendant thinks about driving up that night, they ultimately make plans to meet the next day, Friday, October 11th.  Agent Laws texted the defendant the address of the McDonald's and emails him a description of the minivan he'll be driving.

The next morning the defendant and Agent Laws get back

on Yahoo to chat for a little while.  Then the defendant asks
Agent Laws if they can video chat using Skype, again, because he
wants to make sure that this is for real and he can trust that
this rendezvous is actually going to happen.

You saw a clip from this video chat, but the entire
recording is on a DVD labeled Government Exhibit 22.  You should
take the time to watch the whole thing back in the jury room.
It will only take half an hour, but it's an important piece of
evidence.

The two men get to see each other live and get
comfortable.  They ask about sexually transmitted diseases and
whether they are into bondage or S&M.  Watch how they interact.
Do they look and talk like two people who are playing a game or
are they making real plans to meet and engage in sexual activity
with the children?

The defendant is concerned about getting caught by the
police so he asks Agent Laws to show him his penis and offers to
do the same.  You heard Agent Laws explain how there is a
mistaken belief that cops aren't allowed to expose themselves.
Here, Agent Laws refuses for his own reasons, but notice how
quickly the defendant is able to overlook this because he wants
to move forward.

So they turn to the logistics and details.  Make no
mistake, ladies and gentlemen, the defendant intended to
persuade Mark and Amy to engage in sexual activity with him.

1    Watch the video in Exhibit 22 and hear him in his own words.

2    Here, the defendant says he's going to follow Agent Laws's lead

3    and join in.  He is, quote, open to absolutely everything.

4    Agent Laws asks the defendant about, quote, weird fetishes.  The

5    defendant says no, this is it.  Meeting adults online who will

6    share their children is his only weird fetish.

7        Finally, here's the defendant in unambiguous language,

8    with no code words, explaining just what he wants to do.  He

9    wants Amy, the 9-year-old, to perform oral sex on him and for

10   him to perform it on her.  He also wants to perform oral sex on

11   Mark, the 8-year-old boy, and have the boy perform it on him.

12       The video ends with the defendant saying that he will

13   meet Agent Laws at the McDonald's around 1:30 p.m., telling him

14   what car he'll be driving and that he will text from the road

15   with updates on his progress.  One of the last things he says is

16   he asks Agent Laws if the kids will be with him at the

17   McDonald's.  He wants to make sure that they're there.

18       So what happens next?  You heard Agent Laws testify

19   that he and other officers set up the operation and waited at

20   the McDonald's.  The defendant got his things together.  He got

21   in his car and he drove over two hours to Fairfax, Virginia.  He

22   showed up.

23       His last text to Agent Laws was asking where he was as

24   he searched the parking lot in a downpour for the minivan, then

25   he knocked on the window, startling Agent Laws.  And before he

could open the door to greet him, they both were handcuffed and taken away.

You heard Special Agent Eyler testify that the defendant was brought to a mobile forensic vehicle to be interviewed, and the recording of that interview is on a disk labeled Exhibit 41. Agent Eyler told you that during his interview, the defendant admitted that he met Agent Laws on a Social-Incest website and that he talked to him about what he does with his children.

When confronted with his own words, the defendant said it was really bad, that his actions were, quote, undefendable. You heard that the defendant admitted engaging in a Skype chat. But once Agent Eyler said that Skype doesn't keep records, that is, once the defendant thought Agent Eyler would never know the truth about what was said, he denied telling Agent Laws that he would have sex with his children. But watch Exhibit 22. He says precisely the opposite of that. The defendant didn't know there was a recording.

During the interview the defendant also said that he was not going to have sex with Agent Laws's children, but then told Agent Eyler that maybe down the line he would have considered it. And although he said that sex with children is wrong, he also said that maybe on some level he believes it is okay.

You also heard that law enforcement found something in

the defendant's vehicle when he was arrested.  It was a piece of
lined notebook paper.  On it, the defendant had written the name
Jaye and the names Amy and Mark with their ages next to them, 9
and 8.  He also had written the names and ages of Noah and Logan
so he could remember his story.  That paper is Exhibit 43.  You
can examine it back in the jury room.

That is the heart of the government's case.  The key
evidence is the defendant's own words typed out on a screen,
spoken over the phone and in video, and handwritten on notebook
paper.  This evidence proves beyond a reasonable doubt that the
defendant intended to persuade Mark and Amy through their father
to engage in sexual acts with him.  He, therefore, is guilty of
attempted enticement of a minor.

Now, the defendant claims that the government set all
of this up.  They said in their opening statement that the
government, quote, chose the game and chose the playing field.
That's not what the evidence showed.  Agent Laws found the
defendant on an incest website.  He was already in the game.

The defense also will argue that it was Agent Laws's
idea to have a Yahoo Chat and that Agent Laws suggested the idea
for a meeting and the time and place.  That also is not what the
evidence showed.

Recall that it was the defendant who first said, oh, my
God, we need to meet.  It was the defendant who first provided
his phone number, and it was the defendant who repeatedly

suggested that they engage in a video chat. It also was the defendant who was so eager to meet that he said that he was thinking about driving up the very first night they spoke. And it was the defendant on the second phone call who told Agent Laws that they should do pizza and porn at lunchtime instead of at dinner, causing Agent Laws to pull the children out of school.

The issue is whether the defendant intended to use Agent Laws to coerce Mark and Amy into sexual activity with him. The defense suggests that he did not because he didn't bring the children any toys and he didn't offer Agent Laws any money or drugs. That's not this case.

Ladies and gentlemen, what the evidence showed is that the defendant wanted Agent Laws to include him in pizza and porn night. This was routine for Agent Laws and his children, but there was nothing routine about having a stranger come over to join in.

