1

2                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF VIRGINIA
3    _____ALEXANDRIA DIVISION_____

4                                  )
     UNITED STATES OF AMERICA       )
5                                   )  Case No. 1:14-cr-246
               v.                   )  Alexandria, Virginia
6                                   )
     WILLIAM ANDREW CLARKE,         )  October 24, 2014
7                                   )  9:35 a.m.
                 Defendant.         )
8    _____)

9    _____

10

11                       TRANSCRIPT OF HEARING

12              BEFORE THE HONORABLE CLAUDE M. HILTON

13                   UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20   APPEARANCES:

21   For the United States:   Matthew J. Gardner, Esq.

22   For the Defendant:       Karin R. Porter, Esq.
                              David B. Benowitz, Esq.
23                            Defendant William Andrew Clarke,
                              in person
24
      Court Reporter:        Tracy L. Westfall, RPR, CMRS, CCR
25   Proceedings reported by machine shorthand, transcript produced
     by computer-aided transcription.

1          P R O C E E D I N G S

2          THE CLERK:  Criminal No. 2014-246, *United States of*

3  *America v. William Andrew Clarke*.

4          MR. GARDNER:  Good morning again, Your Honor.  Matt

5  Gardner for the United States.

6          THE COURT:  Good morning.

7          MS. PORTER:  Good morning, Your Honor.  Karin Porter

8  for the defendant, William Clarke, along with my cocounsel,

9  David Benowitz.

10          THE COURT:  Good morning.

11          MR. BENOWITZ:  Good morning, Your Honor.

12          THE COURT:  We've got several motions here.

13          These motions in limine I'm going to deny at this time

14  without any prejudice to being raised at the time of trial.

15          We've got a motion to dismiss the indictment because

16  the statute is unconstitutional.  You've also got a motion to

17  dismiss which deals with the evidence.  I'm not sure I

18  understand that motion to dismiss.

19          You want to tell me what that's about, just briefly,

20  under Rule 12(b)(2)?

21          MR. BENOWITZ:  Yes, Your Honor.

22          Essentially, what we're arguing is that even if we

23  stipulate or agree, and we have, to every piece of evidence that

24  the government wants to introduce, that the evidence -- and

25  looking at the evidence in the light most favorable to the

government, that that evidence is not sufficient to sustain a conviction under 2422(b).

That is the essence of our argument. I can certainly make -- I certainly have more comments to make if the Court would like to hear them, but that is the essence of it.

THE COURT: All right. Well, whatever you want to tell me about this motion, you need to tell me now.

MR. BENOWITZ: Certainly, Your Honor.

Your Honor, as I've stated, we believe there are no factual disputes. The government, in its opposition to our motion, cites to the *Muse* decision that relates, but that relates to stipulations that relate to jury instructions, not to the situation that we're talking about.

The key here is whether there was an actual dispute over any fact at issue for the purpose of deciding the motion, and here there is not, and that is the key. And if the Court were to allow the government simply to say, well, we believe there's a factual dispute when there's not, it essentially gives the government veto power over any motion of this type.

We believe that this motion is ripe for decision and that it would waste judicial resources to allow this to go to a trial and essentially hold this in abeyance until we have a Rule 29 motion when the evidence is exactly the same. We agreed with everything the government has -- we stipulated to everything that the government is attempting to introduce at this point.

1          Again, we believe that the record can't support a

2     conviction for an attempted violation of 18 U.S.C. 2422(b).  The

3     government has to show that Mr. Clarke took a substantial step

4     towards knowingly persuading, enticing, inducing, or coercing a

5     minor to participate in prohibited sexual activity, and the

6     substantial step in a 2422(b) offense must be a communication

7     using a facility of interstate commerce which knowingly aims to

8     achieve the assent of that minor, which in this case would be

9     fictional.

10          THE COURT:  It can be done through an intermediary.

11          MR. BENOWITZ:  I'm sorry.  Excuse me, Your Honor?

12          THE COURT:  It can be done through an intermediary.

13          MR. BENOWITZ:  Yes, Your -- well, we argue that it

14     cannot.  We understand the case law as it stands.  There are

15     certain circuits that disagree with that.

16          Our argument, for purposes of this motion, is that it

17     cannot be done through an intermediary.  But even if it could,

18     our argument is that the government's evidence still is not

19     enough to sustain a conviction.