The evidence shows that the defendant told Agent Laws to tell the children his name was Andy so that he would know to respond to that name. He said he would follow Agent Laws's lead, and he said specifically what he wanted to do once he jumped in. If you believe that the defendant did all of those things in order to use Agent Laws to persuade the children into having sex with him, to invite Andy into their routine, then he is guilty of this crime.

1    Aside from his own words, the defendant's actions also

2  reveal his intent.  If not to persuade these children through

3  Agent Laws to have sex with him, what was he doing?  Why did the

4  defendant pack an overnight bag in the trunk of his car and

5  drive hours to meet a man he had known for a day at a McDonald's

6  in Fairfax?  Why did he write the name of that man and the names

7  and ages of his children on a piece of paper that he took with

8  him?  Those are the actions of a man who is planning on meeting

9  a family for a weekend of sexual activity.

10    In a little while, Judge Hilton is going to give you

11  instructions regarding the law to guide you in your

12  deliberations.  He will remind you, as I have, that the

13  government bears the burden.  He will instruct you that a person

14  is guilty of enticement of a minor if he uses the Internet to

15  knowingly attempt to entice any person under the page of 18 to

16  engage in illegal sexual activity.

17    In this case, thankfully, no real minors were involved.

18  You will be instructed that it does not matter that no real

19  minors existed or that the defendant only communicated with an

20  adult.  We must prove only that defendant intended to engage in

21  conduct with an adult that was designed to persuade a minor to

22  engage in sexual activity.

23    Also, because the defendant is charged with attempting

24  to commit this crime, the fact that he ultimately could not have

25  succeeded is not a defense.  You will be instructed that the

government must prove that the defendant intended to commit the crime and then took a substantial step towards completing the crime.  Discussions can be a substantial step if they leave little doubt that a person intended to commit the crime, but in many cases the substantial step is more concrete, like making plans to meet and then following through on those plans.

The government has proved beyond a reasonable doubt that the defendant, William Andrew Clarke, attempted to entice two children to have sex with him.  He did so through his conversations with Special Agent Laws, and then he took the ultimate step towards commission of the crime, he showed up.

We now ask you to return the only verdict supported by the evidence in this case, finding the defendant guilty of enticement of a minor.  Thank you.

MR. BENOWITZ:  Ladies and gentlemen, you may not like Andrew Clarke, but he is not guilty.  You may not like what he said in his communications, in his chat, in his Skype and Yahoo, but it doesn't change the fact that he is not guilty of this charge.

You definitely don't like what he wrote, but it doesn't change the fact that the government didn't do their job here. Mr. Clarke is not guilty of what he is charged with, which is attempting to persuade, induce, coerce, or entice a minor.  He didn't do that here.

There's not much dispute here about the evidence, what

the evidence is.  It's all in the chat, in the Yahoo.  There's a
video and an audio of his interview.  There's not much dispute
there.  But what you will see when you review that evidence is
the government didn't do their job, and the government here
didn't prove their case and hasn't proven their case beyond a
reasonable doubt.

Now, what does that mean?  Beyond a reasonable doubt is
the highest standard we have in our justice system.  So, for
example, if you're suing someone civilly, like there's a car
accident and the two sides are suing each other, one side just
has to prove their case to 51 percent.  Beyond a reasonable
doubt is way higher than that.  There's an even higher standard,
which is clear and convincing evidence.  Beyond a reasonable
doubt is way higher than that.

What that means is, ladies and gentlemen, when you go
back and you start to deliberate and talk about this evidence,
if you have a reasonable doubt, Mr. Clarke's not guilty.  Now,
you can each have a different reasonable doubt.  You only need
to have one reasonable doubt.  That's not going to be hard here
because there's so much reasonable doubt.  But if you have one,
Mr. Clarke's not guilty.

What is reasonable doubt?  Judge Hilton is going to
explain that to you.  Basically, it means, you know, we picked
you-all because you have common sense, you come from different
places, different educations, different walks of life.  You-all

have common sense and you're all reasonable people.  So when you

look at the evidence and you have a reasonable doubt, it's just

what it says.  It's not a minuscule doubt or any sort of

minutia.  If you have a reasonable doubt, Mr. Clarke's not

guilty.

Now, the government just missed the boat here

completely.  It started when you heard Agent Laws, when he was

being asked questions by the government, he said that the type

of cases he's been working on are child pornography, possession,

and travel cases.  He didn't even say that he works on

enticement cases.

He controlled the scenario.  He controlled the

questions that were being asked.  He doesn't do these types of

cases.  That's what he said.  He didn't even mention it with all

of his experience.

Now, again, let's be clear.  Mr. Clarke is not charged

with travel with intent to have sex with a minor.  You have to

decide based on the charge here, not this.  If you believe that

Mr. Clarke wasn't having a fantasy or wasn't fantasy talking,

we'll talk about that.  The evidence may show this, but that's

not what he's charged with.

Now, Judge Hilton, again, he's going to instruct you on

what the law is in this case, what the law is you're to

consider, and you're only supposed to consider the offense,

you're to consider the offense for which Mr. Clarke is charged.

Now, you heard from Agent Eyler, and you're going to have Defendant's Exhibit 7, I believe, which is her operational plan. It was created by the agents. And what does it say? It says that they were -- the plan was to arrest Mr. Clarke for traveling with intent to have sex with a minor, not talking about attempted enticement. What they were doing is completely different. They missed the boat.

Now -- and again, in Agent Eyler's interview with Mr. Clarke, and you can listen to this, what she says is, well, it was your dialogue with him, meaning Jaye, and your plans to engage in sexual contact encounters with his children, planning that, and then coming up here and traveling to meet him to help fulfill, that is what you did wrong, and the same with Jaye. You're both wrong.