20          THE COURT:  All right.  I understand your position on

21     that, but I simply can't find that at this point.  It seems to

22     me that the government does have sufficient evidence to go

23     forward, and I'm going to deny your motion to dismiss.

24          I'm also going to deny your motion to dismiss as to the

25     unconstitutionality of the statute.

 1          Now we've got motions to suppress.  Do I need to hear

 2   evidence in regard to these motions?

 3          MR. GARDNER:  Your Honor, it's the government's

 4   position that with regard to the motion to suppress the vehicle

 5   search, that that's a legal matter and that Your Honor can look

 6   at the face of the affidavit and see that there's no material

 7   omission there.  So, no, with respect to that.

 8          With respect to the motion to suppress, the government

 9   has Special Agent Eyler here and she can testify briefly that,

10   in essence, that she provided *Miranda* warnings to Mr. Clarke,

11   that he agreed to speak with agents, and that there weren't any

12   threats made.

13          I'm happy to do that.  I'm not sure it's necessary.  I

14   think the facts of the case on that issue are not in dispute.

15   The government agrees with the defense that Special Agent Eyler

16   told Mr. Clarke when he was first arrested that they were

17   investigating Jaye, who was the undercover agent, and that that

18   wasn't true, obviously.  He's an ICE agent.

19          That's a legal issue for the Court.  I've set out case

20   law in my motion saying that federal law enforcement can do a

21   ruse of that sort as long as it's not so utterly coercive that

22   it overbears the will of the person being interviewed, which the

23   government would submit there's no possibility of that here.  In

24   fact, it put him more at ease is what it did.

25          So I'm happy to call Agent Eyler if the Court would

1    like just to say that *Miranda* rights were given and he waived

2    them, but, otherwise, the government believes there's no factual

3    dispute.

4         THE COURT:  I don't know if the question is whether I

5    like or not.

6         MS. PORTER:  Your Honor, respectfully, it is the

7    government's burden to produce evidence to support a warrantless

8    search of the vehicle.

9         Based on their opposition paper, they are relying upon

10   an inventory search.  So if the government chooses not to

11   present evidence, then the remedy is granting of the suppression

12   motion.  I just don't see how we can --

13        THE COURT:  An inventory search is a perfectly proper

14   search, is it not, unless --

15        MS. PORTER:  Well, if it's done correctly.

16        THE COURT:  -- something strange?

17        What about this one?  Is there anything other than they

18   impound the vehicle and search it?  They should search every

19   vehicle they impound to preserve evidence and preserve other

20   things that may or may not be in there.

21        MS. PORTER:  Well, Your Honor, that's exactly the

22   defense's point is that the inventory search done in this case

23   was not proper.  It's my understanding -- well, just based on --

24        THE COURT:  Okay.  You've answered my question.  I

25   think I need to hear evidence on it.

1          Call your witnesses.

2          MR. GARDNER:  Thank you, Your Honor.  The United States

3   calls Special Agent Eyler.

4                        **KRISTINA EYLER,**

5              after having been duly sworn or affirmed,

6              took the stand and testified as follows:

7                     **DIRECT EXAMINATION**

8   BY MR. GARDNER:

9   Q.  Good morning.

10  A.  Good morning.

11  Q.  Can you state and spell your name for the record.

12  A.  Kristina Eyler with a K.  Last name is Eyler, E-Y-L-E-R.

13  Q.  How are you employed?

14  A.  With the Department of Homeland Security.

15  Q.  Are you the case agent on *United States v. Clarke*?

16  A.  Yes.

17  Q.  Do you see Mr. Clarke in the courtroom today?

18  A.  Yes, I do.

19  Q.  Can you briefly identify him?

20  A.  He's sitting between counsel.

21          MR. GARDNER:  Your Honor, can the record reflect the

22  witness has --

23          THE COURT:  She's identified him.

24          MR. GARDNER:  Thank you, Your Honor.

25

1    BY MR. GARDNER:

2    Q.  Were you present for Mr. Clarke's arrest in October of 2013?

3    A.  Yes.

4    Q.  Can you describe where that occurred?

5    A.  In a -- near the McDonald's in Fairfax, Virginia.

6    Q.  Can you briefly describe how the arrest happened?

7    A.  We had word that Mr. Clarke was going to be arriving and

8    meeting us at this McDonald's in Fairfax.  We observed a

9    gentleman standing outside the vehicle of our UC agent,

10   recognized him from previous photographs and webcam, and

11   apprehended him at that time.