Now, of course, Jaye is the undercover so he didn't really do anything wrong. But that's what they're talking about. That's the facts that the government developed. That's what they investigated. It's not this charge.

Now, what's he charged with? Let's talk about that. Now, one thing to remember, key thing to remember, because the government is making much of Mr. Clarke's communications with Jaye. They still have to be directed, the actions or the communications still have to be directed towards persuasion, inducement, coercion, or enticement of the minor. Even if Mr. Clarke is talking to Jaye, he still has to be trying to get,

to persuade, induce, coerce, or entice the minor.  It's not just talking to Jaye.  It's not just talking about having sex with Jaye's fictitious kids.  That's not the crime.

It's trying to get to those kids through the talk, and it's specific kind of talk: persuasion, inducement, coercion, or enticement.  That's not what happened here.

Now, what else does the government have to prove?  Now, the government has to prove that Mr. Clarke intended to cause the assent, the acceptance, the agreement, to transform the will on the part of the minor.  It's not arranging to have sex.  And I know you're hearing this for the first time, and it's complicated, but that's what you have to -- you have to keep that separation in your mind.

Again, it's not that Mr. Clarke intended to act or acted with the specific intent to engage in sexual activity.  That's just not it.  And the government also has to prove, when you're talking about an attempt, and that's what we're talking about here, that Mr. Clarke took a substantial step towards causing the acceptance on the part of the minors, not towards causing actual sexual contact.  That's the distinction, and it's a huge distinction.

Now, when we're talking about persuasion, inducement, coercion, and enticement, Judge Hilton is going to define those for you, but they're basic, common-sense definitions about what we're talking about here.  When he's talking about persuasion,

it's causing someone to do something by asking or arguing or
trying to get them to do something, giving reasons.  Inducement
is, again, to cause something to happen.  Basic dictionary
definition.

Coercion is to make something do -- make somebody do
something by using force or threats.  Again, there's no evidence
of that here.  Enticement is to try and attract someone by
offering or showing something that's appealing or interesting.

Now, let's look at, the government was relying a lot
and just showed you an exhibit, Government Exhibit 8.  This is
really disgusting.  Right?  You're all looking at this.  You
heard this.  The government's relying on it.  It's disgusting.

It's Jaye saying that he's not bi, but he has an
8-year-old son.  He doesn't really play with him, although he's
helped me masturbate a few themes.  The girl is great, talking
about his fictitious daughter, is great at oral and anal.
That's just nasty.  That is disgusting.  No one is promoting
that here.

Then, look, this is what Mr. Clarke says.  OMG, oh, My
God, you have a son!  We need to meet.  Now, if this is travel
to engage in sex with the intent to engage in sex with a minor,
okay, powerful.  Here, it's irrelevant.  It doesn't meet the
requirements of what Mr. Clarke is charged with here.

It has nothing to do with persuasion, inducement,
coercion, or enticement of the minor.  It's Mr. Clarke and Jaye

talking about having sex with his kids.  It doesn't meet the
force of the indictment.  It doesn't get to the kids.  It's just
talking about it.

Now, what you can see is Mr. Clarke, he didn't attempt
to persuade, induce, coerce, or entice anyone.  Let's look at
what Jaye did and what Andy did, Mr. Clarke.  Jaye, he found and
reached out to Andy initially.  He friended him.  Andy didn't
reach out to Jaye.

Now, this is key.  The government's been talking about
this and we're going to talk about this.  Jaye says he's been
doing pizza and porn nights with his kids for three years once a
week.  So by my basic math, that's over 150 times in this
scenario that these fictitious kids have had sex with their
father on a Friday night, pizza and porn night.

There is nothing that Mr. Clarke is going to do in this
scenario to effect that, and you can see that when you look at
the communications.  It's going to happen whether Mr. Clarke
participates or not.  There's no difference there.  There's no
persuasion.  There's no change in the scenario.  That's
reasonable doubt.

Jaye sends a photo of the kids to Mr. Clarke without
Andy even asking.  Who's doing the persuading here?  It's Jaye,
not Andy.

Now, Jaye asked Andy to bring a toy.  And you know,
based on the search, the search of Mr. Clarke's car, that Andy

didn't even do that. So where is the persuasion there? Where is the inducement? the coercion? the enticement? There isn't. It's reasonable doubt.

Now, when you look at the communications, you'll see Jaye asks Andy to bring candy for him, Jaye, and the kids. What you'll see, you'll see when you look at the interviews, is that Mr. -- or if you look at the communications, Andy is talking about or he's saying, well, I have to come up. My friend, Brandy, is having surgery. We're having a party for her.

In the interviews he talks about bringing candy for Brandy, his friend. You'll see Defendant's Exhibit 3, which is a card, and you've got Defendant's Exhibit 2, which you'll see back in the jury room, which shows a gift bag with the envelope, Brandy over it, and that's where the candy is. Those are party-sized, party-sized candy bags. It corroborates what Mr. Clarke was saying.

You'll also have a stipulated medical record showing that Brandy was in the hospital. You've got a picture of Brandy that Mr. Clarke's cousin corroborated. He said, hey, that's Brandy.

Now, Agent Eyler said she didn't even open this envelope doing an investigation into this case. She didn't open it? Really? Think about that, ladies and gentlemen. That's reasonable doubt. All of this is reasonable doubt.