12   Q.  Was he handcuffed?

13   A.  Yes.

14   Q.  Where was he brought after he was handcuffed?

15   A.  Probably about 23 yards away is a mobile forensic lab that

16   has a interview room in the back.

17   Q.  It's like a van?

18   A.  It's an RV.  Yes.

19   Q.  Was he brought into a room within that RV?

20   A.  Yes, he was.

21   Q.  Can you describe the room?

22   A.  It's got a table with chairs on either side.  There's a door

23   that can be closed that's separated from where the forensic lab

24   is.

25   Q.  Did you interview Mr. Clarke in that room?

1    A.   Yes.

2    Q.   Was he handcuffed at the time you interviewed him?

3    A.   I don't remember if I removed them at that time or if

4    somebody removed them prior to me entering.

5    Q.   But he was not handcuffed when you interviewed him?

6    A.   No.

7    Q.   When you interviewed him, did you read him his *Miranda*

8    rights?

9    A.   Yes.

10   Q.   Roughly, perhaps not word for word, can you describe what

11   you told him?

12   A.   I read it from a picture that I have on my cellphone.

13   Basically, you have the right to remain silent.  Anything you

14   say can and will be used against you in a court of law.  If you

15   can't afford an attorney, the Commonwealth of Virginia or the

16   federal government can provide one for you free of cost.

17   Q.   Did you ask anything of Mr. Clarke at that point?

18   A.   I asked him if he understood his rights.

19   Q.   What did you say?

20   A.   He said yes.

21   Q.   Did you ask him anything after that?

22   A.   I asked him if he wanted to talk to me.

23   Q.   What did he say?

24   A.   Yes.

25   Q.   After that, did you interview him?

1   A.   I did.

2   Q.   At any point did you or any other agents that you're aware

3   of threaten Mr. Clarke?

4   A.   No.

5   Q.   Did you show or brandish your weapon or a gun in front of

6   him?

7   A.   It was on my hip, but I don't believe it was visible at the

8   time.

9   Q.   Did you see any other agents at any time threaten Mr. Clarke

10  with a weapon of any sort?

11  A.   No.

12  Q.   Was an inventory of Mr. Clarke's car done at the same time?

13  A.   Yes.

14  Q.   Did you direct that an inventory be done of his car?

15  A.   I don't remember whether I did it or somebody else at the

16  scene.

17  Q.   Who actually did the inventory?

18  A.   Personnel from VSP, Virginia State Police.

19  Q.   Virginia State Police.

20  A.   Yes.

21  Q.   And what was the purpose, to your knowledge, of doing the

22  inventory?

23  A.   It was going to be impounded and towed away from the private

24  parking lot that it was sitting in.  So it was done to protect

25  whatever valuable property was going to be left in that vehicle.

1    Q.  With the assistance of the courtroom security officer, I

2    have Exhibits 2 and 3, a copy of both for the witness and for

3    the Court.

4         Do you recognize these two photographs?

5    A.  Yes.  They're the same.

6    Q.  I'm sorry.  I think I have them switched out.

7    A.  There you go.  Thank you.

8    Q.  Do you recognize Exhibits 2 and 3?

9    A.  Yes.

10   Q.  What are these photographs of?

11   A.  Pictures that were taken of signs that are posted near the

12   parking area where Mr. Clarke's vehicle was located.

13   Q.  On the day of his arrest?

14   A.  Yes, sir.

15   Q.  About how far from this sign was his car on the date of the

16   arrest, roughly?

17   A.  Trying to think.  20 yards maybe, 30 yards.  I'm not really

18   a hundred percent sure.  Just guessing.

19   Q.  Is it your understanding that for cars abandoned in this

20   parking lot that it would be towed?

21   A.  Based on the sign, yes, sir.

22   Q.  Did you personally perform a search of Mr. Clarke's car

23   based on an inventory, the inventory of his car?

24   A.  No.

25   Q.  Did you obtain a warrant in this case?

1   A.  I did.

2   Q.  Did you do a search of Mr. Clarke's car based on the

3   warrant?

4   A.  Yes.

5   Q.  At some point prior to obtaining the warrant, were you told

6   that during the inventory search a laptop had been recovered

7   from Mr. Clarke's car?

8   A.  It was -- it was seen visible in his vehicle.  It wasn't

9   recovered from the vehicle.

10  Q.  At the time you wrote the affidavit, did you know with a

11  hundred percent certainty that there was a laptop in his car?