1          Now, what other reasonable doubt is there?  Look at

2    what Jaye didn't do.  And the government is trying to minimize

3    this, but this is the key.  You have to find evidence of

4    persuasion, inducement, coercion, or enticement to find

5    Mr. Clarke guilty, and there just isn't any.

6          Mr. Clarke didn't offer money to Jaye in exchange for

7    sex with kids.  Reasonable doubt.  He didn't offer drugs or

8    anything of value to Jaye or the fictitious kids.  That's the

9    key.  That's reasonable doubt.  He didn't offer to have sex with

10   Jaye in order to get access to these kids.  He never even had

11   contact with these kids or anyone he believed to be kids.  He

12   didn't offer money, toys, an Xbox.  He didn't offer anything to

13   these children either directly or through Jaye.  That's all

14   reasonable doubt, all reasons that Mr. Clarke is not guilty.

15         He didn't ask Jaye to pass along any communications to

16   the kids.  He didn't make any promises to the kids through Jaye.

17   What he did do, he asked Jaye what Jaye would tell them about,

18   would tell the kids about him.  That's not persuasion,

19   inducement, coercion, or enticement.

20         In fact, at one point, and you heard this from the

21   government witnesses, Jaye -- I'm sorry -- Mr. Clarke said to

22   Jaye, let's take the kids out of the equation and just get to

23   know each other.  Is that persuasion?  No.  Inducement?  No.

24   Coercion?  No.  Enticement?  No, not of these children, of these

25   fictitious children.

1          Now, the government made a lot about the travel that

2     Mr. Clarke did, that he traveled up to meet Jaye.  That's not,

3     and you'll see, travel is not a form of interstate commerce.

4     Interstate commerce is Internet, phone, Yahoo, Skype.  The

5     attempt has to be through interstate commerce.  It's not the

6     travel.  The travel is irrelevant here for this case.  It's just

7     irrelevant.  That's reasonable doubt there, ladies and

8     gentlemen.

9          Now, you also heard about the condoms and lube that

10    were found in the car.  It was there months before this whole

11    scenario.  You know that Mr. Clarke's a gay man.  He may use

12    that in his sexual activity with adults.  It doesn't go to this

13    offense.  That's reasonable doubt.

14         You heard both from the government investigation and

15    from witnesses that we put on that all of the things that

16    Mr. Clarke was talking about, about prior sex with other people

17    in this -- in the interview, talking about his roommate, Jeff,

18    and Noah and all these people, it's all untrue.

19         Jaye has a scenario where he is lying to Mr. Clarke.

20    Mr. Clarke has a scenario where he is lying to Jaye.  People lie

21    on the Internet.  You heard Agent Laws say that.  Now, you know

22    that, when you see the letter, you'll have to see the

23    government's exhibit, the letter that was found in Mr. Clarke's

24    car where the names of the kids, where Noah and Logan and Jeff

25    40 was written on one side, then the names Jaye and Amy and the

fictitious son written on the other side, because it's all fake.

He's got to write down the name Jeff and then Noah and Logan because it's not true. Why else would he have to write it down if it actually was happening?

Now, the other thing, the reason we know that the government didn't believe any of this, it's because they didn't start following up, and you heard Agent Eyler say this, they didn't start following up until January of 2015 on those kids. They didn't do the interviews with the actual kids until February of 2015, over a year later.

If they really believed that something was going on, they would have jumped on that. Reasonable doubt, ladies and gentlemen.

Now, I don't get to come back. This is our last chance to speak on behalf of Mr. Clarke. We've shown you the reasonable doubt that's in this case. And when you go back and deliberate, we're confident that you're going to find the reasonable doubt that we've highlighted and that you're going to find other reasonable doubt, and that you're going to acquit, find Mr. Clarke not guilty.

Again, we don't get a chance to come back. The government gets the chance to get up and talk to you for a few minutes, respond to what I've said. But I would urge you, when the government is talking, think about what I would say. Think about the reasonable doubt here. Think about the fact that

there is no evidence showing that Mr. Clarke persuaded, induced, enticed, or coerced these fictitious kids on the Internet directly or through Jaye.

Court's indulgence.

Thank you.

MR. GARDNER: Thank you, Your Honor.

Ladies and gentlemen, first, Mr. Benowitz said the fact that Mr. Clarke showed up at the McDonald's is irrelevant here. Of course it's relevant. It's part of why we know Mr. Clarke is serious. It's a substantial step that he is making to committing this crime.

Mr. Benowitz also talked about the entire defense's case showed that Mr. Clarke was lying when he said that he molested Noah and Logan. The government agrees with that, agreed so from the beginning. Agent Eyler said that was the conclusion of her investigation, that that was a lie.

Why did Mr. Clarke lie about that? So that he could seem credible, like he truly was into this so that he could meet up with Jaye and eventually meet up with Mark and Amy.

Mr. Benowitz spoke at length about where is the persuasion here, where is the coercion of Mark and Amy. First, this is not the kind of situation, and the government's not alleging, that Mr. Clarke was going to sit down with Mark and Amy and talk with them and chat with them about it and say, hey, this is going to be a good idea. That's not what we're talking

1    about when we're talking about persuasion here.

2         This case is about coercion, absolutely about coercion.

3    And if you want to know where the persuasion and coercion is,

4    look at the Skype video chat, look at Mr. Clarke when he

5    describes exactly what he's going to do. He wants to engage in

6    sexual activity with an 8- and a 9-year-old. He wants them, two

7    kids, to perform oral sex on an adult man. Ladies and

8    gentlemen, that's coercion. It's not convincing them it's a

9    good idea. It is changing their will to do something that no

10   child would ever consent to. That's coercion. That's what

11   Mr. Clarke is attempting to do.

12        Further on that, and, again, we have to look from

13   Mr. Clarke's point of view, he didn't know that this was an

14   undercover operation. He obviously believed Mark and Amy were

15   real. Look at what his words and actions caused Jaye to do.