12  A.  No.

13  Q.  Why not?

14  A.  The vehicle had been towed to the Virginia State Police lot,

15  which I don't monitor, I don't have access to.

16  Q.  In other words, you weren't a hundred percent certain of the

17  state of the car at the time that you wrote the affidavit?

18  A.  No.

19  Q.  Is it possible that in addition to the laptop that there may

20  have been other pieces of computer media in the car like a thumb

21  drive or a phone?

22  A.  Yes.

23  Q.  And you just didn't know at the time you wrote the affidavit

24  one way or the other about that?

25  A.  No.

1      MR. GARDNER:  No further questions, Your Honor.

2      THE COURT:  All right.  Cross-examine.

3                      **CROSS-EXAMINATION**

4  BY MS. PORTER:

5  Q.  Good morning.

6  A.  Good morning.

7  Q.  You would agree that the purpose of an inventory search is

8  to protect the personal property of the owner; is that correct?

9  A.  Yes, ma'am.

10 Q.  And also the purpose of an inventory search would also be to

11 protect the police department or law enforcement agencies

12 against claims of theft.  You would agree with that, right?

13 A.  Yes.

14 Q.  And you would agree in this case that an inventory search or

15 a purported inventory search was conducted immediately or almost

16 immediately after my client was arrested or apprehended in the

17 parking lot; is that correct?

18 A.  Yes.

19 Q.  And you would agree that nothing was collected from that

20 vehicle on the date my client was arrested on October 11th of

21 2013; is that correct?

22 A.  Correct.

23 Q.  Okay.  And so the whole purported purpose of the inventory

24 search to protect personal property is bogus, isn't it?

25 A.  No.

1    Q.  Well, the property was not collected, right?

2    A.  Correct.

3    Q.  And you would agree that a computer is valuable property?

4    A.  Yes.

5    Q.  It's valuable property to the owner, correct?

6    A.  Yes.

7    Q.  And it also has evidentiary value, potentially, to law

8    enforcement; isn't that correct?

9    A.  Possibly, yes.

10   Q.  In this case those -- the computer and other items in the

11   car were not secured after whoever inventoried it; is that

12   correct?

13   A.  How do you mean secured?

14   Q.  Meaning they weren't taken out of the vehicle and logged or

15   catalogued and put into police property for safekeeping; isn't

16   that correct?

17   A.  No, because that's not what you do during an inventory.  You

18   just document the items that were located if they are valuable.

19   Q.  What policies and procedures are you referring to when you

20   say that that's not proper procedure?

21   A.  What's not proper procedure?

22   Q.  To not safe keep the property.  I mean, isn't that the whole

23   point when officers search a vehicle, because it's being

24   impounded, right, and there's valuable property in it, in order

25   to safe keep it, they have to put it in a place that's safe,

1  right?

2  A.  No.  Not necessarily, no.

3  Q.  Well, what are they supposed to do with property that they

4  find in a car that's worth a couple hundred dollars, if not

5  more?

6  A.  From past experience when I was a police officer, if a

7  vehicle -- I had a vehicle towed, like for an accident or

8  something like that, I would conduct an inventory of the vehicle

9  and document what items were going to be left in the vehicle.

10     So once a vehicle is towed by a third party, let's say as an

11 example, a tow company, when that person retained possession of

12 their vehicle, that log that I initially had seen those items in

13 that vehicle, if they're not there, then that's an issue that

14 they've got to deal with the towing company.

15 Q.  Okay.  And so what you're saying is the safekeeping is just

16 basically to write it down that something was in the car and

17 then just leave it in the car for the tow truck driver to come

18 get, right?

19 A.  That's my understanding.

20 Q.  And you have no personal knowledge about how the inventory

21 search was conducted in this case; isn't that true?

22 A.  Correct.

23 Q.  You don't know who did it?

24 A.  I don't recall unless I look at the document.

25 Q.  Okay.  But you have no personal knowledge of that, right?

1    A.   No.   I was interviewing Mr. Clarke.

2    Q.   And you said that you were told that there was a laptop

3    computer found pursuant to this inventory search; is that

4    correct?

5    A.   Yes, ma'am.

6    Q.   Okay.   But then also you said that at the time that you

7    wrote the search warrant affidavit, you were unaware that there

8    was a computer in the laptop -- I mean, a computer in the car;

9    isn't that correct?

10   A.   I wasn't a hundred percent sure because I never saw it in

11   the vehicle at the time.

12   Q.   But somebody told you.   A law enforcement agent told you

13   that?