16   Mr. Clarke arranged for this meeting. Told Mr. Clarke he was --

17   or told Jaye he was interested, told him he was coming, that

18   they should meet Friday for lunch, and because he said he was

19   coming for lunch, Jaye said, okay, I'm going to pull the kids

20   out of school early and tell them Cousin Andy is coming over for

21   pizza and porn night.

22        Think about it from Mr. Clarke's point of view at that

23   time. What does he think is happening to those two kids, Mark

24   and Amy, who have been raped for years? They're being pulled

25   out of school early by their abusive father and told, you know

what, tonight you're going to be raped again.  You're going to

be sexually exploited again, not just by me, but by some other

guy, Cousin Andy, who's coming over.

        MR. BENOWITZ:  Objection.

        MR. GARDNER:  That's what those kids were told based on

what Mr. Clarke --

        MR. BENOWITZ:  Objection, Your Honor.

        THE COURT:  Objection overruled.

        MR. GARDNER:  That's the coercion that the government

is talking about in this case.

        The defense said in closing, quote, said that

Mr. Clarke's actions, quote, it doesn't get to the kids.  Ladies

and gentlemen, had this been real, absolutely that gets to the

kids.

        The defense also said that there was, quote, no change

in the scenario.  This happened 150 times.  What's the big deal,

essentially?

        MR. BENOWITZ:  Objection.

        MR. GARDNER:  Again, ladies and gentlemen, having

another man come and rape those two children is a change in the

scenario.  It's coercive.  That's what the government's talking

about.

        Lastly, the defense talked at length about the fact

that this case was charged incorrectly.  That's absolutely not

true.  The charge in this case, the allegations are that

Mr. Clarke engaged in online enticement and coercion of a minor

to -- I'm sorry -- attempted online coercion/enticement of a

minor to engage in illicit sexual activity. It's exactly what

this case is about. It's exactly what the evidence shows.

Ladies and gentlemen, we ask you to find Mr. Clarke

guilty. Thank you.

THE COURT: Ladies and gentlemen, now that you've heard

the evidence and argument of counsel, it becomes my duty to give

you instructions as to the law that's applicable to this case.

It's your duty as jurors to follow the law as stated by

the Court and to apply the rules of law so given as to the facts

as you find them from the evidence in the case. You're not to

single out one instruction alone as stating the law, but must

consider the instructions as a whole.

You should not be concerned with the wisdom of any rule

of law as stated by the Court. Regardless of any opinion you

have as to what you think the law ought to be, it would be a

violation of your sworn duty if you ignore the law as I give it

to you and apply some other law.

It would also be a violation of your sworn duty as

judges of the facts to base your verdict upon anything but the

evidence in this case.

Now, as I've told you before, this defendant, William

Clarke, is charged with unlawfully and knowingly using any

facility and means of interstate and foreign commerce to attempt

to persuade, induce, entice, and coerce any individual who had

not attained the age of 18 years to engage in sexual activity

for which any person can be charged with a criminal offense,

including Section 18.2-61(a)(iii) of the Code of Virginia, which

is rape of a child under age 13, Section 18.2-67.1(a)(i), which

charges forcible sodomy of a child under 13 years, Section

18.2-67.3(a)(i), which charges aggravated sexual battery of a

child under the age of 13 years, or the attempt to do so.

Section 2422(b) of Title 18 U.S.C. provides, in part,

whoever, using the mail or any facility or means of interstate

or foreign commerce, or within the special maritime and

territorial jurisdiction of the United States knowingly

persuades, induces, entices, or coerces any individual who has

not attained the age of 18 years, to engage in prostitution or

any sexual activity, or attempts to do so, commits an offense

against the United States.

There are three essential elements of this offense

which the government must prove beyond a reasonable doubt.

First, that the defendant knowingly used a telephone,

computer, or any facility or means of interstate commerce, to

attempt to persuade or induce or entice or coerce, any person

under the age of 18 to engage in sexual activity;

Second, that the defendant believed that such

individual was less than 18 years of age; and

Three, that, had the sexual activity occurred, the

defendant could have been charged with a criminal offense under the laws of the Commonwealth of Virginia.

It is not a defense that the minors did not in fact exist. The government must prove that the person the defendant believed he was attempting to persuade or induce or entice or coerce to engage in sexual activity was a minor.

It is not a defense that the defendant did not directly communicate with the fictitious minor child. Direct communication is not necessary. The government must only prove that the defendant intended to engage in conduct that was designed to persuade, induce, entice, or coerce a minor to engage in unlawful sexual conduct.

Now, transmission of communications by means of the telephone or Internet constitutes the use of a facility or means of interstate commerce regardless of whether the communication actually crossed a state line.

The terms persuade, induce, and entice should be given their ordinary meaning. In ordinary usage, the words are effectively synonymous, and the idea conveyed is of one person leading or moving another by persuasion or influence as to some action or state of mind.

Now, in order to prove that the defendant attempted to induce, entice, or coerce an individual under the age of 18 to engage in sexual activity, the government must prove the following two elements beyond a reasonable doubt.

First, that the defendant intended to commit the crime of coercion or enticement of a minor to engage in sexual activity; and

Second, that the defendant did an act constituting a substantial step towards the commission of that crime.

Factual impossibility is not a defense to a charge of attempt.

For purposes of the crime of attempt, a substantial step is a direct act in the course of conduct planned to culminate in the commission of a crime that is strongly corroborative of the defendant's criminal purpose. In determining whether or not the defendant took a substantial step towards the commission of a crime, you must consider all of the evidence admitted in the case concerning the defendant and the alleged commission of the crime.