14   A.   Yes, ma'am.

15   Q.   Are you saying that you didn't believe that person?

16   A.   No, but I didn't have 24 -- I didn't monitor that vehicle,

17   where it was located.   So I don't know what could have happened

18   to the vehicle once it left the property.

19   Q.   Well, you said there was a form that was filled out; isn't

20   that correct?

21   A.   Yes, ma'am.

22   Q.   And you presumably have access to that form, right?

23   A.   Yes.

24   Q.   Did you bother to look at it?

25   A.   Yes.

1    Q.  Did you look at it before you wrote the affidavit for the
2    search warrant?
3    A.  I don't remember.
4    Q.  Well, wouldn't that be an important fact to know in
5    preparation for this hearing?
6    A.  No, because the purpose was not just to retrieve the laptop.
7    It was to search the vehicle in its entirety.
8        Because when an inventory is done, you don't search the
9    vehicle in its entirety.  You just look for anything that could
10   be of value.
11   Q.  What policies and procedures are you referring to when you
12   say that in an inventory search you don't search the entire
13   vehicle?
14   A.  What I'm saying is you don't search every crevice of a
15   vehicle for inventory.
16   Q.  And my question is what policies and procedures are you
17   relying upon to say that that's not the policy to search
18   everything inside of the car?  What are you referring to?
19   A.  Well, I can't -- I can't give you testimony on how someone
20   else does an inventory.  I'm talking about what -- when I used
21   to do inventories.
22   Q.  So we don't know who did the inventory, correct?
23   A.  Well, I believe you have the form that was done.
24   Q.  Let me rephrase.  You do not know who performed the
25   inventory?

1   A.  Not off my head right now, no.

2   Q.  And you do not know what policies and procedures were

3   followed by whatever law enforcement agent conducted this

4   purported inventory search; isn't that correct?

5   A.  I don't know VSP policy.

6   Q.  Well, you don't even know if VSP was even followed or that

7   -- you don't know who did it, basically.  You can't give us a

8   name and you didn't see it.

9   A.  Do you have a copy of the --

10  Q.  I'm asking the questions.

11          THE COURT:  That's been asked and answered now a couple

12  times.

13          MS. PORTER:  Thank you, Your Honor.

14  BY MS. PORTER:

15  Q.  Now, when did you submit the affidavit for the search

16  warrant?  What date was that?

17  A.  I don't know.

18          MS. PORTER:  Court's indulgence for a moment.

19  BY MS. PORTER:

20  Q.  If I showed you a copy, would that refresh your

21  recollection?

22  A.  Yes, ma'am.

23  Q.  Do you recognize that document?  Make sure it's the same.

24  A.  Yes, ma'am, I do.

25  Q.  Okay.  And can you refer to it in order to refresh your

1  recollection as to the date that you submitted the affidavit?

2  A.  It looks like it says the 21st November 2013.

3  Q.  Okay.  Does that refresh your recollection?

4  A.  Yes.

5  Q.  And you would agree that is five or six weeks after the

6  inventory search that you submitted the affidavit, correct?

7  A.  Yes, ma'am.

8       MS. PORTER:  May I ask the court security officer to

9  retain that document for me.  Thank you so much.

10  BY MS. PORTER:

11  Q.  So you have no idea -- or do you have any idea where my

12  client's vehicle was during those six weeks?  Do you have any

13  personal knowledge of that?

14  A.  Well, I was told it was transported to the Virginia State

15  Police barrack on Braddock Road.

16  Q.  So you don't have personal knowledge of that, correct?

17  A.  No.

18  Q.  And you don't have any personal knowledge as to how the

19  property inside of the vehicle was secured for safekeeping, do

20  you?

21  A.  No.

22  Q.  Now, I'd like to ask you some questions about the affidavit

23  for the search warrant itself regarding, I believe --

24       Court's indulgence.

25       When you set forth a probable cause statement in the search

1    warrant, it's true that you used the statement:  If there is a

2    computer found in the vehicle, then, et cetera, we believe that

3    there's probable cause to search the computer or other storage

4    media; isn't that correct?

5    A.   Yes.

6    Q.   And so why did you say if there is a computer in the

7    vehicle?

8    A.   Because I didn't see the computer in the vehicle.

9    Q.   Okay.  But you knew an inventory search had been done?

10   A.   Correct.

11   Q.   Okay.  But you thought -- you thought one had been done?

12   A.   Uh-huh.

13   Q.   And isn't it fair to say that if the inventory had been done

14   correctly, that it would have been clear that there was a

15   computer in the car, right?