In determining whether the defendant's actions amounted to a substantial step toward the commission of a crime, it is necessary to distinguish between mere preparation on the one hand and the actual doing of the crime on the other. Mere preparation, which may consist of merely planning the offense, or of devising, obtaining, or arranging a means for its commission, is not an attempt, although some preparations may amount to an attempt. The acts of a person who intends to commit a crime will constitute an attempt where the acts themselves indicate an intent to willfully commit the crime, and

1  the acts are a substantial step in a course of conduct planned
2  to culminate in the commission of the crime.

3      The government does not need to prove that the
4  defendant actually persuaded or induced or coerced or enticed an
5  individual under the age of 18 to engage in sexual activity.
6  The ability to successfully complete the act is immaterial.

7      Now, the third element of the offense as charged in the
8  indictment requires the government to prove that if the proposed
9  and anticipated sexual activity had occurred, it was in
10  violation of Virginia law.  You must unanimously agree that the
11  sexual activity would violate Virginia law.

12      Now, the first offense, as I've previously told you, is
13  rape, which is defined as sexual intercourse with a complaining
14  witness, whether or not his or her spouse, or causes a
15  complaining witness, whether or not his or her spouse, to engage
16  in sexual intercourse with another person and such act is
17  accomplished with a child under 13 as the victim.

18      The second such offense is forcible sodomy, which is
19  defined as cunnilingus, fellatio, anilingus, or anal intercourse
20  with a complaining witness, whether or not his or her spouse, or
21  causes a complaining witness, whether or not his or her spouse,
22  to engage in such acts with any other person and the complaining
23  witness is less than 13 years of age.

24      The third such offense is aggravated sexual battery,
25  which is defined as sexual abuse of the complaining witness and

the complaining witness is less than 13 years of age.

Now, a person acts knowingly when that person acts consciously and with awareness and comprehension and not because of ignorance, mistake, or misunderstanding or other similar reason.

Now, the intent of a person or the knowledge that a person possesses at any given time may not ordinarily be proved directly because there is no way of directly scrutinizing the workings of the human mind. In determining whether a person knew or what a person intended at a particular time, you may consider statements made or acts done by that person and all other facts and circumstances received in evidence which may aid in your determination of that person's knowledge or intent.

You may infer, but you're certainly not required to, that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. It is entirely up to you, however, to decide what facts to find from the evidence that have been presented to you during the trial.

Now, you've heard the testimony from an undercover law enforcement officer who was involved in the government's investigation in this case. You've also heard audio recordings from the government's undercover operation. Law enforcement officials are not precluded from engaging in stealth and deception, such as the use of undercover agents, who may conceal their true identities, and, such as the use of recording

1  devices, all in order to investigate suspected violations of the

2  law.  There is nothing improper or illegal with the government

3  using these techniques.  Indeed, certain types of evidence would

4  be extremely difficult to detect without the use of undercover

5  agents.  Whether or not you approve of the use of an undercover

6  agent to detect unlawful activities is not to enter into your

7  deliberations in any way.

8        Now, where a statute is worded in the disjunctive,

9  meaning it uses the word "or," federal pleading requires the

10  government to charge in the conjunctive, meaning that it must

11  use the word "and."  Where a statute specifies several alternate

12  ways in which an offense may be committed, it is sufficient for

13  conviction if only one of those alternatives is proven beyond a

14  reasonable doubt.

15       Now, this indictment charges that offenses were

16  committed on or about certain dates.  Although it is necessary

17  for the government to prove beyond a reasonable doubt that the

18  offenses were committed on dates reasonably near the dates

19  alleged in the indictment, it is not necessary for the

20  government to prove that the offenses were committed precisely

21  on the dates charged.

22       The defendant here is not on trial for any other act or

23  conduct not specifically charged in this indictment.

24       There are two types of evidence from which you may find

25  the truth as to the facts of this case: direct and

circumstantial.  Direct evidence is the testimony of one who asserts actual knowledge, such as an eyewitness.  Circumstantial evidence is proof of a chain of facts or circumstances indicating the guilt or innocence of a defendant.  The law makes no distinction between the weight to be given between direct or circumstantial evidence.  Nor is a greater degree of certainty required of circumstantial evidence than of direct.  You should weigh all of the evidence in the case.

The burden is always on the prosecution to prove guilt beyond a reasonable doubt.  This burden never shifts to a defendant, for the law never imposes upon a defendant in a criminal case the burden of calling any witnesses or producing any evidence.

The defendant has the right to remain silent and has the right not to testify and remain silent here at trial.  No conclusion or any consideration can be drawn from the fact that a defendant exercises that right and does not testify.

The law presumes a defendant to be innocent of a crime.  Thus, a defendant, although accused, begins the trial with a clean slate, with no evidence against him, and the law permits nothing but legal evidence presented before the jury to be considered in support of any charge against the accused.

So the presumption of innocence alone is sufficient to acquit a defendant unless you're satisfied beyond a reasonable doubt of the defendant's guilt after a careful and impartial

consideration of all of the evidence in the case.

It's not required that the government prove guilt beyond all possible doubt. The test is one of reasonable doubt.

Now, the punishment provided for the offense charged is a matter exclusively within the province of the Court and should never be considered by the jury in any way in arriving at a fair and impartial verdict as to the guilt or innocence of the accused.

The indictment returned by the grand jury is not to be considered by you as any evidence of guilt. An indictment is simply the formal means by which a case is processed initially to bring about a trial.

Now, arguments and statements of counsel are not evidence in the case. The attorneys have entered into stipulations, and those stipulated facts are proper evidence.

From time to time in their arguments, the lawyers may have stated what law was applicable to this case. If they made a reference, as they had a right to do, that is contrary to what I state the law to be, you must disregard what the lawyers said and abide by what the Court states the law to be.