16   A.   I still wouldn't have known if it was there because I didn't

17   have access to the vehicle during that time.

18   Q.   Well, don't you have a duty to confirm facts relating to

19   your own investigation before you submit an affidavit for a

20   search warrant?

21   A.   Yes.

22   Q.   Okay.  And wouldn't it have been as easy as to pull the form

23   that documented the evidence inside of the vehicle, right?

24   A.   Yes, but that doesn't guarantee the items are still going to

25   be in that vehicle.

 1   Q.  I don't understand.

 2   A.  I said I don't have access to that vehicle, that -- the lot

 3   where it was towed.  I don't know how secure it was.  I don't

 4   know who is allowed to go in and out of that storage facility.

 5   So I was unsure whether it was there or not.

 6   Q.  Exactly, Agent.  And that is why it's important that at the

 7   time the inventory is done, the agent is supposed to take the

 8   valuables out of the vehicle and put them in police property for

 9   safekeeping.  Isn't that the whole point?

10   A.  I've never done that in the past.

11            THE COURT:  We've been over this before now.

12            MS. PORTER:  Yes, Your Honor.  I'll move on.

13   BY MS. PORTER:

14   Q.  So you would agree then the statement that you put in the

15   affidavit that if there is a computer, coupled with your

16   statement that an inventory search was completed, is inherently

17   misleading, isn't it?

18   A.  I don't understand.  Can you repeat that, please?

19   Q.  Well, if you're saying there was an inventory search done,

20   then the only logical conclusion is that you found the probative

21   evidence in the vehicle, right?

22   A.  I found evidence, yes, ma'am.

23   Q.  And then to say if there is a computer as the basis for your

24   probable cause is a conditional statement, right?

25   A.  The word "if" doesn't determine probable cause.

1  Q.  Exactly.

2  A.  So why is that word "if" relevant?

3  Q.  Because --

4         THE COURT:  We're just arguing here now.

5         Do you have some other areas to go into?

6         MS. PORTER:  Yes, Your Honor.  I'll move on.  Thank

7  you.

8  BY MS. PORTER:

9  Q.  Now I'd like to ask you some questions about the interview

10  with my client.  That took place on October 11, 2013; isn't that

11  correct?

12  A.  Yes, ma'am.

13  Q.  What time did that take place?

14  A.  Shortly after he arrived, within 10, 15 minutes.

15  Q.  How long was the interview?

16  A.  Maybe approximately an hour.

17  Q.  And it was video and audio recorded, wasn't it?

18  A.  Yes, ma'am.

19  Q.  Do you have that recording here today?

20  A.  Not with me, no.

21  Q.  Why not?

22  A.  I don't have my case file with me.

23  Q.  You knew there was a suppression motion on the docket today,

24  right?

25  A.  Yes, ma'am.

1    Q.   And you decided not to bring the video?

2    A.   Well, I believe you have a copy of it.

3    Q.   Well, my question to you is you decided not to bring the

4    video?

5    A.   No, I did not.

6    Q.   Inside the mobile command unit, it's true that the forensics

7    lab is equipped with computers and printers; isn't that correct?

8    A.   Yes, ma'am.

9    Q.   And you would have access to email and the Internet as well?

10   A.   On the computers?

11   Q.   Right.

12   A.   Yes, ma'am.

13   Q.   In this case you decided before you interviewed my client to

14   advise him of his *Miranda* rights orally; is that correct?

15   A.   Yes.

16   Q.   Okay.  You could have printed them out, right?

17   A.   I could have.

18   Q.   You could have put them in front of my client so he could

19   read them and understand them in black and white; isn't that

20   correct?

21   A.   Yes.

22   Q.   And you chose not to do that, correct?

23   A.   Yes.

24   Q.   The purpose of doing that is so that he would not pay

25   particular attention to the document so that he wouldn't take

1  the interview as seriously you were, correct?

2  A.  No.

3  Q.  Why did you not present a formal *Miranda* waiver form to my

4  client?

5  A.  I read him his rights.

6  Q.  You chose not to do it in writing, correct?

7  A.  Correct.

8  Q.  In fact, the whole purpose from the start of the

9  apprehension and the plan to arrest my client was to present the

10  apprehension in the interview of him to portray him as merely a

11  witness against Agent Laws who was acting as Jaye; is that

12  correct?