The lawyers from time to time have referred to certain facts that came out in evidence. If your recollection of those facts is different from the lawyers, your recollection prevails because you are the sole judges of the facts.

Now, from time to time during the course of the trial,

the lawyers made objections to the introduction of certain
evidence or to the form of questions.  If I sustained those
objections, you cannot consider any evidence that I sustained an
objection to or facts contained in a question to which an
objection was sustained.

Now, you as jurors are the sole judges of the
credibility of the witnesses and the weight their testimony
deserves.  You may be guided by the appearance and conduct of
the witness, or by the manner in which the witness testifies, or
by the character of the testimony given.

You should carefully scrutinize all of the testimony,
the circumstances under which each witness has testified, and
every matter in evidence which tends to show a witness is worthy
of belief.

Consider each witness' intelligence, motive and state
of mind, and demeanor and manner while on the stand.  Consider
the witness' ability to observe the matter to which he has
testified and whether he impresses you as having an accurate
recollection of these matters.  Consider also any relation each
witness may bear to either side of the case, the manner in which
each witness might be affected by the verdict, and the extent to
which, if at all, each witness is either supported or
contradicted by other evidence in the case.

You have also heard the testimony of law enforcement
officers here today.  And you're instructed that a law

1    enforcement officer's entitled to no -- testimony is entitled to

2    no greater weight than that of any other witnesses that you have

3    heard testify before you.

4          And after making your own judgment, you will give the

5    testimony of each witness such weight, if any, as you think it

6    deserves.

7          Remember, your verdict cannot be based upon surmise,

8    speculation, or sympathy for either party, but must be based

9    solely upon the evidence and the instructions of the Court.

10         Now, as you-all retire to deliberate on your verdict,

11   your first duty will be that of selecting a foreperson and

12   proceeding with the process of your deliberations involving a

13   rational discussion by all of you for the purpose of reaching a

14   unanimous verdict.

15         Each of you should decide for yourself in context of

16   the evidence of the law, but give proper consideration to the

17   views of other jurors.  Reconsider your views if you're

18   persuaded by a rational discussion.  Don't do so solely for the

19   sake of reaching a unanimous verdict.

20         Your verdict must be unanimous.

21         I'll send to the jury room with you a verdict form

22   which has the style and number of the case.  There's a line

23   there as to Count 1 where you should write either guilty or not

24   guilty, and a place for your foreperson to sign at the bottom.

25         Remember, once you've retired to deliberate on your

verdict, any communications you have with the Court must be in writing and signed by your foreperson. If you do need to contact me for any reason, please don't indicate numerically how you stand on any issue before you.

I'll let you retire to the jury room and begin your deliberations. The marshal will gather up these exhibits and the verdict form and bring those into you as soon as we can get them together.

You-all may retire to the jury room.

(The jury exits at 4:20 p.m.)

THE COURT: One of you-all turn that podium around.

Do you have something you want to raise? Do you have any objections?

MR. GARDNER: No objections, Your Honor.

MS. PORTER: Thank you, Your Honor.

I'm going to start off with, I believe Your Honor was reading from government's instruction No. 32 to start, and this is the attempt explanation.

We specifically, Your Honor, we would --

THE COURT: Well, I didn't exactly follow it. I thought it more correctly states the law as opposed to your instruction.

MS. PORTER: Yes, Your Honor. If I may, if I could argue that. The language, Your Honor, that we were offering to the Court and we're urging the Court to accept is the language

1    that the D.C. Circuit recently overturned the district court

2    specifically on the denial of the instruction that the defense

3    is offering today, and that's why we're offering it.

4            Defense Exhibit {sic} 21 is a correct statement of the

5    law.  The law from the *Hite* case, found at 769 F.3d 1154, is

6    relying on the *Engle* case from the Fourth Circuit.

7            Your Honor, it is absolutely important that the jury is

8    instructed as it relates to the two elements contained in

9    attempt -- intent and substantial step.

10            This is a complicated, Your Honor, statute for

11   laypeople to get their heads around.  They need the proper

12   guidance.  Your Honor, the law is completely on point.

13            With Your Honor's permission, I'll pass up a copy of

14   the --

15            THE COURT:  I understand what you're talking about.  I

16   find that I properly instructed the jury in this regard to

17   attempt.  Your objection will be overruled.

18            MS. PORTER:  Just to be clear then on the record.  The

19   defense is offering Defense No. 21 for the arguments set forth

20   based on the *Hite* decision and based on *Engle*.

21            As well --

22            THE COURT:  Don't go through all of that.  If you want

23   to get with my court reporter later, I have preserved your

24   objection.  You don't have to get it all to me here.

25            MS. PORTER:  Your Honor, I think that I do.  Our

1    objections have to be made in open court.

2         THE COURT:  You're not in state court.  You've made

3    your objection.  Your objection's on the record.

4         If you want to give something else in addition to that,

5    you can get with my court reporter.  I understand what's done in

6    state court now.  All you have to do is put your objection up

7    here.  I've recognized your objection.  That's all you need to

8    say.

9         MS. PORTER:  Yes, Your Honor.  Well, at this point then

10   we are objecting to all of the instructions, Your Honor, that

11   weren't consistent with what the defense previously filed in

12   this case.

13        THE COURT:  Okay.  I find that the jury was properly

14   instructed, and that objection will be overruled or denied,

15   whichever.

16        MS. PORTER:  Are you precluding argument on the other

17   instructions, Your Honor?  Are you precluding the defense from

18   making argument on the other instructions that we had --

19        THE COURT:  You said you object to every instruction

20   that I gave that didn't comport with yours.

21        MS. PORTER:  Well, specifically --

22        THE COURT:  So I assume that includes them all.

23        MS. PORTER:  We would object to the defense instruction

24   No. 19 not being admitted as written in our prior filings.

25        THE COURT:  You've already objected to all of your

 1    instructions that I didn't give.  That's on the record.