13  A.  Yes, sir.

14  Q.  In fact, the government went to great lengths to make sure

15  that my client knew that, quote, Jaye was being arrested, right?

16  A.  Yes.

17  Q.  Did you witness that?

18  A.  Yes.

19  Q.  Okay.  Who apprehended my client?

20  A.  I don't remember.

21  Q.  Who apprehended Agent Laws?

22  A.  I did and one other person, but I don't remember who that

23  was with me.

24  Q.  And that apprehension of Agent Laws was done right in front

25  of my client, correct?

1   A.   Yes.

2   Q.   The sole purpose was so that Jaye -- Jaye's sort of persona

3   was kept intact for my client?

4   A.   Yes, ma'am.

5   Q.   Then when you took my client into the mobile command unit,

6   basically, your first words are we're here to talk to you about

7   Jaye, we've been after him.  Correct?

8   A.   Yes, ma'am.

9   Q.   Essentially.  And you also said that you wished that you

10  would have apprehended him in Alaska, but you didn't have the

11  opportunity to do so, correct?

12  A.   Yes, ma'am.

13  Q.   All right.  And you were asking my client to provide

14  information about Jaye; is that right?

15  A.   Yes.

16  Q.   And isn't it true that you never told my client that he was

17  under arrest until the very end of the interview, right?

18  A.   Correct.

19  Q.   Right.  And my client in fact asked you, he said, am I under

20  arrest, right?

21  A.   Uh-huh.

22  Q.   You didn't answer him, did you?

23  A.   I don't recall.

24  Q.   You don't recall?

25  A.   No, ma'am.

1  Q.  Well, if you had the video here, would it help refresh your

2  recollection that you failed to answer my client's question?

3  A.  Sure.

4  Q.  Right.  And what about the other officer that was present

5  during the interview?  Is he here?

6  A.  No.

7  Q.  Do you recall when my client asked am I under arrest, did

8  that other officer answer him?

9  A.  I don't recall.

10  Q.  Did you review the video before coming to testify today?

11  A.  Not all of it, no.

12  Q.  How much did you review?

13  A.  Just a small portion.

14  Q.  When did you review it?

15  A.  This morning.

16  Q.  And you don't recall?

17  A.  I didn't watch the entire video.

18  Q.  Did you watch the beginning?

19  A.  Just a small portion of it, yes.

20  Q.  So you watched the part about you verbally advising my

21  client of his *Miranda* rights, correct?

22  A.  Yes.

23  Q.  Well, isn't that the same point when my client says am I

24  under arrest?

25  A.  I don't recall.

1   Q.  And you never told my client that Agent Laws or Jaye was

2   actually a law enforcement officer; isn't that true?

3   A.  Yes.

4   Q.  In fact, Mr. Clarke, my client, was charged with Virginia

5   state crimes; is that correct?

6   A.  That day, yes, ma'am.

7   Q.  He was brought to a magistrate in Fairfax County?

8   A.  Yes.

9   Q.  And he was charged with the Internet solicitation charge

10  under Virginia law, correct?

11  A.  Yes, ma'am.

12  Q.  And he was also charged with two counts of attempted

13  indecent liberties?

14  A.  Okay.  Yes.

15          MS. PORTER:  Thank you.  No further questions.

16          THE COURT:  Do you have anything further?

17          MR. GARDNER:  Two quick questions.

18                  **REDIRECT EXAMINATION**

19  BY MR. GARDNER:

20  Q.  With the assistance of the courtroom security officer, I'd

21  like to show you what's been marked as Government's Exhibit 1.

22      Do you recognize that?

23  A.  Yes.

24  Q.  What is that?

25  A.  It's a copy of a video of the interview I had conducted with

1  Mr. Clarke.

2         MR. GARDNER:  Thank you, Your Honor.  Nothing further.

3         THE COURT:  All right.  Thank you.  You may step down.

4  (Witness stands down.)

5         Do you have anything else?

6         MR. GARDNER:  Not from the government, no.  The

7  government would move Exhibits 1 through 3 into evidence, Your

8  Honor.

9         MS. PORTER:  There's no objection.

10        THE COURT:  Those are the photographs?

11        MR. GARDNER:  2 and 3 are the photographs.  1 is the

12 videotape of the interview.

13        THE COURT:  We have admitted -- we're not looking at

14 this videotape here this morning.