 2              MS. PORTER:  Thank you, Your Honor.

 3              THE COURT:  So you don't have to object anymore.

 4              All right.  We'll stand in recess till the jury

 5    returns.

 6         (Recess taken at 4:25 p.m. and deliberations begin.)

 7         *  *  *

 8         (NOTE:  The following is dictated to the court reporter out

 9    of the presence of the Court, the jury, and the government at

10    4:38 p.m.)

11              MS. PORTER:  The defense objects to the judge's denial

12    of the defense's requests to have the Court rule before closing

13    arguments on how it intends to rule on the requested

14    instructions.  The defense submits that this is a violation of

15    Rule 30 of the Federal Rules of Criminal Procedure.

16              This rule sets forth that the Court must inform the

17    parties before closing arguments how it intends to rule on the

18    requested instructions.  Counsel for the defense made at least

19    once, if not more, requests to have this done and to clarify

20    with the Court that it was in fact denying the defendant's

21    request in which the Court did.

22              The defense also objects to the Court's disallowance to

23    the allow the defense to object in detail as to the requested

24    instructions.  This is also a violation of Rule 30 under

25    subsection (d), which states, A party who objects to any portion

of the instructions or to a failure to give a requested

instruction must inform the Court of the specific objection and

the grounds for the objection before the jury retires to

deliberate.  An opportunity must be given to object out of the

jury's hearing and, on request, out of the jury's presence.

Failure to object in accordance with this rule precludes

appellate review, except as permitted under Rule 52(b).

The defense objects to the Court's ruling in not

allowing her to make specific objections to the instructions and

to force her to make a summary objection to the objections of

the Court's instructions to the jury.

Specifically, the defense reiterates the objection to

the attempt instruction that was given to the jury.  And under

the attempt statute -- or excuse me.  Strike that.  Under

attempt, there's two elements, the intent and whether or not the

defendant committed a substantial step in furtherance.

The defense argued that the Court's instruction was

highly prejudicial and ignored clear Fourth Circuit precedent

contained in the *Engle* case, which is found at 676 F.3d 405

from February 29, 2012, from the Fourth Circuit, which

specifically sets forth the requirement that the government

prove that the defendant intended to cause the assent or

transform the will of the minors, or the fictitious minors in

this case.

Counsel for defendant argued that the Court's denial of

1   this instruction was highly prejudicial to the defense, and she

2   cited to *United States v. Hite*, found at 769 F.3d 1154, decided

3   by the D.C. Circuit, October 21, 2014, in which the D.C. Circuit

4   ruled and found that the district court committed error when it

5   allowed for a flawed instruction and set forth, quote, The jury

6   could have convicted the defendant without necessarily finding

7   that he intended to transform or overcome the will of either

8   fictitious minor, so long as they found that he sought to

9   arrange for sexual activity with them, end quote.

10          This decision is completely on point with the facts set

11  forth in this case, and the district court's error in this case

12  in refusing the defense instruction to be consistent with the

13  opinion in *Hite* is grounds for reversible error.

14      (Dictation to the court reporter concluded at 4:45 p.m.)

15      * * *

16      (Question from the jury at 5:10 p.m.)

17          THE COURT:  I've got a note from the jury.  We've got

18  two questions.

19          "Are there additional copies of the evidence books?"

20          There are not, are there?

21          MR. GARDNER:  Not ready.  We can probably make one.  I

22  don't know that --

23          THE COURT:  I think it's better to tell them no.

24  There's probably one person back there that wants to look at the

25  evidence book.

1    And then the third, what they say is the third question

2    says, "We're prepared to leave by 5:30 today, Monday, and return

3    at 9:30 a.m. on Tuesday.  Is this okay?"

4    That kind of comports with what we do any way.  I guess

5    my question is do you want to stay around here and wait till

6    5:30 and let them go, or why don't we recess now and let the

7    marshal stay with them and let them go at 5:30 and we won't have

8    to sit here.

9    MR. GARDNER:  I'm fine with that, Your Honor, from the

10   government for letting them recess now, I think.

11   MR. BENOWITZ:  We're fine with that, Your Honor.

12   THE COURT:  All right.  Then I'll -- well, let me put

13   no on this.

14   Marshal, just give them that note.  And we'll adjourn

15   till tomorrow morning at 9:30.

16   MR. BENOWITZ:  Your Honor, do we need to appear at 9:30

17   or is the jury simply going to start deliberating at 9:30?

18   THE COURT:  Well, they're going to start deliberating

19   by 9:30.  How far away are you going to be?

20   MR. BENOWITZ:  I could be within 20 minutes if that's

21   acceptable.

22   THE COURT:  Well, what time do you want to come down?

23   I don't want you to stay out there at 20 minutes all

24   day.  I want people closer than that, or at least one of you.  I

25   don't care that all of you are here.

181

1        MR. BENOWITZ:  I can plan to be down here, let's say --
2   I can be relatively close by 11:00?
3        THE COURT:  That will be fine.  20 minutes away until
4   11:00; come down at 11:00.
5        MR. GARDNER:  We will not appear at 9:30.  We will wait
6   to hear from the Court.
7        THE COURT:  Right.  You're going to be down in your
8   office.
9        MR. GARDNER:  Yes.
10        THE COURT:  We'll adjourn until tomorrow morning at
11   9:30.
12        * * *
13      (Proceedings concluded at 5:14 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

<u>CERTIFICATION</u>

I certify, this 9th day of April 2015, that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter to the best of my ability.

/s/
_____
Tracy Westfall, RPR, CMRS, CCR