15        MR. GARDNER:  No.  The government's position is there's

16 no need to.  The agent's testified to it.  I just wanted to

17 complete the record to show that we're not being deceitful.

18        THE COURT:  Well, that puts something in the record

19 that shouldn't be.  We haven't seen the video --

20        MR. GARDNER:  I'm sorry --

21        THE COURT:  -- and I'm not going to watch the video.

22 There's no reason to do it.  So there's no relevance to putting

23 it in evidence here.

24        MR. GARDNER:  That's fine.  The government just wanted

25 to offer it and say that we have it.  That's all.

1          MS. PORTER:  Your Honor, the only relevant portion of

2    the video that would be for the Court's education would be the

3    fact that -- of what I was trying to get out of the agent, that

4    when my client asked if he was under arrest, nobody answered

5    him.

6          So if the government is willing to stipulate to that,

7    you know, if they've already reviewed it --

8          THE COURT:  That's their evidence.  That's what she

9    said.

10         MS. PORTER:  Right.  That's our point.

11         THE COURT:  Don't have to stipulate.  That's the

12   evidence they put on.

13         MS. PORTER:  No.  The evidence is she doesn't remember.

14         THE COURT:  Oh, I guess that's right.  She doesn't

15   remember.

16         MS. PORTER:  She doesn't remember.

17         MR. GARDNER:  I've watched the video.  Mr. Clarke asks

18   if I'm under arrest, and neither agent answers him directly.

19         THE COURT:  All right.  Then it's stipulated.

20         MS. PORTER:  Thank you.

21         THE COURT:  All right.  Do you have any evidence to

22   present?

23         MS. PORTER:  Court's indulgence one moment.

24         Your Honor, we don't have any evidence.

25         THE COURT:  All right.  Well, as far as the motion to

1    suppress these statements are concerned, they'll be denied.

2    This defendant was arrested on October the 11th.  He was taken

3    into a -- placed in handcuffs.  He was taken into a room in an

4    RV that was there on the location.  He was read his *Miranda*

5    rights.  Clearly stated that he understood them.  Asked if he

6    wanted to talk.  He said yes, he did want to talk.

7           Whether or not he may have somewhere along asked am I

8    under arrest, there was no answer, I don't think has much

9    relevancy.  He knew he was arrested.  When somebody puts

10   handcuffs on you, takes you into custody and takes you in for

11   interrogation, you know you're under arrest.

12          He was properly advised of his rights.  He waived his

13   rights and went ahead and talked with the officer.

14          As to the car inventory, the motion to suppress there

15   will be denied as well.  The car was properly inventoried and

16   taken to a state police lot at the time he was arrested.  The

17   car had to be impounded.  He was arrested and the car had to be

18   taken somewhere and preserved.

19          This officer, Eyler, stated that she later got a

20   warrant, a valid search warrant, and it was properly searched.

21   Nothing wrong with the affidavit for this warrant.  Had ample

22   probable cause for it and searched the car.

23          So anything that was found as a result of that search,

24   any motion to suppress that will be denied as well.

25          MS. PORTER:  Your Honor, may I be heard briefly on the

```
 1  motion to suppress vehicle issue?
 2          THE COURT:  I don't think that's necessary.  I've read
 3  your submissions.
 4          MS. PORTER:  Your Honor, I do have an argument relating
 5  to that issue that wasn't briefed.
 6          THE COURT:  You can't do that to me.  You've got to put
 7  it in your brief.
 8          MS. PORTER:  Yes, Your Honor.  It is relevant in the
 9  sense that we did argue it factually in the motion.  If Your
10  Honor could just indulge me for one moment.
11          THE COURT:  I found it to be a proper search.  Your
12  motion to suppress will be denied.
13          MS. PORTER:  Thank you, Your Honor.
14          THE COURT:  All right.  Now, have I ruled on all of
15  your motions?
16          MS. PORTER:  Yes, Your Honor.
17          MR. GARDNER:  Yes.
18          THE COURT:  All right.  Thank you.  That takes care of
19  our criminal business.
20          I'll take a brief recess and come back and deal with
21  the civil cases.
22      * * *
23      (Proceedings concluded at 10:11 a.m.)
24
25
```

1                        <u>CERTIFICATION</u>

2

3         I certify, this 2nd day of July 2015, that the

4    foregoing is a correct transcript from the record of proceedings

5    in the above-entitled matter to the best of my ability.

6

7                         /s/
                    _____
8                    Tracy Westfall, RPR, CMRS, CCR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25